## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,

v.

RICHARDSON DANGLEBEN, JR.,

                    Defendant.

Case No. 3:23-mj-44

### UNITED STATES' OPPOSITION TO THE MOTION TO DISMISS

The United States of America, through Delia L. Smith, United States Attorney for the District of the Virgin Islands, and Michael J. Conley and Kyle Payne, Assistant United States Attorneys, hereby files this opposition to the motion to dismiss docketed at ECF Number 14.

### I.      FACTUAL AND PROCEDURAL HISTORY

On July 4, 2023, while wearing a bullet proof vest, Defendant Richardson Dangleben, Jr. shot and killed Virgin Islands Police Department Detective Delbert Phipps, Jr. with an assault rifle. Inside the defendant's vehicle was a handgun with an obliterated serial number. The Government filed a complaint, which charged the defendant with unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k), and first-degree murder, in violation of 14 V.I.C. §§ 921 922(a)(3)(A)(i).

The defendant has moved to dismiss the obliterated serial number charge, citing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 213 L. Ed. 2d 387, 142 S. Ct. 2111 (2022), and contending that 18 U.S.C. 922(k) is inconsistent with the Second Amendment. The Government opposes the motion.

## II.     DISCUSSION

### A. The Second Amendment and *Bruen* generally.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for lawful purposes like self-defense in the home. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628-.34.

But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" that it "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" (cleaned up)). The Court meant its list of "presumptively lawful regulatory measures only as examples," and the list is not exhaustive. *Heller*, 554 U.S. at 627 n.26.

2

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in Heller more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by proving that "proper cause exists." *Id*. at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id*. First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id*. at 2134-35. The petitioners— "two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id*. at 2134. And their proposed conduct—"carrying handguns publicly for self-defense"—fell within "the right to keep and bear arms." *Id*.

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id*. at 2135-56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id*. at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id*.

**B. Prohibitions on possession of firearms with obliterated serial numbers are constitutionally sound.**

**1. The Second Amendment's text does not reach prohibitions on possession of firearms with obliterated serial numbers.**

The burden is on the defendant to show, at the first step, the plain text applies—as it is, for example, in the First Amendment context, for a person challenging a regulation to show that they engaged in conduct protected by the First Amendment.[1] *Accord United States v. James*, No. CR 19-79, 2023 WL 3996075, at *4 (D.V.I. June 14, 2023).

Dangleben's challenge to the prohibition on possession of a firearm with an obliterated serial number fails at the first step of the *Bruen* analysis because the text of the Second Amendment does not cover his conduct. This is because—as this Court has previously held, *United States v. Walter*, No. 3:20-CR-0039, 2023 WL 3020321, at *5 (D.V.I. Apr. 20, 2023)—the serial number requirement does nothing to "infringe[]" on the right to bear arms.[2]

The Second Amendment only proscribes laws that "infringe[ ]" on the protected right to "keep and bear Arms." Nothing in § 922(k) infringes that right. *See, e.g.,* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). As the Third Circuit remarked, "Section 922(k) did not bar [the defendant] from possessing any otherwise lawful marked firearm for the purpose of self-defense, and a person is just as capable of defending himself with a marked firearm as with an unmarked firearm. With or without a serial

---

[1] If that burden is satisfied, the burden is on the Government at the second step to show that the regulation is consistent with the nation's historical tradition of firearms regulation. *Bruen*, 142 S. Ct. at 2135.

[2] The defendant does not address this Court's prior opinion rejecting his argument.

number, a pistol is still a pistol." *United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010).[3] The lack of any infringement on the core Second Amendment right places the statute outside the text of what the Second Amendment covers.

The fact that the law affects gun ownership and requires a single, objective criteria—a serial number—prior to possession is not an "infringe[ment]" that renders the statute unconstitutional. That single restriction is less onerous than the "narrow, objective, and definite" fingerprint, training, and background restrictions imposed in the "shall issue" licensing regimes that the Supreme Court found unproblematic. *Bruen*, 142 S. Ct. at 2138, n. 9; *see also id.* at 2161-62 (Kavanaugh, J., concurring). Like prohibitions on possession of firearms without serial numbers, those "shall issue" regimes will result in certain individuals being unable to possess firearms—those who fail the objective checks and tests—but that fact alone does not render the prohibition unconstitutional. An obliterated serial number restriction does not destroy or hinder the ability to own a gun any more than the "reasonable, well-defined restrictions" *Bruen* concluded would be permissible.[4] *Id.* at 2156.

