**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.                              ) | Case No. 3:23-MJ-0044 |
| ) | |
| **RICHARDSON DANGLEBEN, Jr.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**APPEARANCES:**

**DELIA L. SMITH, UNITED STATES ATTORNEY**
**MICHAEL CONLEY, ASSISTANT UNITED STATES ATTORNEY**
**KYLE PAYNE, ASSISTANT UNITED STATES ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST. THOMAS, U.S. VIRGIN ISLANDS
    *FOR THE UNITED STATES OF AMERICA*

**MATTHEW CAMPBELL, ESQ.**
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST. THOMAS, U.S. VIRGIN ISLANDS.
    *FOR DEFENDANT RICHARDSON DANGLEBEN, JR.*

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

  **BEFORE THE COURT** is Defendant Richardson Dangleben, Jr.'s ("Dangleben") Motion to Dismiss, filed on July 14, 2023. (ECF No. 14.)[1] Dangleben challenges the constitutionality of the law criminalizing the possession of a firearm with a removed, obliterated, or altered serial number. For the reasons stated below, the Court will deny the motion.

### I. BACKGROUND

  On July 7, 2023, the Government filed a two-count complaint against Defendant Richardson Dangleben. (ECF No. 1.) Count One of the Complaint alleges that Dangleben committed first-degree murder of a Virgin Islands police officer while engaged in the

---

[1] The United States filed an opposition on July 17, 2023. (ECF No. 15.) Defendant Dangleben filed a reply on August 18, 2023. (ECF No. 21.)

performance of his official duties in violation of 14 V.I.C. §§ 921, 922(a)(3)(A)(I). *See id.* Count Two alleges Dangleben was in possession of a Firearm with a removed, obliterated, or altered serial number in violation of 18 U.S.C. § 922(k). *See id.*

On July 14, 2023, Dangleben filed a motion to dismiss Count Two of the Complaint. In that motion, Dangleben makes a facial challenge to the charged statute—18 U.S.C. § 922(k)—arguing that in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Section 922(k) violates the Second Amendment of the Constitution.

The Government filed its response on July 17, 2023. (ECF No. 17.) Dangleben then filed a reply on August 18, 2023. (ECF No. 21.) Thus, the matter being fully briefed is now properly before the Court.

## II. LEGAL STANDARD

The Second Amendment of the Constitution provides that "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In 2008, the Supreme Court decided the landmark case of *District of Columbia v. Heller*, holding that the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). Although the Court in *Heller* recognized the right to carry and possess a weapon for the purposes of self-defense, the Court also underscored that the right guaranteed under the Second Amendment is not an "unlimited" one. *Id.* at 626; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (reiterating the limited nature of the right to bear arms). The *Heller* Court noted that dating back to "Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Thus, the Court made clear that at least some firearm-related regulatory measures could withstand scrutiny under the Second Amendment. *See McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures" on firearms). While *Heller* acknowledged that the Second Amendment was subject to certain limitations, for more than

a decade, the Supreme Court left the lower courts without a test for determining whether a given firearm regulation passed constitutional muster. *See New York State Rifle & Pistol Association, Inc., v. Bruen*, 142 S. Ct. 2111, 2125 (2022).

In the wake of *Heller*, federal appellate courts around the country, including the Third Circuit, ultimately "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Id.* Step one involved a historical analysis wherein the court would determine whether the regulation imposed a burden on conduct falling within the scope of the Second Amendment's original meaning. *See Bruen*, 142 S. Ct. at 2126; *see also United States v. Marzzarella*, 614 F.3d 85, 87 (3d Cir. 2010). If the conduct fell beyond the Amendment's original scope, 'then the analysis [could] stop there; the regulated activity [was] categorically unprotected.'" *Bruen*, 142 S. Ct. at 2126 (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)). If the Court determined in step one that the historical evidence was "'inconclusive,'" or suggested that the conduct was "*not* categorically unprotected" by the Second Amendment, the court would then apply "means-end scrutiny" in step two. *Id.* (emphasis in the original) (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019).

The *Bruen* Court, however, rejected the Court of Appeals' two-step approach, finding that while step one, "which demands a test rooted in the Second Amendment's text, as informed by history," was consistent with *Heller*, step two's "means-end scrutiny," was not. *Id*. at 2127. After addressing the former appellate framework, *Bruen* held that the following standard now applies to Second Amendment challenges:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126.[2]

---

[2] The *Bruen* Court also held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home," 142 S. Ct. at 2122.

