IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
SAINT THOMAS DIVISION

United States of America
*Plaintiff,*

v.                                                    Criminal No. 3:23-0072-RAM-GAT

Richardson Dangleben, Jr.
*Defendant.*

**<u>Surresponse in Opposition to Government's Motion for Extension of Time</u>**

The Government seeks a 120-day stay of all proceedings in order to allow it to "review" the no-seek notice filed over a year ago in this case, based on the United States Attorney General's February 5, 2025, Memorandum. Because the Government (a) has no right to review and reverse its previously filed no-seek notice, and (b) has waived any such right assuming *arguendo* that it exists, there is no good cause for a stay of proceedings. Rather, this Court has ample cause to manage its docket in a manner respecting Mr. Dangleben's constitutional and statutory rights and allow this case to proceed as the non-capital case it remains today. For the reasons set forth herein, Richardson Dangleben, Jr. opposes the Government's motion for a 120-day stay of these proceedings.

I.        **Factual and Procedural Background**

Mr. Dangleben was indicted on October 13, 2023, on thirteen different charges. (ECF No. 24). Count One charged use of a firearm during a crime of violence resulting in death, including murder, pursuant to 18 U.S.C. §924(j)(1). The potential punishment for that offense was either the death penalty or life in prison.

On November 8, 2023, the Court held a status conference. (ECF No. 31). At that hearing, undersigned counsel requested an order from the Court that any notice pursuant to 18 U.S.C. § 3593 be filed within sixty days. Government counsel joined in that request, stating that sixty days was reasonable for such notice. (*See generally* ECF No. 46 at 2). Subsequently, the Court entered an Order directing that any notice pursuant to 18 U.S.C. § 3593 be filed by January 12, 2024. (ECF No. 35).

On January 12, 2024, the Government filed a motion seeking an extension of time from January 12 to February 12, 2024, to file any notice pursuant to 18 U.S.C. § 3593. (ECF No. 40). Mr. Dangleben opposed that extension of time for lack of good cause. (ECF No. 43 at 1-2). Prophetically, counsel observed:

> Extending the January 12th deadline for notice of intent to seek the death penalty keeps this case in limbo and increases the likelihood that further delays—perhaps lengthy ones—will be necessary before this case can be tried.

(ECF No. 43 at 2-3). In reply, the Government asserted that the then-calendared trial date of October 28, 2024 provided sufficient time for counsel to prepare for a capital case, if notice of intent to seek the death penalty was filed by the Government. (ECF No. 45).

In determining that the Government's motion for extension of time would be granted, the Court remarked on the case's status as complex, the discovery deadline and the then-calendared trial date, and the complexity of the Justice Department protocol, set out in Section 9-10.010 et seq. of the United States Attorney's Manual, which "provid[es] the procedure designed to promote consistency and fairness." (ECF No. 46 at 5). The Court also noted:

> A decision to seek the death penalty would completely change the posture of the case, requiring: (i) the appointment of learned counsel pursuant to 18 U.S.C. § 3005; (ii) that the investigation and preparation of mitigating evidence for a potential penalty phase proceed simultaneously with investigation and preparation for the guilt phase based on accepted capital case representation standards, including the procurement of additional experts for mitigation purposes; and (iii) Defendant's counsel to reassign virtually all other cases on his docket and focus almost exclusively on this case.

(*Id.* at 3). The Court's final order stated that "no further request to extend the notice deadline **SHALL**

2

be entertained absent exigent circumstances and supporting evidence." (*Id.* at 5 (emphasis in original)).

On February 7, 2024, the Government filed its notice of intent not to seek the death penalty. (ECF No. 47.)  In reliance on the notice, counsel for Mr. Dangleben did not seek the appointment of learned counsel or a mitigation specialist and did not undertake a mitigation investigation.

On February 12, 2025, the Government filed a motion to stay proceedings in Mr. Dangleben's case for "at least 120 days in light of the Attorney General's February 5, 2025, Memorandum Reviving the Death Penalty and Lifting the Moratorium on Federal Executions." (ECF No. 122 at 1; *see also id.* at 3).[1] On February 21, 2025, Mr. Dangleben filed a response in opposition in which he requested the appointment of learned counsel, in part, for the purpose of formulating "the appropriate response to the government's contemplated 'reevaluation'" after determining "how Mr. Dangleben should respond to the government's motion to stay proceedings." (ECF No. 129 at 8).

On February 24, 2025, the Court ordered the Government to reply to that response and address "whether the United States has a right under 18 U.S.C. §3593 to change its position and whether it has waived or forfeited such right given it has already filed a Section 3593 Notice on February 7, 2024." (ECF No. 131). The Court also appointed learned counsel to Mr. Dangleben. (ECF No. 133).

On March 2, 2025, the Government filed its reply, arguing *first,* it has the right to change its position based on timeliness (ECF No. 134 at 3-4), its right to internal deliberative processes (*id.* at 4-5) and "circumstances outside the prosecution's control" (*id.* at 5-6), and *second,* "exigencies…excuse any failure to comply with the Court's earlier deadline." (*Id.* at 6-7).

The Court subsequently authorized the filing of this surresponse. (ECF No. 136).

---

[1]     The Government's reply claims that the AG Memo was issued "[a]midst this [case's] uncertain schedule." (ECF No. 134 at 2). To the extent that this claim could be interpreted as implying that the AG Memo was issued based on the AG's consideration of Mr. Dangleben's individual case, such an assertion appears dubious at best.

II.    **The Government's position is untenable; thus, it avoids the Court's direct questions.**

In its February 24th order, the Court directed the Government to answer two questions:

1.  whether the United States has a right under 18 U.S.C. §3593 to change its position; and

2.  whether it has waived or forfeited such right given it has already filed a section 3593 Notice on February 7, 2024.

(*See* ECF No. 131).

A.  **The Government provides no authority supporting the reversal of its no-seek notice and instead seeks to litigate the issue of timeliness of §3593 notices.**

Regarding the first question, the Government never actually answers it. Instead, the Government begins by providing a lengthy discussion of the requirement that notice provided pursuant to 18 U.S.C. §3593 must be made a reasonable time before trial. (*See* ECF No. 134 at 2-4). The cases cited by the Government only address timeliness,[2] without ever addressing whether the Government has a right to 'change its mind' after (a) the Government has elected not to seek the death penalty, (b) it has filed a notice memorializing that election, and (c) the deadline for filing such a notice of intent has passed. Whether a first notice would be considered timely has no logical bearing on whether the Government has a right to file a 'second superseding notice' more than a year later. If this was a case where the Government failed to reach a decision or failed to file *any* notice by a court-established deadline, timeliness *could* be an issue.[3] The issue here, however, is not one of timeliness.