---

[3] *Marzzarella* ultimately affirmed the constitutionality of § 922(k) under a means-end balancing test after stating it "need not decide whether Marzzarella's right to bear arms was infringed." 614 F.3d at 95. This kind of balancing is no longer permitted under *Bruen*. However, the government submits that the reasoning in *Marzzarella* should still be seen as persuasive authority, even if it partially relied on a now-outdated balancing test.

[4] The Government notes that one district court has held that § 922(k) unconstitutionally infringed on the Second Amendment because the court could imagine a hypothetical situation where a gun owner might end up unlawfully possessing a firearm since they failed to satisfy the objective serial number requirement. *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at **2-3 (S.D.W. Va. Oct. 12, 2022). But, as discussed above, the same would be true of the "shall issue" schemes that might limit firearm possession by someone who, for example, fails the safety courses. They, too, would not be able to possess a firearm due to failure to comply with objective criteria. Just as the Supreme Court had no problem with the constitutionality of these statutes, this Court

Moreover, the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625. And "as the Third Circuit noted in *United States v. Marzzarella*, the defendants "do[] not assert, any lawful purpose served by obliterating a serial number on a firearm. Because a firearm with a serial number is equally effective as a firearm without one, there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm. These weapons would then have value primarily for persons seeking to use them for illicit purposes." 614 F.3d 85, 95 (3d Cir. 2010). The same logic applies here. There is no lawful purpose served by possessing a gun with an obliterated serial number. The only purpose of such guns is to evade law enforcement and engage in illicit activities. *See also United States v. Colon- Quiles*, 859 F. Supp. 2d 229, 234 (D.P.R. 2012) (rejecting Second Amendment challenge in part because "this Court cannot identify any lawful purpose that would be served by obliterating a serial number on a firearm"). Because Dangleben's possession of the gun with an obliterated serial number was not for a "lawful purpose," the conduct is outside the ambit of the Second Amendment's text.

Again, this restriction is similar in impact to the "shall issue" licensing regimes,

---

should have none with prohibitions on possession of firearms with obliterated serial numbers. *See* The Volokh Conspiracy, Requirement of Serial Numbers on Guns Violates Second Amendment, written by Eugene Volokh (Oct. 13, 2022) *available at* https://reason.com/volokh/2022/10/13/requirement-of-serial-numbers-on-    guns-violates-second-amendment/ (suggesting *Price* did not account for the Supreme Court's analysis of the "shall issue" licensing regimes and concluding *Bruen* "provides more room for regulations such as this, which have very little effect on people's ability to keep and bear arms"). The Second Amendment, after all, does allow for "*some* categorical limits" on gun possession. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis in original); *see also id.* at 641 ("[S]ome categorical disqualifications are permissible"). Prohibitions on possession of firearms with obliterated serial numbers are the type of "reasonable, well-defined restriction[]" the Supreme Court allowed in *Bruen*. 142 S. Ct. at 2156. That should be the end of this Court's analysis since § 922(k) does not infringe on the right to possess firearms in self-defense.

which set up objective criteria that must be met before lawfully possessing a firearm in 43 states. Those objective criteria were in place "to ensure only that those bearing arms in the jurisdiction are, in fact, 'law- abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9. Dangleben cannot explain why a state or territory can compel individuals to submit to background checks or be trained in use-of-force laws but cannot require that same citizen to keep a serial number on the firearm. Just as the government can impose regulations to identify which individuals may lawfully possess firearms, it can also impose regulations allowing it to identify particular firearms.

## 2. Prohibitions on possession of firearms with obliterated serial numbers coincide with historically imposed firearm regulations.