*United States v. Dangleben*
Case No. 3:23-mj-0044
Memorandum Opinion
Page **4** of **16**

Thus, under the new framework, courts still must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* However, in light of *Bruen*, once the individual proves that his or her conduct is covered under the Second Amendment, "the Constitution presumptively protects the conduct." *Id.* Therefore, unlike under the Court of Appeals framework, once the individual establishes this presumption in step one, the burden shifts to the Government, who "must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2126-27. In other words, if the individual demonstrates that the regulated or prohibited conduct is within the scope of the Second Amendment, the only way the Government can prevent the firearm regulation from being found unconstitutional is if the Government can show that the law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.[3]

When conducting the analysis to determine whether a particular firearm regulation is consistent with the country's historical tradition, the *Bruen* Court recognized there often will not be a historical regulation directly on point, given that certain modern firearm regulations may have been "unimaginable at the founding." *Id.* at 2132.[4] Therefore, because the Second Amendment's fixed meaning must necessarily apply to new circumstances, the historical inquiry "will often involve reasoning by analogy." *Id.* However, given that "everything is similar in infinite ways to everything else," the *Bruen* Court cautioned courts to only analogize to historical regulations that are "'relevantly similar.'" *Id.* (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993). According to *Bruen*, the two central considerations for determining whether regulations can be analogized is

---

[3] Although the Supreme Court in *Bruen* insisted that the new Second Amendment framework now involves just one step, *see Bruen*, 142 S. Ct. at 2117, this Court agrees with the district court in *United States v. Avila* that the logic in *Bruen* "is difficult to collapse into just one step." Crim No. 22-cr-224, 2023 WL 3305934, at *4 (D. Col. May 8, 2023). Accordingly, this Court has also adopted the approach that "*Bruen*'s directive is best understood as one to eschew means-end analysis in favor of text, history, and tradition." *Avila*, 2023 WL 3305934, at *4 (citing *Bruen*, 142 S. Ct. at 2134-56); *see also Range v. Attorney General United States of America*, 69 F.4th 96, 101 (3d Cir. 2023) (effectively applying a two-step approach post-*Bruen*).

[4] The Supreme Court disposed of the notion that a given historical regulation must be a "historical *twin*." *Bruen*, 142 S. Ct. at 2133 (emphasis in the original). Instead, the historical regulation must simply be "a well-established and representative historical *analogue*." *Id.* (emphasis in the original).

"whether [the] modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133.

In identifying relevant historical regulations and statutes, "the Government can utilize analogues from a range of historical periods, including English statutes from the late 1600s, colonial-, Revolutionary- and Founding-era sources, and post-ratification practices specifically from the late 18th and early 19th centuries." *Herrera v. Raoul*, 2023 WL 3074799, at *5 (N.D. Ill. Apr. 25, 2023) (citing *Bruen,* 142 S. Ct. at 2135-56; *Heller*, 554 U.S. at 605-626; *United States v. Rahimi*, 61 F.4th 443, 455-59 (5th Cir. 2023)).

Notwithstanding the new framework and the requirements for identifying relevant historical analogies, *Bruen* by no means displaced the presumptively lawful regulations explicitly set out in *Heller*. *See Bruen*, 142 S. Ct. at 2162 (noting that the governments remain free to enact "[1] prohibitions on the possession of firearms by felons and the mentally ill"; [2] "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"; [3] "laws imposing conditions and qualifications on the commercial sale of arms"; and [4] bans on weapons that are not "in common use.") (Kavanaugh, J., concurring) (citations omitted); *see also Heller*, 554 U.S. at 626. Consequently, the *Bruen* standard is only relevant where the firearm regulation at issue does not fall into one of *Heller*'s presumptively lawful categories.

### III. DISCUSSION

#### A. Party's Arguments

Dangleben is raising a facial challenge to 18 U.S.C. § 922(k); the federal regulation which makes it "unlawful for any person . . . to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered[.]" 18 U.S.C. § 922(k); *see* ECF No. 14 at 1.