Rather, the question is whether 18 U.S.C. § 3593 authorizes the government to withdraw or reverse a previous decision not to seek the death penalty. The answer is no.  The only amendment the

---

[2]    *See United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003); *United States v. Wilk*, 452 F.3d 1208 (11th Cir. 2006); *United States v. Breeden*, 366 F.3d 369 (4th Cir. 2004); *United States v. Ponder,* 347 F.Supp.2d 256 (E.D. Va. 2004); *United States v. Le*, 311 F. Supp. 2d 527 (E.D. Va. 2004); *United States v. McGriff*, 427 F. Supp. 2d 253 (E.D.N.Y. 2006), as cited at ECF No. 134 at 2-4.

[3]    Though the issue of waiver would remain.

statute authorizes is the amendment of previously filed notice of intent *to* seek the death penalty. Moreover, such an amendment is not a matter of right, but rather requires permission of the court based on a showing of good cause. 18 U.S.C. § 3593(a). Even if Section 3593(a) could be read to allow the government to reverse a prior no seek decision, at the very least the reversal would require permission of the court and a showing of good cause. The government has neither.

Next, the Government argues that the Court "has no authority to control the Department of Justice's internal policies." (ECF No. 134 at 4). But the Government was not impeded by this Court in considering and applying its internal policies to make a determination in this case. The Government's February 7, 2024, notice was not a statement of policy—internal or otherwise. It was a definitive notice of the Government's litigation position in this case.[4] The Government advances the argument that "[n]o statutory provision requires the Government to formally file notice of a decision not to seek the death penalty." (ECF No. 134 at 3). But they did file such a notice. Both the Court and Mr. Dangleben relied on that litigation position going forward. Thus, once again the cases cited by the Government in its brief go to issues neither the Court nor Mr. Dangleben have raised.[5]

---

[4] "The United States intends to proceed with either a non-capital trial or plea agreement in this matter and will not seek the death penalty for Richardson Dangleben, Jr. Thus, a special hearing to determine whether a sentence of death is justified pursuant to 18 U.S.C. § 3593(a) is not requested." (ECF No. 47).

[5] For example, *United States v. Tsarnaev*, No. 13-10200-GAO, 2013 WL 5701582, *2 (D. Mass. Oct. 18, 2013) addressed whether the District Court had the authority to order the Government to extend the time within which the defendant could provide mitigating evidence to the United States Attorney's Office for inclusion in the submission to the Department of Justice's Capital Case Unit. *United States v. Hardrick*, No. 10-202, 2011 WL 2516340, *2 (E.D. La. June 22, 2011) similarly addressed a defense motion to extend the date for the presentation of mitigation evidence to the Department of Justice Capital Case Review Committee. The Government's citation to *United States v. Frye*, 372 F.3d 729, 733 (5th Cir. 2004) fares no better. While there were allegations in *Frye* that the assigned prosecutor had represented at several hearings that he did not believe that the Government would seek the death penalty, there was only a single §3593 notice filed, and that notice indicated that the Government would be seeking the death penalty. Moreover, that notice was timely filed in compliance with the District Court's deadline for filing such notice.

The Government offers no authority for the proposition that it can change its officially filed position not to seek the death penalty. In arguing that "[t]his Court should, however, conclude that the vacatur of the trial date vitiated the effect" (ECF No. 134 at 6) of the deadline to file its §3593 notice, the Government continues to try to make this issue one of timing. To be sure, the timing—seeking a potential change of an officially filed position more than a year later—is problematic. But the issue is that the Government already met that deadline, and now seeks to revisit the decision it made. The continuance of a trial date does not automatically extend, or toll associated case-related deadlines, nor does it mean that previously filed documents are rendered moot. Moreover, 18 U.S.C. § 3593 protects interests beyond just the defendant's interest in having sufficient time between the notice and the trial. *See United States v. Ferebe*, 332 F.3d 722, 736-737 (4th Cir. 2003).

Nowhere in Mr. Dangleben's unopposed motion to extend deadlines for expert disclosures and motions did the parties represent any update to the status of the Government's decision not to seek the death penalty. Nor did the government raise this issue at the status conference on August 16, 2024. (ECF No. 56). If the Government thought that the continuance of trial date could have the effect of vitiating the notice deadline, it was incumbent on the Government to address that claim at the time it was ripe for adjudication. Frankly, had the Government indicated at that point that it may seek to revisit its decision whether or not to seek the death penalty, Mr. Dangleben would have made different strategic decisions. The novel idea now advanced by the Government that the continuance of the trial date granted in August 2024 allows them carte blanche to do a de novo review based on the "unforeseen" policy of a new attorney general is without precedent and is highly problematic for reasons discussed *infra.*

**B. The government has waived its ability to seek the death penalty, and the waiver analysis in its reply is not based in law**

The Government clearly and unequivocally waived its opportunity to file a notice of intent to seek the death penalty. On November 16, 2023, the Court filed an order requiring the government to file any notice pursuant to 18 U.S.C. §3593(a) by January 12, 2024. (ECF No. 35). Undersigned counsel had requested such an order during the November 8, 2023, status conference, and the Government agreed to it. (ECF No. 46 at 2). On January 12, 2024, the Government moved to extend the deadline for filing that notice until February 12, 2024 (ECF No. 40), which the Court subsequently granted. Under these circumstances, there can be no plausible claim that the Government was unaware of its statutory right to file a death notice pursuant to §3593(a). That it did not do so by the Court's extended deadline can only be considered the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Removing all doubt of whether the Government waived its right to file a notice of intent to seek the death penalty is the fact that the Government actually filed a notice stating the opposite— that it would not seek the death penalty. (See ECF No. 47). There could be no more definitive waiver than a notice stating that the United States "will not seek the death penalty." (*Id.*) The filing of that no-seek notice further proves that the Government's failure to file a timely death notice cannot be considered an "inadvertent failure to raise an argument" subject to forfeiture analysis. Instead, the Government's waiver should be enforced.

In its reply, having failed to answer the Court's first question as to whether the Government has the right to change its position in this case, almost as an afterthought, the Government offers that "this Court should not construe waiver or forfeiture from the Government's previously announced decision to forgo a capital prosecution in this case." (ECF No. 134 at 3). According to the Government, this is true because the Government's no-seek "did not hinge on anything of value from Dangleben" and thus there is no agreement to enforce. (ECF No. 134 at 3). This cursory argument

and analysis of the Court's question misapprehends the doctrines of waiver and forfeiture, as neither waiver nor forfeiture requires a bargain between the parties.

"The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 n.1 (2017). Waiver is the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The Supreme Court has deemed an argument waived, for example, when a party "twice informed the U.S. District Court that it would not challenge, but is not conceding, the timeliness of [the petition]." *Wood v. Milyard*, 566 U.S. 463, 465 (2012) (cleaned up).

In contrast, "forfeiture is the failure to make the timely assertion of a right." *United States v. Olano*, 507 U.S. 725, 733 (1993). "[A]n example of [forfeiture] is an inadvertent failure to raise an argument." *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017). The distinction between waiver and forfeiture "can carry great significance." *Id.* at 146. A party's waiver should be enforced. *Id.* at 146 n.7; *Wood*, 566 U.S. at 472–73  ("It would be 'an abuse of discretion' for a court 'to override a State's deliberate waiver' ") (citation omitted).