Even if Dangleben's conduct were covered by the text of the Second Amendment, his challenge would still fail because there have long been laws that require firearms and ammunition to be marked or that prohibit the transport or disposition of noncompliant materials. These laws, which are analogous to obliterated serial number restrictions, show that the Second Amendment is not offended by laws that require the marking and tracking of firearms and that prohibit the possession of noncompliant firearms. Indeed, this Court has previously concluded that "historical regulations . . . , namely commercial regulations controlling firearms trade, as discussed in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017), and regulations applicable to firearm owners pertaining to registration and taxation, as discussed in certain legal articles, *Holton*, 2022 WL 16701935, at *5, are sufficiently analogous to Section 922(k) and support the conclusion that Section 922(k) is consistent with this Nation's historical tradition of firearm regulations under *Bruen*." *Walter*, 2023 WL 3020321, at *5 (footnote removed).

Maine, for example, in 1821 required an inspector to "mark and number" "in a

permanent manner" the barrel of every "musket, pistol, or rifle barrel" that properly fired. Ex 1, at 2, § 1.[5] The law made it illegal to "falsely alter the stamp or mark," or sell or offer to sell any unmarked firearm. *Id.* §§ 3-4. Massachusetts in 1814 required "any musket or pistol" to be "marked and stamped" that they were compliant "before the same shall be sold [or] stocked," and prohibited the manufacturing, purchasing, sale, or delivery of any noncompliant firearm. Ex. 1, at 3-4. Thus, the early states had laws that required firearms to be marked, just like modern serial numbers. They then required compliance with that marking scheme before the guns could be transferred or even possessed.

This type of regulatory and marking scheme likewise applied to gunpowder. These laws shed light on the Second Amendment as "gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense." *Miller et al v. Bonta, et al.*, No. 3:19-cr-1537, (S.D. Cal. 2022) (ECF No. 137-3, at 22) (Declaration of Saul Cornell); *cf. Bruen*, 142 S. Ct. at 2149 (citing article by Cornell). New Jersey, for example, required in 1776 that gun powder could not be offered for sale "without being previously inspected and marked … as directed." Ex. 1, at 5. Rhode Island in 1885 prohibited the delivery of gunpowder that was "not marked with a plain and legible label" and also punished the removal of the label. Ex. 1, at 7. This is consistent with laws that require firearm markings and punish their removal. *Cf. Bruen*, 142 S. Ct. 2153 (looking at laws from late 19th century). In 1795, Pennsylvania had a law requiring that all gunpowder be marked, and the Commonwealth prohibited importing, transferring, or selling any gunpowder that

---

[5] Many of the laws cited in this response are available through virtual collections on the Duke Center for Firearms Law website, as well as on HeinOnline. Rather than cite each case (and their long titles) individually, the Government has compiled them in an attached exhibit.

was not appropriately marked. Ex. 1, at 10 §§ 6, 10. The law also required the inspector to prepare a report and submit it to the Governor so it could be kept "to be file[d] and remain [in] the office of the Secretary of the commonwealth." *Id.* § 2. New Hampshire in the early 1800s required an inspector to "mark each cask" of gunpowder that did not comply with the statutes' standards, and the state punished any manufacturer who sold, disposed of, or exported the material without the proper markings. Ex. 1, at 14 §§ 5, 8. Georgia required barrels of gunpowder to have the word "gunpowder marked in large letters" and punished any transportation "without being marked as directed." Ex. 1, at 16.

Governments likewise restricted the transport of such materials by unlicensed individuals, again showing the proclivity to track gunpowder and firearms consistent with the regulatory scheme that has led to the obliterated serial number restrictions at issue here. *See Price,* 2022 WL 6968457, at **5-6 (tracing history of federal regulatory scheme). Indiana, for example, allowed governments to "regulate and license ... the keepers of gunpowder and other explosive compounds." Ex. 1, at 17; *see also, e.g.*, Ex. 1 at 20 (Chicago 1851, §§ I and II) ("[N]o person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission ... in writing, signed by the mayor and clerk and sealed with the corporate seal" and requiring clerk to "make an entry thereof in a register" to keep track of permitted parties); Ex. 1, at 22 (Connecticut 1775) (no "gunpowder made and manufactured ... shall be exported out of the [Colony] without license"); Ex. 1, at 25 (Massachusetts 1651) ("no person ... shall transport any gunpowder out of this jurisdiction, without license first obtained"); Ex. 1, at 27 § 3 (Providence, RI, 1821) (prohibiting anyone who "shall keep, have, possesses, or transport" or sell gunpowder without a license).