Since Section 922(k)'s prohibition on possessing firearms with an obliterated serial number is not subject to *Heller*'s list of presumptively lawful regulations,[5] the burden is on

---

[5] In *Heller*, the Supreme Court explained that its decision did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the

Dangleben to demonstrate that "the Second Amendment's plain text covers" the regulated conduct. *Bruen*, 142 S. Ct. at 2126.

To establish the presumption, Dangleben argues that Section 922(k) 'criminalizes the mere possession of a firearm.'" ECF No. 14. Therefore, because the Second Amendment guarantees the right to carry a firearm in self-defense, Dangleben claims Section 922(k) necessarily infringes on that fundamental right. *See* ECF No. 14 at 3 (quoting *United States v. Price*, Crim No. 2:22-cr-00097, 2022 WL 6968457, at *3 (S.D.W.V. Oct. 12, 2022).[6]

Given that Dangleben understands Section 922(k) to be within the scope of the Second Amendment, he concludes that the regulation must be struck down as unconstitutional because of his belief that Section 922(k) is inconsistent with the history and tradition of firearm regulation in this country. Dangleben contends that serial numbers were not used on firearms at the founding and "were not broadly required for all firearms" in the United States until 1968. He also argues there was no relevantly similar historical analogue around the time of ratification either. Given that the societal needs addressed by 922(k)—namely, stopping black market firearms trading and solving crimes—likely existed during the founding era, Dangleben claims the lack of any analogous historical regulation supports the theory that 922(k) is inconsistent with the Nation's history and should therefore be found unconstitutional.

The Government disagrees on both fronts. As for whether the Second Amendment covers the conduct regulated under Section 922(k), the Government contends it does not. According to the Government, a regulation is only within the scope of the Second

---

commercial sale of arms." *Heller*, 554 U.S. at 626. Because section 922(k) does not fall into one of these above-mentioned categories, the statute is thus subject to the Second Amendment framework set out in *Bruen*.

[6] To support his theory, Dangleben relied on *United States v. Price*, 2022 WL 6968457, at *3. In *Price*, the district court noted that under section 922(k), a man could legally buy a gun but still be prosecuted simply because he later removed the gun's serial number despite having no intention to otherwise place the firearm into the stream of commerce. Thus, according to the district court in *Price*, Section 922(k) would infringe on the man's right to possess his lawfully purchased gun given that his later obliteration of the serial number would make the mere possession of the firearm illegal. To bring home the point, the district court took the hypothetical one step further by noting that if the man's daughter inherited her father's deserialized firearm, she too could be prosecuted under Section 922(k). *See id.* Therefore, despite otherwise engaging in no unlawful conduct, the *Price* court asserted that both the man and his daughter risked becoming felons by their mere possession of the deserialized firearm.

Amendment if the regulation *infringes* on the right to bear arms. The Government, therefore, argues that since a person is no less capable of defending themselves with a serialized firearm than with a deserialized firearm, Section 922(k) does not infringe on the Second Amendment merely by prohibiting the possession of deserialized firearms.

Additionally, the Government also maintains that the serial number requirement set out in Section 922(k) cannot amount to an infringement on the right to bear arms because the regulation is notably less onerous than the "fingerprint, training, and background restrictions imposed in the 'shall issue' licensing regimes that the Supreme Court found unproblematic" in *Bruen*. (ECF No. 15.)

Finally, the Government explains that "the 'Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . .."' *Id.* (quoting *Heller*, 554 U.S. at 625.) Thus, the Government argues that Dangleben cannot maintain that a prohibition on the possession of a deserialized firearm infringes on the Second Amendment because a deserialized firearm is not the type of weapon generally carried by law-abiding citizens for a lawful purpose. The Government concludes that since there is no lawful purpose for obliterating a serial number, such possession must fall outside the scope of the Second Amendment.

The Government goes on to argue that even if the conduct regulated by Section 922(k) falls within the scope of the Second Amendment, there are still sufficient historical analogues to obliterated serial number restrictions that render Section 922(k) constitutional. *See* ECF No. 15 at 7.

### B. Analysis

In order to initiate step one of the *Bruen* framework, the Court must first identify what specific conduct the statute in question regulates. Therefore, the Court will begin the analysis by first defining the regulated conduct in Section 922(k). Dangleben attempts to argue that Section 922(k) regulates "mere possession" of a firearm. (ECF No. 14. at 3.) Thus, because a plain text reading of the Second Amendment reveals that the right to "bear arms" means a "right to possess arms for self-defense," Dangleben claims the regulated conduct in Section 922(k) is covered under the amendment. However, because Section 922(k) only regulates

the possession of certain kinds of firearms, namely deserialized firearms, Dangleben impermissibly overgeneralizes the regulated conduct at issue here.