The policy supporting waiver and forfeiture is the "party presentation principle," which applies "in both civil and criminal cases, in the first instance and on appeal." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). "[A]s a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' " *Id.* at 244 (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring)). Waiver "serve[s] several important judicial interests, protecting litigants from unfair surprise; promoting the finality of judgments and conserving judicial resources; and preventing district courts from being reversed on grounds that were never urged or argued before [them]." *Webb v. City of Phila.*, 562 F.3d 256, 263 (3d Cir. 2009) (cleaned up). As detailed herein, the Government's reversal

of its prior no-seek notice is an unfair surprise to Mr. Dangleben. It wastes judicial resources, as this case must now grind to a halt while the Government's untimely reversal is addressed.

The Courts enforce waiver and forfeiture against criminal defendants and the government equally.[6] The United States Government is the prosecuting party here, an entity which includes both the United States Attorney's Office for the District of the Virgin Islands as well as the United States Attorney General. The Government waived its opportunity to file a death notice when it (a) failed to file one by the February 12th deadline, and (b) instead filed its February 7th notice stating it would not seek the death penalty. This was a conscious decision made after careful deliberation, and that decision has consequences which this Court must enforce.

### C. The Government invents the idea that it should not be sanctioned—prohibited from seeking the death penalty—because it has not engaged in "misconduct"

Failing to address the Court's questions, the Government presents itself as a victim and asks not to be barred from seeking the death penalty for "circumstances outside the *prosecution's* control." (ECF No. 134 at 5, *emphasis* added). Those circumstances? The confirmation of a new Attorney General as part of a new iteration of the same government prosecuting this case who wants to revisit all past no-seek decisions. All of these "circumstances" were internal to the same government that now argues it should not be prejudiced because of its own actions and decisions.

It is worth noting that even in this strawman, prosecution-as-victim argument the Government attempts to set up, the cases it cites do not stand for the stated proposition that the striking of a death notice is equal to dismissing an indictment. (ECF No. 134 at 5). Contrary to the Government's citation,

---

[6] *See United States v. Olano*, 507 U.S. 725, 731 (1993) ("No procedural principle is more familiar ... than that a constitutional right ... may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)); *United States v. Ritter*, 416 F.3d 256, 268 ("the government should not be afforded a second opportunity to carry its burden that the challenged evidence should not be suppressed.").

*United States v. Lopez-Matias*, 522 F.3d 150, 152-53 & n.6 (1st Cir. 2008) clearly states that "[d]ismissal of the Notice is not as extreme as dismissal of an indictment." *Id.* at 154 & fn. 9. (emphasis added). This is so because "[t]he government may still seek a conviction and the serious penalty of life imprisonment." *Id.* While noting that the procedure for evaluating the propriety of striking a death notice and dismissing an indictment were the same, the Court "acknowledge[d] that here the remedy is not so 'drastic,' *United States v. Soto–Beníquez*, 356 F.3d 1, 30 (1st Cir.2004), 'extraordinary,' *United States v. Hemmer*, 729 F.2d 10, 13 (1st Cir.1984), 'draconian,' *United States v. Josleyn*, 99 F.3d 1182, 1196 (1st Cir.1996), or 'extreme,' *United States v. Horn*, 29 F.3d 754, 760 (1st Cir.1994), as the outright dismissal of serious criminal charges." *Lopez-Matias*, supra, at 154 & fn. 9. Nor does the language the Government pulls from inapposite cases about "sanctions" and "misconduct" have any bearing here.[7]

The decisions made by the Government have consequences, and enforcement of the Government's officially filed notice not to seek the death penalty is not a sanction. It would not be striking a notice of intent to seek the death penalty. The Court would merely be holding the Government to the timely and carefully considered decision it already made.

---

[7]     The Government's citation to *Vázquez-Rijos v. Anhang*, 654 F.3d 122, 127 (1st Cir. 2011) is utterly without merit (ECF No. 134 at 5), as that case stemmed from a civil matter in which a wife sued her deceased husband's parents, seeking a share of his estate. Further, the language relied upon by the government comes from *Young v. Gordon*, 330 F.3d 76, 81 (1st Cir. 2003), another civil matter in which one attorney sued a group of attorneys for breach of contract and tortious interference with business relationships. While the Government may appreciate the language of the quotations it cites, those civil cases for damages have no relevance here. *United States v. Santana*, 6 F.3d 1, 11 (1st Cir. 1993) (*See* ECF No. 134 at 5) was a non-capital drug trafficking case in which the District Court dismissed drug charges due to outrageous government misconduct during its investigation. It was never a capital-eligible case, nor did it involve the filing of any notice. Instead, the District Court's exercise of supervisory authority in *Santana* involved a dismissal based on the government's "fronting" of heroin to a target, and its subsequent inability to retrieve the heroin from that target, which was presumably distributed to other members of society. In other words, it involved a sanction of dismissal for "government misconduct not injuring the defendant." *Santana, supra*, at 10-11 (citing cases).

**D.  The Government's commentary on the ABA Guidelines also misses the mark.**

Having failed to answer the Court's inquiries, the government takes issue with Mr. Dangleben's citation to *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003). (*See* ECF No. 134 at 4-5). Mr. Dangleben did not cite to the ABA Guidelines as binding precedent answering this Court's two questions. Rather, he cited the ABA Guidelines as authoritative statements setting forth the need for learned counsel and the applicable standards for representation in a capital-eligible case. (*See* ECF No. 129 at 4). The filing of the no-seek notice in this case caused Mr. Dangleben to forego appointment of learned counsel, a mitigation specialist, and other experts necessary to prepare a defense consistent with the ABA Guidelines and to proceed with his defense non-capitally.

The ABA Guidelines "do not estop the government from pursuing the death penalty after indicating it would not do so." Mr. Dangleben never asserted they did. This argument is yet another distraction from the Government's failure to offer a single authority affirmatively providing that the Government can change its official and definitive filed notice not to seek the death penalty. (*See id.*)

**III.    The Government's request violates procedural due process, particularly where Mr. Dangleben detrimentally relied on the Government's notice that it would not seek the death penalty.**

A basic element of the procedural due process notice requirement is that all parties know the rules when the proceeding starts and the rules cannot thereafter be changed.[8] The unprecedented step

---

[8]      *Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment, Cent. Region v. Union Pacific R. Co.*, 522 F.3d 746, 752 (7th Cir. 2008) (finding due process violation would occur if party were permitted to create "a new rule previously unknown and unapplied" not only based on "the mandates of due process, but from the fundamental rule of social interaction we all learned on the kindergarten playground. It is unfair to alter the rules of the game mid-play."); *United States v. Pacheco*, 434 F.3d 106, 116 (1st Cir. 2006) (finding violation of fundamental fairness when trial judge violated ruling previously issued in the trial, in its handling of subsequent issues); *Bae v. Peters*, 950 F.2d 469, 478 (7th Cir.1991) (acknowledging that a due process violation can occur if "a last-minute change in

that the Government is asking this court to take, fundamentally violates procedural due process. The Court's decision will influence whether Mr. Dangleben gets to live or must die. The Government asks this Court to create a new rule where one does not currently exist, to the detriment of Mr. Dangleben. Certainly, given the heightened due-process protections required in a death-penalty trial, the rules cannot be changed without violating Mr. Dangleben's constitutional rights.