This historical perspective shows that the Second Amendment was not offended by

laws that required markings on guns and gunpowder before they could be sold, manufactured, and, in some instances, possessed. By contrast, as discussed above, numerous laws early in the country's history restricted the movement of unmarked guns and gunpowder and prohibited tampering with such markings, similar to the manner in which obliterated serial number restrictions operate.[6]

There also have been proscriptions on the commercial sale and transport of firearms since the Founding Era. Courts have recognized that "colonial governments substantially controlled the firearms trade." *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals. A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions' ... In the 1800s, three southern states imposed taxes on personally held firearms." Robert Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("The Founders would likely challenge the notion that the government could not register weaponry or prohibit gun ownership. Unlike modern Americans, the founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the established social order."); *Minutes from a Convention of the Federalist Society: Civil Rights: The Heller Case*, 4 NYU J.L. & Liberty 293, 309 (2009) ("[T]he Founders did have

---

[6] The *Price* court did not grapple with the provisions discussed above because it said no such provisions were presented to it. 2022 WL 6968457, at *4 n.3 (S.D.W. Va. Oct. 12, 2022).

gun control. They had mandatory musters. Everyone with a gun had to show up and register their firearm").

Similarly, in the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia likewise provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id*. at 698 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id*. at 685. Further, and consistent with this Founding Era tradition, States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *Spitzer*, 80 Law & Contemp. Probs. at 74.

In *Heller*, the Supreme Court specifically provided that its ruling would not call into question regulations on the "commercial sale of arms." *Heller*, 554 U.S. at 627. This example was included in a laundry list of "longstanding" prohibitions that were to be considered "presumptively valid" because of the historical recognition and vintage. *Id*. at 626. And the Court noted that its list was not exhaustive. These serial number restrictions are clearly statutes affecting, and relating to, the commercial sale of firearms and such regulations were consistent with laws then in existence during the relevant periods.

In sum, historical sources demonstrate a wide panoply of laws from the Founding Era which required firearm "registration" and which heavily regulated the sale and transfer of firearms. These are historical analogues to the current serial number requirement, which is necessary to, and in aid of, modern legislative schemes regulating the commercial sale of firearms. Thus, even if this Court finds that these are not "distinctly similar historical regulation[s]," *Bruen*, 142 S. Ct. at 2131, it should nevertheless conclude that serial number requirements and restrictions are "analogous enough to pass

constitutional muster." *Id*. at 2133.

## III.    CONCLUSION

For these reasons, the Government respectfully requests that the Court deny the

pending motion to dismiss.[7]

Respectfully submitted,

DELIA L. SMITH
UNITED STATES ATTORNEY

Dated: July 17, 2023                    By:    *s/ Michael J. Conley*
                                               Michael J. Conley
                                               Assistant U. S. Attorney
                                               United States Attorney's Office
                                               District of the Virgin Islands
                                               5500 Veteran's Drive, Suite 260
                                               St. Thomas, VI 00802
                                               Office: (340) 774-5757

                                               *s/ Kyle Payne*
                                               Kyle Payne
                                               Assistant U. S. Attorney
                                               United States Attorney's Office
                                               District of the Virgin Islands
                                               5500 Veteran's Drive, Suite 260
                                               St. Thomas, VI 00802
                                               Office: (340) 774-5757

---

[7] The Government notes that the defendant cites various court decisions holding different firearms statutes unconstitutional. But, as he admits, each prohibition must be analyzed separately. Moreover, for each case he cites showing that a different provision is unconstitutional, multiple other court have reached the opposite conclusion as to that provision.