As the district court in *United States v. Reyna* explained, the regulated conduct covered under Section 922(k) cannot be distilled down to "mere possession" of a firearm because to do so would be "inconsistent with how the Supreme Court evaluates Second Amendment challenges." *See* Crim No. 3:21-cr-41, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) (noting that in *Heller*, the Court defined the regulated conduct as "handgun possession in the home" and in *Bruen*, the conduct was defined as "publicly carrying a handgun") (citing *Heller*, 554 U.S. at 628; *Bruen*, 142, S. Ct. at 2134). Moreover, not only would using such a general level of abstraction be inconsistent with Supreme Court precedent, but it would also be inconsistent with the original meaning of the Second Amendment. *See id.* The Second Amendment does not generally protect the right to possess "any weapon" "for whatever purpose," but rather specifically protects the right to carry and possess a firearm typically possessed by law-abiding citizens for the purposes of self-defense. *See Heller*, 554 U.S. at 625-26, 635; *Bruen*, 142, S. Ct. at 2131. Thus, because the Second Amendment is specific as to the conduct it covers, the regulated conduct must be defined in a similarly precise fashion. Under Section 922(k), an individual can still possess countless other kinds of firearms, just not one with the serial number removed, altered, or obliterated. Accordingly, the regulated conduct at issue here is not the mere possession of any firearm but rather the possession of a firearm with a removed, obliterated, or altered serial number.

With the regulated conduct now properly defined, the Court will turn to whether the conduct regulated under Section 922(k) falls within the scope of the Second Amendment. Regulated conduct is only within the scope of the Second Amendment if the regulation "infringe[s]" on "a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133; *see also United States v. Libertad*, Crim No. 22-cr-644, 2023 WL 4378863, at *3 (S.D.N.Y. July 7, 2023) (noting that "any number of [firearm] regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it."); *United States v. Holton*, 3:21-CR-0482, 2022 WL 16701935, at *4 (N.D. Tex.

Nov. 3, 2022) (finding that Section 922(k) is not within the scope of the Second Amendment because the regulation does not infringe on the amendment).

The Court agrees with the Government that Section 922(k) does not infringe on an individual's Second Amendment right to bear arms. Section 922(k) merely prohibits a person from possessing a gun with an altered, removed, or obliterated serial number. *See* 18 U.S.C. § 922(k). The regulation does not modify or in any way affect the function, utility, or effectiveness of an individual's firearm. *See Holton*, 2022 WL 16701935, at *4 (quoting *Marzzarella*, 614 F.3d at 94) ("the presence of a serial number does not impair the use or functioning of a weapon in any way[.]. . .[A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm."). Even the finest marksmen will remain just as accurate after removing the serial number from his or her firearm because, as the Third Circuit aptly stated, "[w]ith or without a serial number, a pistol is still a pistol." *Marzzarella*, 614 F.3d at 94. Accordingly, because a person can defend themselves just as effectively with a serialized or deserialized firearm, there is nothing about Section 922(k)'s prohibition that limits an individual's right to bear arms and defend oneself in the case of confrontation.[7] *See United States v. Walter*, 2023 WL 3020321, at *5 (D.V.I. Apr. 20, 2023) (noting that even after *Bruen*, this Court still agreed with the Third Circuit's step one analysis finding in *Marzzarella* that "Section 922(k) d[oes] not bar [an individual] from possessing any otherwise lawful[ly] marked firearm for the purpose of self-defense.") (quoting *Marzzarella*, 614 F.3d at 94).[8]

---

[7] The conclusion that 922(k) falls outside the scope of the Second Amendment is also reasonable because it "would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility." *Marzzarella*, 614 F.3d at 94.