One of the flaws in the Government's 'logic' is that it presumes that despite its abrupt about-face regarding the death penalty, Mr. Dangleben has not been prejudiced. Throughout its reply, the Government repeats the refrain that the continuance of the trial date either vitiated the death-notice deadline, or otherwise rendered it unenforceable, and a subsequent notice would be timely because there is no currently scheduled trial date. (ECF No. 134 at 4, 5, 6). But the Government ignores the obvious: that had this case proceeded to trial on October 24, 2024, the Trump Administration would not have the ability to reconsider the no-seek. If there was any authority for the ability of the Government to revoke a filed no-seek more than a year after the Court's deadline for §3593 notice, or if the Government had given any indication of its intent to try this unorthodox tactic, Mr. Dangleben would have made different choices.

Throughout the preparation of his defense, Mr. Dangleben detrimentally relied on the Government's February 7, 2024, notice affirmatively stating that it "intends to proceed with either a

---

the charge ... prejudice[s] a defendant's opportunity to defend himself"); *cf. DeJoria v. Maghreb Petroleum Exploration, S.A.*, 935 F.3d 381, 389 (5th Cir. 2019) ("There is a deep irony in allowing DeJoria to contend he was denied due process in Morocco when it was his lobbying efforts that changed the rules of the game midway through the proceedings in the United States.") *Lee County Branch of the NAACP v. City of Opelika*, 748 F.2d 1473, 1480 n. 12 (11th Cir.1984) (observing that "due process ... mandate[s] that when the rules of the game are changed, the players must be afforded a full and fair opportunity to play by the new regulations" (citation and internal quotation marks omitted)). *See also Black v. Romano*, 476 U.S. 606, 621-22 (1986) (Marshall, J., concurring) ("Thus, while the State can define the rules of punishment initially, choosing probation or imprisonment, the State cannot change the rules in the middle of the game."); *cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 424, 432-34 (1982)(concluding that state's failure to "comply with a statutorily mandated [state] procedure" violated due process).

non-capital trial or plea agreement in this matter and will not seek the death penalty for Richardson Dangleben" (ECF No. 47). As part of that preparation, some five months after the Government filed that no-seek notice, undersigned counsel filed an unopposed motion to extend deadlines, including the trial date. (ECF No. 55). At no point before the Court granted that motion (*see* ECF No. 59) did the Government give any indication that it would later claim that the unopposed motion to continue vitiated and indefinitely extended the previous death-notice deadline **and** allowed the Government to reverse its prior no-seek notice. Instead, because the Government had no indication at that point that it would later decide to change its mind – or intention to do so, the Government remained silent.

No competent attorney[9] would continue a declined capital-eligible case if he knew that doing so would expose his client to a re-evaluation of the prior no-seek, particularly with the very real possibility that the next Administration would be led by President Trump, a man obsessed with greatly expanding the use and reach of capital punishment. The motion to continue deadlines filed herein, which would obviously have the effect of continuing the trial date into 2025, was made in full reliance on the Government's no-seek notice.

18 U.S.C. §3005 establishes a statutory right, upon indictment in a death-eligible case, to the "prompt" appointment of two attorneys, of whom "at least 1 shall be learned in the law applicable to capital cases" (hereinafter "Learned Counsel"). The Government's conduct directly resulted in denial of Mr. Dangleben's right to counsel for a critical period of well more than a year.

First, even prior to the Notice of Intent deadline set by agreement of the parties (and then extended by the Court at the Government's request), undersigned counsel was advised that it was highly unlikely the death penalty would be sought. Then, upon Mr. Dangleben's Indictment (the triggering point for statutory appointment), it was immediately apparent that no Special Findings[10]

---

[9]     *See, e.g., Strickland v. Washington*, 466 U.S. 668 (1984).

[10]    "Special Findings" in a death-eligible Indictment allege that the defendant is over 18, and that one or more required intent factors and statutory aggravating factors exists. See Justice Manual, § 9-

were alleged, and counsel for the Government confirmed that it had no interest in seeking the death penalty, and that the case was going to be submitted to DOJ with an "expedited no-seek"[11] request.

Based upon these good faith representations, undersigned counsel made an equally good faith election to await the Government's short deadline for its decision, before commencing the lengthy and costly process of engaging Learned Counsel. Upon the Government's February 7, 2024, Notice confirming that its desire **not** to seek the death penalty was approved and formalized—and in justifiable reliance thereon—undersigned counsel did not request Learned Counsel, and the case has proceeded for over a year in all respects as a non-capital case, without the many well-recognized benefits of effective assistance by Learned Counsel. Denial of this statutory right to counsel is clearly prejudicial.

Although well beyond the limited issue presently before the Court (*i.e.*, whether to grant the Government's request for a stay), a brief overview of the crucial importance of the denial of Learned Counsel for approximately sixteen months is warranted. As noted above, by statute, Learned Counsel must be appointed "promptly".

---

10.090 - Special Findings in Indictments

> When a case has gone through DOJ review and a decision has been made not to seek the death penalty before the return of an indictment charging capital-eligible offenses, the indictment need not contain allegations of special findings concerning relevant facts and factors specified in 18 U.S.C. §§ 3591(a)(2) and 3592(b), (c), or (d). For all other charged offenses subject to the provisions of this Chapter, regardless of whether the United States Attorney or Assistant Attorney General ultimately recommends that the Attorney General authorize seeking the death penalty for the charged offense, the indictment shall allege as special findings: (1) that the defendant is over the age of 18; (2) the existence of the threshold intent factors specified in 18 U.S.C. § 3591(a)(2); and (3) the existence of the statutory aggravating factors specified in, as relevant, 18 U.S.C. §§ 3592(b), (c), or (d).

[11] See Justice Manual, § 9-10.070 - *Expedited Decision Submissions* (describing the process for such "expedited" decisions, including—as here—"**any … case where the United States Attorney … is able to recommend the death penalty not be sought without first receiving input from defense counsel**.")(emphasis added)

Judicial Conference policy requires such timely appointment. See, generally, *Model Plan for Implementation and Administration of the Criminal Justice Act* ("Model CJA Plan"), which "reflects the policies of the Judicial Conference of the United States …" ("Qualified counsel must be appointed in capital cases **at the earliest possible opportunity**," and "**[a]t the outset of every capital case**, the court must appoint two attorneys, at least one of whom meets the qualifications for "learned counsel".)(emphasis added).