[8] Although Dangleben seems to contend that it is improper to rely on the Third Circuit's decision in *Marzzarella* for any purpose following *Bruen*, Dangleben overemphasizes the changes *Bruen* made to the traditional Second Amendment analysis. As the undersigned explained earlier in this opinion, *Bruen* merely eliminated step two—the means-end scrutiny—portion of the Second Amendment analysis, leaving step one fully intact. *See Bruen*, 142 S. Ct. at 2127. Thus, it is still entirely proper for courts to rely on portions of pre-*Bruen* precedent that involve step one of the Second Amendment analysis. Despite Dangleben's assertion to the contrary, the section of *Marzzarella* that this Court relied on in *Walter*, and again in this opinion, is part of the Third Circuit's step-one analysis, not the means-end scrutiny portion of the analysis. *See Walter*, 2023 WL 3020321, at *4-5 (relying only on Section A, the step one portion of the *Marzzarella* opinion) (citing *Marzzarella*, 614 F.3d at 91-94). Accordingly, the Court may refer to sections of *Marzzarella* cited to determine whether Section 922(k) infringes on the rights guaranteed under the Second Amendment.

There is also no infringement of an individual's Second Amendment right simply because the regulation may prohibit an individual from possessing a specific gun. "'[F]irearms of similar make and model are essentially fungible."' *United States v. Serrano*, 21-CR-1590, 2023 WL 2297447, at *11 (S.D. Cal. Jan. 17, 2023) (quoting *Holton*, 2022 WL 16701935, at *4). Therefore, just like a broken wristwatch, a law-abiding citizen can quickly and easily replace a deserialized gun with one of the same exact same kind. Since Section 922(k) does not prohibit certain types, calibers, or even functional characteristics of guns, the only loss a person suffers from losing access to a specific gun is the sentimental value of a particular gun—a loss not covered under the Second Amendment.

Even absent the ability for individuals to readily replace a deserialized gun with a serialized one of the same make and model, the Court strains to comprehend how Section 922(k) imposes any burden on the right to bear arms, let alone a meaningful burden. The prohibition against removing a serial number from a firearm requires absolutely no action on the part of the owner. *See Holton*, 2022 WL 16701935, at *5. Placing a serial number on a firearm is a requirement imposed on the manufacturer or importer of the firearm, not the buyer. *See* 26 U.S.C. § 5842(a); *see also* 27 C.F.R. § 179.102.[9] Accordingly, a person in lawful possession of such a firearm must simply avoid taking the affirmative act of obliterating the serial number after the gun is purchased.[10] Since neither removing, altering, nor obliterating the serial number provides any lawful benefit to a person using a firearm, it cannot be suggested that 922(k)'s restriction burdens law-abiding gun owners right to bear arms. *See Holton*, 2022 WL 16701935, at *5.

The conclusion that Section 922(k) does not infringe on the Second Amendment is further buttressed by the fact that the prohibition against possessing deserialized firearms

---

[9] 26 U.S.C. § 5842 states: "Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the Secretary may by regulations prescribe."

[10] The burden is no more significant in the *Price* hypothetical where the daughter inherits an already deserialized firearm rather than purchasing a firearm with a serial number herself. *See* 2022 WL 6968457, at *6. In the case of the hypothetical daughter, she can simply reject the obliterated serial number from her father or potentially rely on the father's proper registration documentation to have the serial number reinscribed on the firearm.

stands in stark contrast to the regulated conduct the Supreme Court has previously held infringed on the rights guaranteed under the Second Amendment. In *Heller*, the District of Columbia imposed an "absolute prohibition of handguns held and used for self-defense in the home." 554 U.S. at 636. Similarly, in *Bruen*, the New York law "broadly prohibit[ed] the public carry of commonly used firearms for self-defense." 142 S.Ct. at 2138. Therefore, unlike the regulations at issue in those Supreme Court cases, which "essentially foreclosed self-defense with commonly used firearms for most people," Section 922(k) leaves an individual free to choose from the exact same types and calibers of firearms that would be available if Congress had not enacted Section 922(k) at all. *Serrano*, 2023 WL 2297447, at *11. The only difference following the enactment of Section 922(k) is that the firearm an individual possesses must now maintain the serial number inscribed on the firearm at the time of manufacturing. Thus, as the Government correctly noted, Section 922(k) is more akin to the "'shall issue' licensing regime," which involve several regulatory hurdles to possessing a weapon, but which the Supreme Court indicated did not infringe on the Second Amendment. *Bruen*, 142 S. Ct. at 2138 n.9.[11]

Moreover, the Second Amendment's right to keep and bear arms "is not a right to keep and carry any weapon whatsoever in any manner whatsoever," and thus does not protect "those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625-26. As noted above, no lawful purpose is served, or benefit gained by obliterating a serial number from a firearm. Accordingly, consistent with *Heller* and *Bruen*,