The CJA Plan for the District of the Virgin Islands, approved by this Honorable Court as Chief Judge on June 14, 2022, adopted the above Model Plan language verbatim. See also, CJA Guideline § 620.10.10 *Federal Death Penalty Cases* ("As required by 18 U.S.C. § 3005, **at the outset** of every capital case, courts should appoint two attorneys, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases.").

Moreover, both Plans also provide that attorneys appointed in federal capital cases "should comply with the American Bar Association's 2003 *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* and the 2008 *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*." These Guidelines stand as "the defining architecture for any measure of effective performance"[12] of defense counsel, and require that "[i]nvestigation and planning for both phases [of a capital case] **must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty**." Commentary, Guideline 1.1.

In short, there are abundant and substantial reasons why Learned Counsel's duties, responsibilities and assistance are universally contemplated "at the outset", "at the earliest

---

[12]    Russell Stetler. W. Bradley Wendel, *The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation*, 41 Hofstra L. Rev. 635, 696 (2013).

opportunity", or "immediately upon counsel's entry"; and why denial of this right is improper and prejudicial.

When viewed through this lens, the arguments advanced in the Government's Reply lose much of their force. Regardless of whether the optimum term is "misconduct", it is undeniable that the Government is directly and proximately responsible for denial of Mr. Dangleben's statutory right to counsel for an extended and crucial period, and thus, waived (see ECF No. 131) any option to seek reevaluation of its no-seek decision.

## IV.    No exigent circumstances justify the Government's motion to stay.

This Court, in extending the deadline for filing a death notice to February 12, 2024, based on the request of the Government, indicated that it would not further extend the deadline barring exigent circumstances[13] with supporting documentation. The Government acknowledged and complied with that deadline. It took its time, and it made its decision.

The Government argues that exigent circumstances are present here because of the Attorney General's February 5, 2025, Memorandum calling on the Capital Review Committee to review all no-seek decisions made by the Biden Administration in pending capital-eligible cases. (*See* ECF No. 122 at 1-2; *see also* ECF No. 122-1; ECF No. 134 at 7). But even if the AG Memo could be considered an exigency—and it cannot—it is an exigency of the Government's own making.

The law does not allow parties to manufacture exigencies in order to profit therefrom. *See, e.g., Kentucky v. King*, 563 U.S. 452, 460-61 (2011) (discussing the "police-created exigency" doctrine and observing that the police may not manufacture an exigency in order to justify a warrantless search).

---

[13]    "Exigent circumstances" have been defined in relevant part as "circumstances that exist in emergency situations..." The Law Dictionary—featuring Black's Law Dictionary, 2nd Ed. (available at https://thelawdictionary.org/?s=exigent)(last accessed February 25, 2025).

Here, the government of the United States, through the Attorney General, appears poised to change its mind. But a changed mind does not an exigency make. If it did, parties could reverse a multitude of litigation postures based on hindsight, buyer's remorse, or a whim. At best, the Attorney General's memo is a self-created exigency for which the Government is entitled to no relief.

The Government's claim of "good faith participation in scheduling this case and the capital decision process" rings hollow in light of the Government's self-created "exigency" stemming from the Attorney General's simple change of mind. The Government argues that the AG Memo was "unforeseen by the Court and parties" when the initial death notice deadline was imposed. (ECF No. 134 at 7). It is always possible that in the future, a party may second-guess a prior litigation position or even wish it had taken a different position. But the mere fact that one Attorney General or one administration views broad categories of crimes differently than another Attorney General or a previous administration fails to establish exigency—such differences of opinion are commonplace.

## V.    There is no basis for reconsidering the Court's Order of a § 3593 notice filing deadline.

By seeking to revisit its decision not to file a notice of intent to seek the death penalty, the Government is, *sub silentio*, asking the Court to reconsider its Order requiring the Government to file notice of intent to seek the death penalty by February 12, 2024. (*See* ECF No. 46 at 5). As noted, technically, the Government has not filed a motion for reconsideration. But the reality is that the motion for stay is only valid if the Court grants *de facto* reconsideration of its prior order setting February 12, 2024, as the deadline for the Government to file notice of intent to seek the death penalty.

The Government has offered no basis under this Court's local rules authorizing the filing of a motion for reconsideration of the Court's January 25, 2024 Order (ECF No. 46). District Court Rule Crim. Proc. 1.2 provides that "[i]n cases of general procedure not covered by these Rules, the Local

Rules of Civil Procedure shall apply." The Local Criminal Rules do not contain a rule discussing motions for reconsideration, although the Local Civil Rules do. District Court Rule Civ. Proc. 7.3 provides in relevant part:

> MOTIONS FOR RECONSIDERATION
> (a) A party may file a motion asking the Court to reconsider its order or decision. Such motion shall be filed in accordance with LRCi 6.1(b)(3). A motion to reconsider shall be based on:
>> (1) an intervening change in controlling law;
>> (2) the availability of new evidence, or;
>> (3) the need to correct clear error or prevent manifest injustice.
> (b) A motion for reconsideration shall state whether it is based upon LRCi 7.3(a)(1), (2) or (3) and shall concisely identify, without argument, the relevant change in controlling law, the new evidence, or the clear error (as applicable)...
> (c) A motion for reconsideration shall include the following certification by counsel: "I express a belief, based on a reasoned and studied professional judgment, that the grounds for reconsideration set forth above are present in this case."

Construed as a *sub silentio* motion for reconsideration, the Government's motion fails procedurally on two grounds. It fails to "concisely identify, without argument, the relevant change in controlling law, the new evidence, or the clear error (as applicable)." (*See* District Court Rule Civ. Proc. 7.3(b)). Presumably, the Government's silence shows that none of these criteria are applicable. Second, there is no certification of counsel stating that "based on a reasoned and studied professional judgment, that the grounds for reconsideration set forth above are present in this case." (*See* District Court Rule Civ. Proc. 7.3(c)).

Furthermore, contrary to the some of the expressions of the Trump Administration, neither the Attorney General's Memorandum, nor the Presidential Executive Order on which it is based, constitute "an intervening change in controlling law." (*See* District Court Rule Civ. Proc. 7.3(a)(1)). Instead, at most, they represent a change in Department of Justice policy. The Government offers no authority—for good reason—claiming that changes in Executive Branch policy represent "controlling law" binding upon this Court.

Similarly, the Government's motion for stay offers no "new evidence" supporting

reconsideration. (*See* District Court Rule Civ. Proc. 7.3(a)(2)). The motion itself simply cites to the Attorney General's February 5th Memorandum. (ECF No. 122 at 1-2). The Memorandum is a policy statement outlining, *inter alia*, the Administration's view of history, the Administration's view of the preceding Administration, and various changes and announcements of Department of Justice policy. (ECF No. 122-1). The Memorandum provides no "new evidence" of anything.