---

[11] Dangleben tries to argue in his reply brief that a comparison to the "shall issue" licensing regimes is not appropriate here because there is a "significant analytical difference" between imposing regulations on individuals before they obtain a firearm and regulations that restrict what a person can do after obtaining a firearm. *See* ECF No. 21 at 4-6. However, Dangleben fails to articulate any meaningful analytical distinction. *See id.* Although "shall issue" regulations may be imposed at an earlier time than Section 922(k)'s possession regulation, that does not suggest the former regulations are somehow less capable of infringing on a person's right to bear arms than the latter. In fact, the preliminary requirements involved in the "shall issue" regulatory regimes have the capacity to prevent an individual from possessing a firearm, of any kind, outside the home. Brian Enright, *The Constitutional "Terra Incognita" of Discretionary Concealed Carry Laws*, 2015 U. Ill. L. Rev. 909, 919-20 (2015); *see also* Michael Rogers, *The Bear Necessities: Good Cause Statutes and "Step Zero" of Second Amendment Analyses*, 80 Ohio St. L.J. 159, 171 (2019). Dangleben seems to suggest that because the "shall issue" regulations restrict an individual's access to a firearm in a different way than Section 922(k), that is somehow analytically significant. The Court's only concern in its Second Amendment analysis, however, is whether the individual's right to the firearm has been infringed. It is not pertinent how the alleged infringement occurs. Accordingly, the Court believes comparisons to the "shall issue" licensing regime are useful for determining whether the firearm regulation at issue in this case infringes on the Second Amendment.

the Court finds that firearms with obliterated serial numbers are not typically used by law-abiding citizens for lawful purposes. *See Reyna*, 2022 WL 17714376, at *5 ("Guns with obliterated serial numbers belong to 'those weapons not typically possessed by law-abiding citizens for lawful purposes' so possession of such guns isn't within the Second Amendment's scope.") (quoting *Heller*, 554 U.S. at 625). Therefore, Section 922(k)'s conduct is not protected by the Second Amendment. *See United States v. Tita*, No. CR RDB-21-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022); *Reyna*, 2022 WL 17714376, at *5; *Holton*, 2022 WL 16701935, at *4.

Any suggestion that deserialized firearms are the types of commonly used weapons covered under the Second Amendment is antithetical to an originalist understanding of the amendment. As the Third Circuit explained in *Marzzarella*, "serial numbers on firearms did not exist at the time of ratification." 614 F.3d at 90. Therefore, "[i]t would make little sense to categorically protect a class of weapons bearing a certain characteristic when, at the time of ratification, citizens had no concept of that characteristic or how it fit within the right to bear arms." *Id.* at 93-94. Consequently, it cannot be assumed that the framers understood deserialized firearms to be covered under the Second Amendment.

Given these various considerations, the Court holds that the regulated conduct under Section 922(k) falls outside the scope of the Second Amendment.[12]

Furthermore, as the Court previously explained in *Walter*, "even assuming arguendo that possession of firearms with an obliterated serial number is protected conduct under the Second Amendment . . ., 922(k) is consistent with this Nation's historical tradition of firearm regulations." 2023 WL 3020321, at *5. Although the advent of serial numbers for firearms

---

[12] Given Dangleben's criticism of this Court's decision in *Walter*, *see* ECF No. 21, Dangleben seems to believe that the Court's analysis up to this point in the opinion has been an impermissible means-end scrutiny analysis. However, simply considering whether a given regulation is burdensome enough to amount to infringement is not means-end scrutiny. Means-end scrutiny is an analysis wherein the Court determines whether the regulation at issue serves a sufficiently important governmental interest that justifies the infringement on the person's constitutional right and is no more burdensome than reasonably necessary to further the government interest. *See Marzzarella*, 614 F.3d at 97-98 (collecting cases on intermediate scrutiny). In this case, the Court is not comparing the Government's interest in enforcing the statute with the burden the statute imposes on Dangleben's Second Amendment right. Instead, the Court is simply considering whether the Section 922(k) infringes on the Second Amendment at all. Therefore, the analysis is appropriate under *Bruen*.

did not begin until well after the founding era,[13] the Court finds there are sufficient historical analogues relevantly similar to Section 922(k) to uphold the statute.