Finally, the Government's motion for stay makes no mention of "the need to correct clear error or prevent manifest injustice." (*See* District Court Rule Civ. Proc. 7.3(a)(3)). The Government's February 2024 discretionary decision not to seek the death penalty for Mr. Dangleben cannot be said to represent clear error. Nor does, or could, the Government reasonably claim that its own discretionary decision not to seek the death penalty for Mr. Dangleben constitutes a manifest injustice. If convicted as charged, Mr. Dangleben faces life without parole in federal prison. That sentence, as opposed to a potential death sentence, simply does not satisfy the exacting "manifest injustice" standard.

## VI.    The proposed reevaluation is based wholly upon improper political considerations.

There can be little doubt that the blanket reevaluations of all decisions not to seek the death penalty are an integral part of the President's political agenda. Highly aggressive and unprecedented expansion of the federal death penalty has been a major policy strategy since **literally** day one of the President's most recent campaign, including calling for the death penalty for drug dealers.[14] His extreme position on the death penalty was one of the centerpieces of his campaign.[15] It is also quite

---

[14] *See* https://www.c-span.org/clip/campaign-2024/former-president-trump-calls-for-death-penalty-for-drug-dealers/5041276 (last accessed March 3, 2025).

[15] *See, e.g.,* https://truthout.org/articles/trump-is-planning-his-2024-campaign-around-expanding-the-death-penalty/ **and** https://www.c-span.org/clip/campaign-2024/donald-trump-calls-for-death-penalty-for-murder-of-police-officers/5117798 **and** https://www.theguardian.com/us-news/2024/oct/14/death-row-capital-punishment-trump-election **and**

telling that Executive Order 14164 reads more like a partisan press release than a proper exercise of the President's core duties to "take care that the laws be faithfully executed" and "uphold the U.S. Constitution". U.S. Const., Art Article II, § 1, cl 7, and § 3.  Among other things, the Order established "… the policy of the United States … **to counteract the politicians and judges who subvert the law by obstructing and preventing the execution of capital sentences**." (Emphasis added)

Despite the compelling evidence of Trump's political agenda, there is—or perhaps was[16]—a voice shouting into the wind:

> "No one should be prosecuted for political purposes. Absolutely not."

Attorney General Pam Bondi, sworn testimony at Senate Confirmation hearing, January 2025.[17]  Yet here we are.

Courts have acknowledged the special applicability of this apolitical principle in capital cases.[18]  The American Bar Association's *Criminal Justice Standards for the Prosecution Function* § 3-4.4(b) (4th ed. 2017), concurs:

> "[i]n exercising discretion to file and maintain charges, prosecuting attorneys **should**

---

https://www.abajournal.com/news/article/trump-wants-to-expand-the-death-penalty-to-include-these-crimes (last accessed March 3, 2025).

[16] In June 2024, then-Attorney General Merrick Garland clarified that "partisan politics play no role in the decisions of federal investigators **or prosecutors** regarding any investigations or criminal charges" *Memorandum for all Department Employees*, Attorney General Merrick Garland, June 24, 2024. That policy had been in full force and effect all throughout the Trump I Administration. *U.S. v. Williams*, No. 20-55, 2020 U.S. Dist. LEXIS 142030, at *11 n.7 (E.D. La. Aug. 10, 2020) ("Counsel for the government confirmed during oral argument that this policy remains applicable today.").

[17] *See* https://www.usatoday.com/story/news/politics/elections/2025/01/15/trump-picks-face-senate-confirmation-hearings/77703322007/ (last accessed March 3, 2024).

[18] See, *e.g., Thomas v. State*, 122 Nev. 1361, 1374, 148 P.3d 727, 736 (2006) ("This court has indicated that the decision to seek the death penalty is a matter of prosecutorial discretion, to be exercised within the statutory limits … and reviewable for abuse of that discretion, such as when the intent to seek the death penalty is not warranted by statute **or is improperly motivated by political considerations** or race, religion, color, or the like.")(emphasis added); *State v. Cummings*, 361 N.C. 438, 472, 648 S.E.2d 788, 808 (2007) (emphasis added) ("The Death Penalty Review Team considered multiple factors in its decision, but **none of those factors included racial or political considerations**."); *Young v. Ninth Judicial Dist. Court*, 107 Nev. 642, 818 P.2d 844, 849 (1991)("We are not persuaded that requiring prima facie evidence of a prosecutor's **improper political purpose in seeking the death penalty** will impermissibly chill the high level of advocacy expected from the death penalty bar.").

**not consider partisan or other improper political** or personal considerations"
*ABA Criminal Justice Standards for the Prosecution Function* § 3-4.4(b) (4th ed. 2017)(section
addressing *Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges*).

Nevertheless, it cannot be denied that "the politicization of the death penalty has a long
history" in this Nation. COLUMN: PERSPECTIVE, 44 Champion 44, 44 (2020). The "politicization
of the death penalty" as a start to this new administration perhaps comes as no surprise, since "…the
Federal Government…executed more than three times as many people in the last six months [of
President Trump's first term] than it had **in the previous six decades**." *United States v. Higgs*, 141
S.Ct. 645, 647 (2021)(Sotomayor, J., dissenting)(emphasis added).

Abundant evidence exists that improper political considerations have already, and will
continue to, infect the Trump Administration's reevaluation of no-seek decisions made under the
Biden administration, including Mr. Dangleben's.

## VII.    This political reevaluation is arbitrary and capricious.

Eighth Amendment jurisprudence prohibits the death penalty from being imposed arbitrarily.
*Lewis v. Jeffers*, 497 U.S. 764, 782 (1990)(noting "the Eighth Amendment's bedrock guarantee against
the arbitrary or capricious imposition of the death penalty.") The Federal Death Penalty Act provides
that any death sentence "imposed under the influence of passion, prejudice, **or any other arbitrary
factor**" must be reversed. 18 U.S.C. § 3595 (emphasis added). *See also*, Justice Manual § 9-10.030
("[A]rbitrary or impermissible factors … will not inform any stage of the decision-making process.")

"Arbitrary" decisions include those which "depend on individual discretion," are "founded on
prejudice or preference rather than on reason or fact," or "involv[e] the unrestrained exercise of will."
*Black's Law Dictionary* (12th ed. 2024). By definition, this case is one in which a previous iteration of

the government determined that the death penalty was not "justified,"[19] and therefore the attempted change of this position falls within one or more of the above categories of arbitrary decision-making. Moreover, counsel has been unable to unearth a single case in the thirty-year history of the Federal Death Penalty Act, in which an Attorney General has ever walked back a formal no-seek announcement. To permit the Government to start with Mr. Dangleben would be "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman v. Georgia*, 408 U.S. 238, 309 (1972)(Stewart, J., concurring).