As Dangleben himself indicated, there were effectively two purposes for enacting Section 922(k). *See* ECF No. 14. The first purpose was to control the black-market firearms trade, reduce the number of stolen firearms, and ultimately keep such weapons out of the hands of dangerous criminals. *See Marzzarella*, 614 F.3d at 98 (citing *Barrett v. United States*, 423 U.S. 212, 218 (1976)); *Comprehensive Violent Crime Control Act of 1989: Hearing on H.R. 2709 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 101st Cong., 2d Sess. 143 (Mar. 6, 1990). The second purpose of 922(k) was to assist law enforcement in solving crimes. *See id.*

During the colonial era, there were similar concerns about the black-market firearms trade and the risk of those firearms entering dangerous hands. Consequently, "colonial governments substantially controlled the firearms trade." *Teixeria v. Cnty. Of Alamdea*, 873 F.3d 670, 685 (9th Cir. 2017).[14] In New York, for example, a 1652 law outlawed the illegal trading of guns by private individuals. *See* Spitzer, *supra* note 11 (citing Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Guns in New Netherland by Private Persons, 1652 N.Y. Laws 128). To keep firearms from individuals the government deemed "dangerous," certain states also passed laws "making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeria*, 873 F.3d at 685.[15] Moreover, such restrictions were not limited simply to transporting or shipping. Mere

---

[13] *See Marzzarella*, 614 F.3d at 93 n.11. (noting that the first serial number did not appear on a Winchester firearm until 1968 and did not appear on Springfield Armory weapons until 1868).

[14] In *Gun Law History in the United States and Second Amendment Rights*, Robert Spitzer notes that "[a]rms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today" and, therefore, "[v]arious registration or taxation schemes sought to address this concern." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs., 55, 76 (2017).

[15] The court in *Teixeria* cited to following sources for evidentiary support for this proposition: Acts of Assembly, Mar. 1657-8, in 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 441 (1823); Assembly Proceedings, February-March 1638/9, in Proceedings and Acts of the General Assembly of Maryland, January 1637/8—September 1664, at 103 (William Hand Browne, ed., 1883); Records of the Governor and Company of the Massachusetts Bay in New England 196 (Nathaniel B. Shurtleff, ed., 1853)).

possession was prohibited to help circumscribe the black market as well. "In colonial Virginia, [for instance,] straying into an Indian town or more than three miles from an English Plantation, while possessing more firearms than needed for personal use, was a crime." *United States v. Bradley*, Crim No. 2: 22-cr-00098, 2023 WL 2621352, at *4 (S.D.W.V. Mar. 23, 2023) (citing *Teixeira*, 873 F.3d at 685 (citing "Acts of Assembly, Mar. 1675–76" in The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 336–37 (2 William Waller Henning ed., 1823))).[16]

In addition to certain restrictions on the firearms trade, there were also registration and muster laws relevantly similar to 922(k)'s modern-day serial number requirement. The militia laws mandated that militiamen bring their firearms to "the muster field twice a year so that militia officers could record which men in the community owned guns." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007) (citing "An Act for regulating and governing the Militia of the Commonwealth of Massachusetts," 1793, in Massachusetts Session Laws; "An Act more effectually to provide for the National Defense, by establishing an Uniform Militia throughout the United States" 1792, in Laws of the United States of America (Philadelphia: Richard Folwell, 1796), 2:92); *see also* Meg Penrose, *A Return to the States' Rights Model: Amending the Constitution's Most Controversial and Misunderstood Provision*, 46 Conn. L. Rev. 1463, 1483 (2014) ("[T]he founding generation endured mandatory gun registration as a basis for ensuring a functional militia, and routinely disarmed those considered threatening to the established social order."); *Minutes from a Convention of the Federalist Society: Civil Rights*: The Heller Case, 4 NYU J.L. & Liberty 293, 309 (2009) ("The Founders did have gun control. They had mandatory musters.

---

[16] Although the laws were enacted in the early 19th century, the Court notes that in an effort to regulate the firearms trade, several states required an inspector to mark and stamp certain firearms before they were sold to ensure that the firearms were compliant and safe to use. *See* Spitzer, *supra* note 11, at 74; *see also* Duke Center for Firearms Law's, *Repository of Historical Gun Laws* (citing Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 685-686; Image 272-273 (Vol. 2, 1821) available at The Making of Modern Law: Primary Sources) and 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1)).