To whatever extent the current President contends that his radical death penalty agenda reflects the "mandate" or "will of the people" expressed by virtue of his election, the utter arbitrariness inherent therein is found in the fact that a mere four years earlier, the "mandate" or "will of the people" was equally expressed by the election of Joe Biden, whose campaign promised he would **end** the federal death penalty.[20]

The further politicization of the Department of Justice has injected further arbitrariness into the Government's proposed reevaluation of no-seeks. Noted constitutional scholar Alan Dershowitz recently commented on the "impossible" job of an Attorney General, "because it merges both a political job requiring loyalty [to the President] with a prosecutorial job requiring complete objectivity, and no human being is capable of doing that."[21] The difficulty observed by Professor Dershowitz is of particular concern as to Attorney General Bondi. In her efforts to ease those concerns and secure

---

[19]    The Federal Death Penalty Act provides for capital prosecution only when "the attorney for the government believes that … a sentence of death *is justified*" 18 U.S.C. § 3593 (emphasis added).

[20]    See, *e.g.*, <u>Federal Death Penalty: What Happens Under Joe Biden? | TIME</u> ("Biden pledged on the campaign trail to work to pass legislation eliminating the federal death penalty and 'incentivize states to follow.'")(https://time.com/5932811/death-penalty-abolition-joe-biden/)(last accessed March 3, 2025).

[21]    *See* https://www.msn.com/en-us/news/politics/trump-defenders-poised-to-go-on-offense-at-doj/ar-AA1uEOAJ?ocid=msedgntp&pc=U531&cvid=516866d3a73e4fb28e5340fa9890967c&ei=34 (last accessed March 3, 2025).

the Senate's Advice and Consent, she promised that:

> "The Justice Department must be independent and must act independently", and DOJ's "number one job is to enforce the law fairly and evenhandedly."[22]

"A determination to pursue a capital prosecution is among the most momentous decisions prosecutors must make. Capital cases involve the severest form of punishment available under the law and have profound consequences …" Justice Manual, § 9-10.140. See also, Attorney General Memo, February 5, 2025 ("determining whether to seek death sentences for certain federal crimes … is among the Department's most serious and solemn responsibilities."). The Supreme Court held:

> … there can be no doubt that the decision to pursue the death penalty is a critical choice in the adversary process. Indeed, after a defendant is charged with a death-eligible crime, whether to ask a jury to end the defendant's life is **one of the most serious discretionary decisions a prosecutor can be called upon to make**.
>
> … The importance of this decision and the profound consequences it carries make it evident that a responsible prosecutor would deem it to be **a most significant exercise of his or her official discretion and professional judgment**. (emphasis added)

*Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016). But quite to the contrary, this administration's unprecedented Executive Orders and AG Memoranda make clear that the President's singular "mission" to "strengthen the death penalty" is the **only** consideration which matters. The concern of improper and arbitrary political considerations infecting these prosecutorial decisions is particularly astute based on the facts of this case where, based on the President's own words, the death penalty *shall* be sought, "regardless of other factors,"[23] eliminating the discretion required by law.

## VIII.  This Court has inherent authority to order the Government to make a § 3593 determination by a date certain

---

[22]     Nomination of Pamela Jo Bondi to be Attorney General of the United States, S. Comm. on the Judiciary, 119th Cong. (Jan. 15, 2025).

[23]     *See*, Executive Order 14164. *See also, Orangetown v. Ruckelshaus*, 740 F.2d 185, 188 (2nd Cir. 1984) ("To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute.")

The Government's proposed reevaluation of its position flies directly in the face of Judicial Conference policy strongly favoring a death penalty authorization process which proceeds expeditiously. The CJA Guidelines "represent the guidelines of the Judicial Conference of the United States", which is "the policymaking body for the federal courts." *Governance & the Judicial Conference | United States Courts (uscourts.gov)*. Chapter 6 addresses *Federal Death Penalty and Capital Habeas Corpus Representations*, and Guideline § 670 confirms the Court's authority and duty to set a deadline for the "filing of a notice under 18 U.S.C. § 3593(a) that the government will seek the death penalty, or notification to the court and the defendant that it will not."[24]

The Court's Order was certainly within the proper scope of its authority and remains unchallenged by the government.[25]

As one District Court recently recognized:

> … there are few choices, perhaps none, that could more thoroughly upend a district court's efforts to manage a trial than a late-breaking decision to seek the death penalty. Because that decision has so many weighty consequences for a trial, district courts must have authority to prevent the disruption that an untimely disclosure would create.

*United States v. Yandell*, No. 2:19-cr-00107-KJM, 2023 U.S. Dist. LEXIS 187189, at *12 (E.D. Cal. Oct. 17, 2023).

The Court's inherent power naturally extends—as it should here—"to ensure obedience to

---

[24] *See* https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-25 (last accessed March 3, 2025).

[25] See, *United States v. Rivas-Moreiera*, No. 1:22-CR-27, 2023 U.S. Dist. LEXIS 243503, at *4 (E.D. Tex. Oct. 7, 2023) ("the court has the inherent power to manage its own docket, including the timing of the Government's filing of its notice of intent to seek the death penalty under 18 U.S.C. § 3593(a).") (citing cases). *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013) ("[S]uch a deadline simultaneously acts as a backstop guaranteeing capital defendants a reasonably speedy process."); *United States v. Colon-Miranda*, 985 F. Supp. 36, 40 (D.P.R. 1997)(government's request to seek the death penalty denied because Court "will not permit the government's confusion, vacillation or strategy to delay unnecessarily this trial or unduly prejudice the defendants."). *Accord*, *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013) ("[T]he timing of the government's death notice directly implicates both the Court's administrative concerns and a defendant's legally guaranteed rights.").

[its] orders." *United States v. Grace*, 526 F.3d 499, 509 (9th Cir. 2008). As another Court observed in a death-eligible case, "[t]he Court has the inherent authority to set such a deadline **and to enforce it**, as it will surely do in this case." *United States v. Hernandez*, 265 F. Supp. 3d 639, 639-40 (D. Md. 2017) (emphasis added).[26]

## IX.    Given all the preceding, reversing the "no seek" for Mr. Dangleben's would be unconstitutional.

The reality is that had Mr. Dangleben pled guilty any time prior to January 20, 2025, he would not have faced the potential of the death penalty. He thus finds himself among those similarly charged who have asserted their constitutional right(s) to 1) trial and/or 2) the time for effective assistance of counsel. That the Administration now seeks to punish his exercise of his constitutional rights is a "trial penalty" of the most extreme kind and presents constitutional and fundamental fairness issues.[27]

"[E]xecution is the most irremediable and unfathomable of penalties", *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and in many significant ways (as set forth herein), "there is no doubt that [d]eath

---

[26]    *See also, Henry v. ExamWorks Inc.*, No. 20-12268, 2021 U.S. App. LEXIS 23345, at *10 (11th Cir. Aug. 6, 2021) ("[T]o ensure the orderly administration of justice, [a district court] has the authority and responsibility to set and enforce reasonable deadlines."); *R&T Roofing Contractor v. Fusco Corp.*, No. 15-2955 (GAG), 2017 U.S. Dist. LEXIS 101223, at *3 (D.P.R. June 27, 2017) ("The authority to set deadlines entails the authority to enforce deadlines."