Everyone with a gun had to show up and register their firearm. . . . "). In Colonial Virginia, a 1631 law required "the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" Spitzer, *supra* note 11, at 76 (citing Virginia Acts of Assembly, Feb. 24, 1631). New Hampshire, New Jersey and Rhode Island went even farther by "authoriz[ing] door-to-door censuses." *See Bradley*, 2023 WL 2621352, at *5 (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007).[17] These muster and registration laws, in addition to taxes on personally held firearms,[18] allowed the government to roughly account for and track the location of the firearms in colonial America.

It is thus plain from the historical record that "founding-era legislatures were concerned about the illegal trading and movement of firearms, while also concerned about preventing the sale of firearms to those deemed dangerous—a shared purpose of § 922(k)." *Bradley*, 2023 WL 2621352, at *5. However, "before the advent and widespread implementation of serial numbers, there was no identifying mechanism to track the transfer of discrete firearms." *Id.* Colonial legislatures were consequently forced to devise crude, broad laws intended to keep track of firearms and prevent such arms from reaching dangerous hands. *See id.* Therefore, the historical regulations discussed above can be viewed as an antecedent to Section 922(k). Thus, in light of these historical analogues, the Court holds that 922(k) is consistent with this Nation's tradition of firearm regulations.

The Court's decision today is consistent with the overwhelming majority of federal courts who have addressed the constitutionality of Section 922(k) since *Bruen*. *See Tita*, 2022 WL 17850250, at *7 (finding that "the conduct outlined in 18 U.S.C. § 922(k) is not protected by the Second Amendment because it does not infringe on an individual's right to bear arms 'in case of confrontation' or self-defense," and even if it was protected, "analogous conduct has been historically regulated such that 18 U.S.C. § 922(k) is constitutional"); *Bradley*, 2023

---

[17] The Churchill article cited the following sources as support: "Order of the Governor and Council, March 28, 1667" in Records of the Colony of Rhode Island and Providence Plantations (Providence: A. Crawford Greene and Brother, 1857) (John Russell Bartlett, ed.)) 2:196; "An Act for the better regulating of the Militia of this Province," 1747, McCord, Statutes at Large, 9:645; "An Act for the regulating, training, and arraying of the Militia," 1781, New Jersey Session Laws.

[18] *See Holton*, 2022 WL 16701935, at *5.

WL 2621352, at *3-4 ("The Court finds that the plain text of the Second Amendment does not cover conduct regulated by § 922(k)" and, alternatively, § 922(k) "is constitutional because there are relevant historical analogues that offer comparable burdens on the right to bear arms."); *Serrano*, 2023 WL 2297447, at *11 ("The Court finds that the Second Amendment's plain text does not cover the conduct regulated by § 922(k)."); *Reyna*, 2022 WL 17714376, at *1 (holding that "the plain text of the Second Amendment doesn't reach a handgun without a serial number"); *Holton*, 2022 WL 16701935, at *4 (finding that "a law requiring serial numbers on firearms " does not infringe "on the right to keep and bear arms," and even if it did, "the Government has identified relevant historical analogues to meet its burden under *Bruen*").[19]

Since the Court's last decision addressing this issue, there have been only two additional district court decisions and no appellate decisions addressing the constitutionality of Section 922(k). Given that those recent decisions do not depart from this Court's prior decision in *Walter*, the Court finds no reason to deviate from that holding today. *See United States v. Avila*, Crim. No. 22-cr-224, 2023 WL 3305934, at *5 (D. Col. May 8, 2023); *United States v. Trujillo*, Crim No. 1:21-cr-1422, 2023 WL 3114387, at *4 (D.N.M. Apr. 26, 2023). Accordingly, the Court finds 18 U.S.C. § 922(k) is constitutional.

## IV. CONCLUSION

For the foregoing reasons, Defendant Richardson Dangleben's motions to dismiss, ECF Nos. 14, is denied. An accompanying Order of even date follows.

**Dated:** October 3, 2023                          /s/ *Robert A. Molloy*
                                                    **ROBERT A. MOLLOY**
                                                    **Chief Judge**

---

[19] The only federal court to find Section 922(k) unconstitutional has been the Southern District of West Virginia in *United States v. Price*. *See* 2022 WL 6968457, at *6.