[27]    *See generally, United States v. Jackson*, 390 U.S. 570, 582 (1968) (death penalty which only applied if a defendant went to trial was unconstitutional, because "[w]hatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights."); *State v. Johnson*, 134 N.H. 570, 575, 595 A.2d 498, 501-02 (1991) ("It is well settled that a statute cannot permit a defendant who insists upon a jury trial and is convicted of capital murder to be sentenced to death, while allowing a defendant who pleads guilty to the same crime to escape the possibility of such a sentence. Such a selective death penalty provision needlessly chills the defendant's right to assert his or her innocence, as well as the accompanying right to a jury trial, under both our State Constitution and the Federal Constitution."). *See also, United States v. Sims*, No. 3:98-cr-45, 2021 U.S. Dist. LEXIS 78840, at *13 (E.D. Va. Apr. 23, 2021) (reducing a life sentence imposed upon a defendant who refused to plead guilty because it was "the result of … the most extreme trial penalty the judicial system can impose on a defendant who exercises his constitutional right to a trial and to hold the government to its burden of proof"); *United States v. Smith*, No. 00-00199-CR-WILLIAMS, 2024 U.S. Dist. LEXIS 232998, at *7-8 (S.D. Fla. Dec. 20, 2024) (same) (citing *Sims*).

is different"[28]. *Ring v. Arizona,* 536 U.S. 584, (2002). In *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991), the Supreme Court explained that because "death is different", it had "imposed protections that the Constitution nowhere else provides".

At its essence, it is "fundamentally unfair", "shocks the conscience", "offends traditional notions of fair play and substantial justice"[29] as well as "evolving standards of decency that mark the progress of a maturing society,"[30] to first tell an accused that the sovereign may seek his/her execution; then formally advise him/her the sovereign has decided his/her life will be spared; then attempt to reverse that official position by saying. "we actually need more time to think about, but we've probably changed our mind". As succinctly stated by Judge Otis Wright of the Central District of California:

> I'm going to say this for the last time. You can't tell people that this form of punishment is off the table so that they can now sleep again and then change your mind and go, "It's back on again" **No.**

*United States v. Cruz Hernandez,* et. al., 2:19-cr-00117-ODW, Trans. of Aug. 12, 2024, Motions Hearing (ECF No. 1248), at 13.

The fundamental fact that "Death is Different" means that there are judicially recognized impacts of the government's decision-making in the § 3593 context. Mr. Dangleben will be subject to unfair prejudice if the Court allows the government to reconsider its decision not to seek death. In *United States v. Green*, 2018 U.S. Dist. LEXIS 21074 *; 2018 WL 786185 (2018), the District Court recognized "the unique anxiety and concern that comes with the looming prospect of the death-

---

[28]    *See also*, *Beck v. Alabama*, 447 U.S. 625 (1980)("As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments"), <u>*Loving v. United States (Loving II)*</u>, 62 M.J. 235, 236 (C.A.A.F. 2005) ("'Death is different' is a fundamental principle of Eighth Amendment law").

[29]    "As interpreted by this Court, the Due Process Clause of the Fourteenth Amendment may be violated by conduct that offends traditional notions of 'fair play and substantial justice,' *Shaffer v. Heitner*, 433 U.S. 186, 207, 212 (1977), or that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 (1952). *Carlson v. Green*, 446 U.S. 14, 46 n.12, 100 S. Ct. 1468, 1486 (1980), Rehnquist, dissenting

[30]    *Atkins v. Virginia*, 536 U.S. 304, 312 (2002).

penalty" and explained it was "a prejudice not easily measurable **and one absent in the majority of criminal cases**." *Id*, at 33.[31] In affirming dismissal on Speedy Trial grounds, the Second Circuit found it significant that the defendants "… were forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives. **The magnitude of the anxiety and concern incurred by this decision is great**, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees." *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) (emphasis added).[32]

Here, the prejudice is even **more** pronounced than a situation where the Government drags its feet and takes its time to make a determination as to whether to seek the death penalty. Mr. Dangleben's understandable anxiety and concern was definitively addressed **and relieved**—the United States formally announced that it would **not** be seeking the death penalty. Moreover, Mr. Dangleben eschewed his statutory right to learned counsel in reliance on the government's representation that it would pursue and expedited no-seek, which was confirmed by the government's filing that it would not be seeking the death penalty. For those same reasons, Mr. Dangleben has not pursued a comprehensive mitigation investigation, as is called for under the ABA Guidelines in capital cases. Like in *Green/Black*, the above considerations "weigh heavily" against permitting the Government to subject Mr. Dangleben and his loved ones to the further "prejudice" of arbitrarily walking back its no-seek decision.

---

[31]    The Court observed that "Defendants sat knowing the government could seek their executions, but not knowing if it would. The anxiety and concern attendant to such circumstances is real and material, as it is exactly the type of toll the speedy-trial guarantee was intended to protect against."

[32]    *See also*, *Esperti v. Wainwright*, 447 F. Supp. 1289, 1295 (M.D. Fla. 1978)(Although the petitioner has not asserted any special anxiety or concern … it is doubtless that one facing a possible death penalty would have to be greatly concerned about the outcome of the trial."); *United States v. Ghailani*, 751 F. Supp. 2d 515, 533 (S.D.N.Y. 2010)("Anxiety of that sort would constitute prejudice for speedy trial purposes."); *United States v. Avalos*, 541 F.2d 1100, 1115 (5th Cir. 1976)(distinguishing case from "a capital case, where the anxiety would justifiably be more severe").

## X.    Conclusion

The Government's final words (ECF No. 134 at 7) go well beyond the narrow issue now pending before the Court—whether the Government should be granted a stay of the proceedings to permit the arbitrary reevaluation of all Biden administration no-seek decisions. It also inserts red herrings into the pending issue(s). As discussed above, due to a formal announcement by the prosecution (pursuant to a validly ordered deadline), this case has proceeded for over a year as—and currently remains—a non-capital case. Denial of the requested stay to reevaluate that determination is neither "draconian", nor a "sanction". Rather, it is simply a well-justified exercise of the Court's unquestioned "inherent authority" to control its docket and uphold its prior unchallenged Order setting a Notice deadline.

For the reasons set forth herein, the Government's motion for a 120-day stay of proceedings should be denied and this case should proceed in its current non-capital posture.


Dated:  March 10, 2025                    Respectfully submitted,

                                          MATTHEW CAMPBELL
                                          FEDERAL PUBLIC DEFENDER

                                          _s/ Matthew Campbell_____
                                          MATTHEW CAMPBELL
                                          Federal Public Defender's Office
                                          1336 Beltjen Road, Suite 202
                                          Charlotte Amalie, VI 00802
                                          Tel (340) 774-4449
                                          Fax (340) 776-7683
                                          E-mail: Matt_Campbell@fd.org

                                          _s/ Allison Ferber Miller_____
                                          ALLISON FERBER MILLER
                                          _Learned Counsel_
                                          5619 2nd St. S.
                                          Arlington, VA 22204
                                          Tel (321) 945-7615
                                          E-mail: allisonferbermiller@gmail.com