**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
SAINT THOMAS DIVISION**

| | |
|---|---|
| United States of America | |
| *Plaintiff,* | Criminal No. 3:23-0072-RAM-GAT |
| v. | |
| Richardson Dangleben, Jr. | |
| *Defendant.* | |

### Motion to Strike the Government's Notice of Intent to Seek the Death Penalty

Richardson Dangleben, Jr., moves this Court to strike the Government's Notice of Intent to Seek the Death Penalty (ECF No. 159) for the following reasons:

## I.    Introduction

The Government's May 21, 2025 Notice of Intent to Seek the Death Penalty (hereinafter, "Death Notice")—filed fifteen months after formally informing this Court, Mr. Dangleben, and his appointed counsel that the Government would *not* seek the death penalty (ECF No. 47) and one day after this Court set an October 6, 2025 trial date and 137 days before that trial date—is an affront to fundamental constitutional, statutory, and equitable principles.  As discussed below:

- The Government's Death Notice was untimely under this Court's validly established deadline for the filing of any notice to pursue death in this case, and no grounds exist to support extending or reconsidering that deadline.

- The operative statute, 18 U.S.C. § 3593(a), does not permit the Government to seek the death penalty after filing a prior formal notice that the Government was not seeking the death penalty.

- Even if it had authority to reverse its February 7, 2024 decision not to seek the death penalty, the Government is unable to satisfy: (a) the statutorily-required showing of good

1

cause to amend,[1] (b) the requirement that any notice to seek death be filed "a reasonable time before the trial," or (c) this Court's equitable powers and inherent authority to administer its docket, and this Court's authority to administer the defense function under 18 U.S.C. §§ 3005, 3599.

- The Government both waived its right to seek the death penalty and is estopped from seeking the death penalty under the circumstances of this case.

- It would violate due process, equal protection, and the Eighth Amendment to permit the Government to seek the death penalty.

Just as the two courts recently did in *United States v. Spurlock*, No. 3:23-cr-00022, __F. Supp.3d __, 2025 WL 1360499 (D. Nev. May 9, 2025) and *United States v. Constanza-Galdomez*, No. 1:22-cr-409 at ECF No. 130 (D. Md. June 18, 2025),[2] this Court should strike the May 21, 2025 Death Notice and prohibit the Government from seeking the death penalty against Mr. Dangleben.[3]

## II.     Background

### A.     The Alleged Offense Conduct

According to the allegations in the superseding indictment, on July 4, 2023, Mr. Dangleben engaged in violent acts culminating in the murder of Virgin Islands Police Department Officer Delberth Phipps, Jr. The indictment also alleged several violent acts against Virgin Islands Police

---

[1] Mr. Dangleben presents this argument only in the alternative, and strongly asserts that 18 U.S.C. § 3593(a), does not permit the Government to seek the death penalty after filing a prior formal notice that the Government was not seeking the death penalty. Nevertheless, assuming *arguendo*, that if reversing a no-seek notice could ever be allowed, Mr. Dangleben asserts that a showing of extraordinary circumstances would need to be shown to do so, or in the alternative, good cause.

[2] Because the court only decided *Constanza-Galdomez* yesterday, that memorandum opinion is not yet available in the Federal Supplement or via Westlaw.

[3] If this initial Motion to Strike is denied, the defense reserves the right to file a Second Motion to Strike that would raise all available additional challenges to the Death Notice, the death penalty, and his prosecution at a future date. This motion is filed as expeditiously as possible after the Government's filing of the Death Notice. This motion focuses on the legal infirmities of that notice strictly as they relate to the timing thereof and the Government's attempt to withdraw its prior no-seek notice. Mr. Dangleben reserves additional arguments regarding other aspects of the Death Notice—for example, a facial challenge to the death penalty or challenges to the specific content of the notice—until the Court resolves the threshold issues raised herein.

Department Officer Shahim Skeete, as well as firearm possession during crimes of violence and a drug trafficking offense. (*See generally* ECF No. 152).

### B.    Relevant Events Between July 2023 and January 2025

On July 7, 2023, the Government filed a complaint charging Mr. Dangleben with first-degree murder of a Virgin Islands police officer and possession of a firearm with a removed, obliterated, or altered serial number. (ECF No. 1). That same day, the court appointed the Federal Public Defender for the District of the Virgin Islands, Matthew Campbell, Esq., as the sole attorney representing Mr. Dangleben. (ECF No. 6).

On October 13, 2023, a grand jury returned a thirteen-count indictment charging Mr. Dangleben with multiple federal and territorial offenses. (ECF No. 24). Count One charged him with using a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j)(1). Because the underlying crime of violence alleged in Count One is first-degree murder, this charge is an offense for which the defendant may be sentenced to death if found guilty. *See* 18 U.S.C. § 3591(a). However, the indictment did not allege any of the "special findings" required where the Government intends to seek the death penalty. *See* 18 U.S.C. §§ 3591(a), 3592(b), (c), or (d); *see also* U.S. Dept. of Justice, *Justice Manual*, § 9-10.090; *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (aggravating factors operate as the functional equivalent of an element of a greater offense and thus Sixth Amendment requires that they be found by a jury).

At some point between the filing of the indictment and the arraignment, held twelve days later, defense counsel asked Assistant United States Attorney Michael Conley whether his office planned to request approval to seek the death penalty, and was told that no such recommendation would be made. (*See* ECF No. 146-1 at 2–3; *see also* ECF No. 145 at 25–26 (AUSA Conley confirming that he had "made it clear" to defense counsel that his office was pursuing an expedited "no-seek" decision

from the Department of Justice[4] and anticipated that the no-seek would be forthcoming)). Based on this representation, FPD Campbell did not request the appointment of Learned Counsel under 18 U.S.C. § 3005, which establishes a statutory right, upon indictment in a death-eligible case, to the "prompt" appointment of two attorneys, of whom "at least 1 shall be learned in the law applicable to capital cases" (hereinafter, "Learned Counsel").[5] (*See* ECF No. 146-1 at 8).

At a November 8, 2023 status conference, defense counsel requested that the Court set a sixty-day deadline by which the Government had to formally notice whether it intended to seek the death penalty, as required by 18 U.S.C. § 3593(a). The Government agreed with the request and did not object to the timing. (ECF No. 46 at 2).

On November 16, 2023, the Court issued an order stating: "[t]he Government SHALL file any notice pursuant to 18 U.S.C. §3593(a) no later than January 12, 2024." (ECF No. 35 (emphasis in original)). On November 22, 2023, the Court designated the case as complex and adopted a joint proposed scheduling order setting various dates, including a new trial date of October 28, 2024.[6] (ECF No. 38).

On January 12, 2024, the Government filed a motion seeking an extension of time to February 12, 2024, to file any notice of an intent to seek death. (ECF No. 40). Mr. Dangleben opposed that extension of time for lack of good cause. (ECF No. 43 at 1–2). While noting that the Government

---

[4] The Justice Manual provides an expedited process for decisions not to seek the death penalty in a case alleging capital charges; there is no correspondent process for expediting a decision to pursue death. *See* U.S. Dept. of Justice, *Justice Manual*, § 9-10.070 (describing the process for such "expedited" decisions, including—as here—"any . . . case where the United States Attorney . . . is able to recommend the death penalty not be sought without first receiving input from defense counsel").

[5] Federal Public Defender Matthew Campbell does not qualify as Learned Counsel as, prior to the filing of this case, he had not represented clients in capital cases since 2007.

[6] Additionally, that order set the discovery deadline on January 12, 2024, the deadline for expert disclosures on June 3, 2024, the deadline for motions on June 29, 2024, the deadline for pretrial briefs on October 18, 2024, and the deadline for electronic exhibits on October 23, 2024. (ECF No. 38 at 3–4).

had "acquiesce[ed] to the January 12, 2024 notice deadline, which 'had the practical effect of ratifying the reasonableness of the deadline imposed,'" the Court granted the Government's motion on January 25, 2024. (ECF No. 46 at 3 (quoting *United States v. Ponder*, 347 F. Supp. 2d 256, 270 (E.D. Va. 2004))). It issued a revised order stating: "[A]ny notice pursuant to 18 U.S.C. § 3593(a) SHALL be filed no later than February 12, 2024; and it is further ORDERED that **no further request to extend the notice deadline SHALL be entertained absent exigent circumstances and supporting evidence**." (*Id.* (emphasis added)).

On February 7, 2024, the Government filed its notice of intent not to seek the death penalty, conclusively confirming AUSA Conley's earlier representation that an expedited no-seek would be forthcoming. (ECF No. 47). Continuing to rely on the Government's representation, now formalized in the notice, counsel for Mr. Dangleben did not seek the appointment of a second, Learned Counsel, a mitigation specialist or any capital-type experts, and did not thereafter undertake any mitigation investigation.[7] (*See* ECF No. 146-1 at 5).

At the time the Government filed its no-seek notice, the deadlines to conclude discovery, disclose expert reports, and file substantive motions, were January 12, 2024, June 3, 2024, and June 29, 2024, respectively, and the aforementioned October 28, 2024 trial date remained effective. (*See* ECF No. 38). Both parties subsequently requested extensions to conclude fact discovery, expert disclosures, filing of substantive motions, and the scheduling of jury selection and trial. (*See generally* ECF Nos. 50, 55, 86, 93, and 94). After a status conference on November 7, 2024, the Court rescheduled an omnibus hearing on all pending motions from January 15–16, 2025, to March 11–12, 2025, and continued the jury selection and trial without date. (*See* ECF No. 90).

---

[7] The *Justice Manual* makes a clear distinction between an expedited decision *not* to seek death and a non-expedited death penalty authorization decision, requiring a submission from the defense only in the latter instances. See *Justice Manual*, § 9-10.070 and 9-10.080. *See also* footnote 3, *supra*.

### C.    Relevant Events Between January 20, 2025, and the Filing of this Motion

On February 12, 2025—more than a year after (a) the Court's deadline for a notice of intent to seek the death penalty had expired and (b) the Government filed its no-seek notice—the Government moved to stay these proceedings for at least 120 days to "permit the Attorney General's Capital Review Committee to review the no-seek decision in this capital-eligible case." (ECF No. 122 at 2). Beyond stating the reason for the requested stay, the motion failed to address the standard applicable for such a motion.

The Government's motion was prompted by a change in administrations, an event that occurs every four or eight years in the United States but had never resulted in the Government's attempt to reverse itself on a death penalty authorization question. . President Trump was sworn in on January 20, 2025. That same day, he issued an Executive Order, "Restoring the Death Penalty and Protecting Public Safety."[8] Among other things, that order stated: "[T]he Attorney General shall, where consistent with applicable law, pursue Federal jurisdiction and seek the death penalty regardless of other factors for every federal capital crime involving . . . [t]he murder of a law-enforcement officer."[9]

Second, on February 4, 2025, Pamela Bondi was confirmed by the Senate to be U.S. Attorney General. On February 5, 2025, Attorney General Bondi issued a memorandum to attorneys in the Department of Justice, "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions" (hereinafter, "Bondi Memorandum").[10] Among other things, that memorandum, consistent with President Trump's Executive Order, provides that: "Absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving the murder of a law-enforcement officer." *Id.; see also id.* ("The murder of a law-enforcement officer, or a capital

---

[8]   The executive order is available at:   https://www.whitehouse.gov/presidential-actions/ 2025/01/restoring-the-death-penalty-and-protecting-public-safety/.
[9] *Id.*
[10] That memorandum is available at: https://www.justice.gov/ag/media/1388561/dl?inline.

6

crime by an alien illegally present in the United States, are the types of aggravating circumstances that, absent significant mitigating circumstances, will warrant the Department seeking the death penalty. *See* 18 U.S.C. §§ 3592(c)-(d).”). Her memorandum also stated:

> The Attorney General's Capital Review Committee is directed to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate.

*Id.*

Mr. Dangleben filed motions requesting a continuance of the omnibus hearing and, for the first time, sought the appointment of Learned Counsel in order to oppose the Government's motion for stay. (ECF Nos. 126, 127). To properly and thoroughly address the Government's stay request, the Court continued all hearings, appointed Learned Counsel, and required the parties to submit briefing on the Government's request for a stay. (ECF Nos. 131, 132, 133, and 136). After initial briefing, the Court held a status conference on March 12, 2025, to discuss the stay motion. (ECF No. 141). The parties then filed supplemental briefs. (ECF Nos. 146, 148). Additionally, at the invitation of the Court (*see* ECF No. 145 at 41), FPD Campbell filed a declaration stating, inter alia, that he would not have moved to extend the deadlines for motions and expert disclosures—which had the practical effect of delaying the October 28, 2024 trial date—“had [he] thought that continuing those deadlines could lead to reversal of the no-seek notice,” (ECF No. 146-1 at 6). The declaration also stated that, because “[a]t no time between February 7, 2024 and January 19, 2025 did [G]overnment counsel communicate any intent to seek the death penalty,” FPD Campbell had not sought the appointment of Learned Counsel or pursued any mitigation investigation. (*Id.* at 8). Had the Government indicated, “at any time between July 7, 2023 and February 5, 2025” that it “was considering recommending the death penalty for Mr. Dangleben or reversing its no-seek notice,” FPD

Campbell "would have immediately sought the appointment of [L]earned [C]ounsel and taken necessary steps to conduct a thorough mitigation investigation." (*Id.*)

On April 7, 2025, undersigned counsel filed a letter responding to an invitation to meet with the Attorney General's Capital Review Committee. (ECF No. 150-1). In that letter, Mr. Dangleben maintained that it was not legally permissible for the Government to reverse its position as stated in its prior no-seek notice by filing a new notice of intent to seek the death penalty over a year later, but nevertheless agreed to attend the meeting in Washington, D.C. with the Committee on April 28, 2025. (*Id.*)

Twelve days before that meeting took place, the prosecution sought and obtained a superseding indictment which: (a) added a drug trafficking predicate to Count One (which charges a violation of 18 U.S.C. § 924(j) and is the only death-eligible count), and (b) added seven special findings pursuant to 18 U.S.C. §§ 3591, 3592.[11]

The meeting between defense counsel and the Capital Case Review Committee occurred on April 28, at which undersigned counsel argued that this case should remain a non-capital case. However, Learned Counsel was not appointed until February 24, 2025 (ECF No. 133), and did not receive her first "seed budget" until April 15, 2025, (*see* ECF No. 151). The seed budget, which was approved by both the Chief Judge of the District Court of the Virgin Islands and the Chief Judge of the United States Court of Appeals for the Third Circuit, was designed to allow newly-appointed Learned Counsel to familiarize herself with the case before submitting a "formal case budgeting proposal." Its authorization of attorney hours for Learned Counsel was limited to only 150 hours, and

---

[11] That the Government sought and obtained a superseding indictment for the specific purpose of adding aggravating circumstances supporting the death penalty *before* undersigned counsel's meeting with the Attorney General's Capital Review Committee casts doubt upon the Government's sincerity in offering that meeting at all and supports the conclusion that the Government's mind was made up well before undersigned counsel arrived in Washington, D.C.

it authorized a mitigation specialist to be retained for 100 hours of work. (ECF No. 151). Clearly, a comprehensive mitigation investigation as contemplated by the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter, "ABA Guideles")[12] was not intended to be completed within those limited number of hours. Nor could one be performed in the thirteen days before that budget was approved and the April 28, 2025 meeting with the Capital Case Review Committee took place.

Two weeks passed after that meeting. During that time, Government counsel had no contact with undersigned counsel regarding the presentation, the deliberative process of the Capital Case Review Committee, or when a decision might be reached. On May 13, 2025, Mr. Dangleben filed a motion to calendar an omnibus hearing.[13] (ECF No. 153).

On May 16, 2025, this Court issued a memorandum opinion denying the Government's motion to stay proceedings. (ECF No. 154). The Court observed that "[t]he Government has provided little to no evidence to support its request for a stay of proceedings." (*Id.* at 7). It also stressed that the February 12, 2024 deadline for filing any notice of an intent to seek death had expired and "seriously question[ed]" whether the Government could "withdraw or amend" its prior no-seek decision, although the Court did not answer that question because "no such request ha[d] been made by the Government." (*Id.* at 7–9 & n.7).

Four days later, the Court held a telephonic status conference and, with the agreement of the parties, calendared the omnibus motions hearing for July 23–25, 2025 and trial to begin October 6, 2025. (ECF No. 158).

---

[12] The duties imposed on capital counsel by the ABA Guidelines are discussed in detail below. *See infra* § III.B.3.
[13] The Government did not oppose scheduling an omnibus hearing as a general matter, although the Government did oppose calendaring that hearing before the week of August 4, 2025. (ECF No. 153).

The following day, without any accompanying motion and without even acknowledging the Government's February 7, 2024 no-seek notice or the long-expired court-ordered deadline for a notice to seek death, the Government filed its Death Notice. (ECF No. 159). That notice was filed 464 days after deadline to file such notices and 469 days after the Government filed its no-seek notice. Further, that notice was filed only 62 days before the omnibus hearing and only 137 days before the trial date.

## III.    Legal Argument

For many independent reasons, this Court should strike the Government's May 21, 2025 Death Notice with prejudice to refiling any additional such notice under 18 U.S.C. § 3593(a).

### A.    The Government's Death Notice Violates this Court's Order Setting a Deadline to Declare the Government's Intent to Seek Death.

Relief here is straightforward. This Court had the authority to set and did set a deadline by which the Government was required to provide notice of its decision as to whether it would seek the death penalty in this case. The Government did not oppose either the setting of a deadline or the timing of the deadline; to the contrary, it joined in undersigned counsel's request that a deadline be set. (ECF No. 46 at 2). After requesting, and receiving, a single thirty-day extension of the original January 12, 2024 deadline, the Government timely filed a notice of its decision not to seek death. (ECF No. 47). Yet fifteen months later, without legal authority, it filed a notice that it now does intend to seek death.

Even assuming *arguendo* that § 3593(a) permits an outright reversal of the Government's formally announced decision not to seek the death penalty—and also assuming, inter alia, that the Government has established cause to withdraw its prior notice and done so within a reasonable time, as required by § 3593, *see infra*—this Court should strike the Government's May 21, 2025 Death Notice because it violates both the letter and spirit of the Court's February 12, 2024 deadline to file any notice of intent to seek death in this case.

10

1. **This Court validly and appropriately established a deadline for the Government's notice regarding an intent to seek death.**

This Court has inherent authority to manage cases and courtroom matters, including by setting deadlines to avoid delays and ensure the efficient administration of justice. *See, e.g.*, *United States v. Diaz*, 66 F.4th 435, 444 (3d Cir. 2023) ("[I]t is well established that '[a] trial judge indisputably has broad powers to ensure the orderly and expeditious progress of trial.'" (quoting *Bitter v. United States*, 389 U.S. 15, 16 (1967)); *see also United States v. W.R. Grace*, 526 F.3d 499, 508–09 (9th Cir. 2008) (en banc)) (noting the "universal acceptance in the federal courts that," in carrying out the mandate to effectuate the speedy and orderly administration of justice, "a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified . . . and that the parties are adequately and timely prepared"). And, in a case involving capital-eligible charges, timely notice of the Government's intention to seek death is not only within a court's authority, it is essential to the fair administration of justice.

As this Court has recognized, a decision to seek the death penalty "completely change[s] the posture" of a criminal case, requiring:

> (i) the appointment of [L]earned [C]ounsel pursuant to 18 U.S.C. § 3005; (ii) that the investigation and preparation of mitigating evidence for a potential penalty phase proceed simultaneously with investigation and preparation for the guilt phase based on accepted capital case representation standards, including the procurement of additional experts for mitigation purposes; and (iii) Defendant's counsel to reassign virtually all other cases on his docket and focus almost exclusively on this case.

(ECF No. 46 at 3). These additional requirements, in turn, create multiple time-consuming and costly obligations on the part of the federal court system to administer—including locating Learned Counsel willing to be appointed, appointing a mitigation specialist and various specialized experts for capital cases, and creating budgets for travel. *See* 18 U.S.C. §§ 3005, 3593, and 3599. In short, "the Government's decision to pursue capital punishment triggers resource-intensive processes in

practically every arena of trial preparation—from appointment of counsel to motion practice to jury selection to qualification of experts." *Spurlock*, 2025 WL 1360499, at *12.

Accordingly, the setting of a notice deadline is recommended in the United States Courts' *Guide to Judicial Policy* for district courts,[14] and district courts around the country regularly follow this recommendation.[15] Furthermore, the Department of Justice's own *Justice Manual* implicitly recognizes the authority and tendency of courts to set such deadlines, as it requires that a capital-eligible case be submitted to the Capital Case Review Committee "no fewer than 90 days before the Government is required, by an order of the court, to file a notice that it intends to seek the death penalty." U.S. Dept. of Justice, *Justice Manual*, § 9-10.060. *See also* Guide to Judiciary Policy, Vol. 7 Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Appx 6A: Federal Death Penalty and Capital Habeas Corpus Representations (Updated Spencer Report, Sept. 2010), Rec. 5(b) (recommendation(s) adopted by the Judicial Conference of the United States) ("Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds

---

[14] *See* U.S. Courts, Criminal Justice Act Guidelines, Guide to Judiciary Policy, Vol. 7 Defender Services, Part A: Guidelines for Administering the CJA and Related Statutes, Ch. 6 § 670 (Jan. 2025) ("Within a reasonable period of time . . . the court should establish a schedule for resolution of whether the Government will seek the death penalty" and set dates for the "filing of a notice under 18 U.S.C. § 3593(a) that the Government will seek the death penalty, or notification to the court and the defendant that it will not.").

[15] *See, e.g.*, *United States v. Rivas-Moreiera*, No. 1:22-CR-27, 2023 WL 11960650, at *1 (E.D. Tex. Oct. 7, 2023) ("[T]he court has the inherent power to manage its own docket, including the timing of the Government's filing of its notice of intent to seek the death penalty under 18 U.S.C. § 3593(a).") (citing cases); *United States v. Diaz Hernandez*, 265 F. Supp. 3d 639, 639–40 (D. Md. 2017) ("The Court has the inherent authority to set such a deadline [for the Government to provide notice of its intention to seek death] and to enforce it, as it will surely do in this case."); *United States v. Slone*, 969 F. Supp. 2d 830, 838 (E.D. Ky. 2013) ("[S]uch a deadline simultaneously acts as a backstop guaranteeing capital defendants a reasonably speedy process."); *United States v. McGill*, No. 09-2856, 2010 U.S. Dist. LEXIS 37839, 2010 WL 1571200, at *2 (S.D. Cal. Apr. 16, 2010) ("Courts routinely establish an outside date by which . . . the [G]overnment must file its notice . . . that it will seek the death penalty."); *United States v. Colon-Miranda*, 985 F. Supp. 36, 40 (D.P.R. 1997) (denying the Government's request to seek the death penalty because the court "will not permit the Government's confusion, vacillation or strategy to delay unnecessarily this trial or unduly prejudice the defendants"); *see also* ECF No. 154 at 5–7 (collecting cases).

expeditiously."); *id.* at 106 (Commentary) (explaining that federal judges can "increase[e] the efficiency of the authorization process . . . by establishing reasonable deadlines and maintaining oversight during the pre-authorization stage of the litigation").

### 2. The Government did not challenge, but rather supported and complied with, this Court's unambiguous February 12, 2024 deadline.

Even if there were some doubt as to the Court's authority to set a deadline on the Government's notice of intent to seek death, the Government affirmatively waived any objection to the order issued in this case. As an initial matter, the Government did not challenge the Court's power to establish the deadline when undersigned counsel first requested that notice be required within sixty days of the parties' November 8, 2023 status conference. To the contrary, the Government "joined in that request, stating that [sixty] days was reasonable to file a notice." (ECF No. 46 at 2). And although the Government subsequently requested a brief extension of the deadline, it explained that it was doing so based solely on AUSA Conley's "unfamiliarity with the Capital Case review process," which had caused him to fail to take the "necessary steps to obtain a final determination from the Attorney General's Review Committee on Capital Cases" by the original deadline. *Id.* In support of its request for an extension, the Government also expressed that it "fully recognizes and fully appreciates the defendant's contention that 'the decision to seek the death penalty would completely change the posture of the case.'" (ECF No. 45 at 1).

Nor did the Government challenge the wording of either the initial order setting the January 12, 2024 deadline or the order granting a thirty-day extension thereof. Both orders expressly stated that "[t]he Government SHALL file any notice pursuant to 18 U.S.C. §3593(a)" by the relevant deadline. (*See* ECF Nos. 35, 47 (emphasis in original)). The Court's use of the phrase "any notice pursuant to 18 U.S.C. § 3593(a)"—as opposed to an "initial notice" or a "first notice subject to later reversal"—clearly indicated that the Government needed to make its final determination regarding its intent to seek the death penalty by the stated deadline, with no objection from the Government.

13

The Government then complied with the order by filing a notice on February 7, 2024, stating:

> The United States intends to proceed with either a non-capital trial or plea agreement in this matter and will not seek the death penalty for Richardson Dangleben, Jr. Thus, a special hearing to determine whether a sentence of death is justified pursuant to 18 U.S.C. § 3593(a) is not requested.

(ECF No. 47 at 1). That February 7, 2024 no-seek notice permanently and forever established that this case is a noncapital case, since no-seek notices are irrevocable. *United States v. Waggoner,* 339 F.3d 915, 918 (9th Cir. 2003) ("[T]he government's irrevocable decision not to pursue the death penalty eliminated Waggoner's right under § 3005 to a second court-appointed counsel.").

In *Waggoner*, the issue presented was "whether 18 U.S.C. § 3005 requires that two attorneys be appointed whenever the Government indicts a defendant for a crime punishable by death, even if the death penalty is not sought." *Id.* at 916. There, Waggoner was charged with a death-eligible offense, and "requested the appointment of second counsel under 18 U.S.C. § 3005 during the presentation of Waggoner's case to the Department of Justice for consideration of whether the death penalty would be sought against Waggoner." *Id.* at 916–17. The district court appointed Learned Counsel on an interim basis. The Government subsequently announced that it would not seek the death penalty, and the district court vacated its order appointing Learned Counsel despite Mr. Waggoner's subsequent motion for reappointment. Mr. Waggoner was convicted after a jury trial and appealed, in part, based on the claim that he was entitled to Learned Counsel because he was charged with a capital-eligible offense, regardless of whether the Government ultimately sought the death penalty. The issue was thus squarely before the *Waggoner* court of whether a no-seek notice was irrevocable, and the court answered that question affirmatively.[16] In reaching this conclusion, the *Waggoner* court cited approvingly *United States v. Casseus,* 282 F.3d 253, 256 (3d Cir. 2002), which held any error in refusing

---

[16] If a no-seek notice was revocable, the *Waggoner* court would necessarily have issued an opposite ruling, since in that circumstance Mr. Waggoner would have remained a capitally-charged defendant under 18 U.S.C. § 3005 regardless of the filing of a no-seek notice.

14

to appoint an additional counsel under § 3005 is harmless when the Government declines to seek the death penalty because, "after the [G]overnment declared that it would no longer seek the death penalty, the appellants were no longer capital defendants." *Waggoner,* 339 F.3d at 918.

In this case, the Government's actions for the twelve months following the expiry of the February 12, 2024 deadline further confirm that it had willingly complied with the Court's order and had no intention of subsequently acting in a manner contrary to that irrevocable notice. As this Court later summarized, "after the Government filed the notice of 'no-seek,' the parties took a more relaxed approach to the schedule of deadlines, and more importantly, setting this matter for trial for a date certain." (ECF 154 No. at 3). Thus, the Court concluded, the "Government cannot dispute that the Court and the parties proceeded for over a year under the impression that the Government would not be seeking the death penalty." *Id.* at 7.

Finally, even after it had requested a stay of proceedings to allow it to reconsider its prior no-seek notice, the Government conceded this Court acted within its authority to "set deadlines for notices of intent to seek the death penalty" when it issued the February 12, 2024 deadline. (ECF No. 134 at 6).

The Supreme Court has explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *United States v. Olano*, 507 U.S. 725, 733 (1993); *see also id.* (contrasting waiver with forfeiture, which "is the failure to make the timely assertion of a right"). The distinction between waiver and forfeiture "can carry great significance," as a forfeited argument may be reviewed at the court's discretion, but a "party's waiver should be enforced" against "[b]oth the Government and criminal defendants." *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023). Indeed, the Supreme Court has held that a "court is not at liberty . . . to bypass, override, or excuse a State's deliberate waiver." *Wood v. Milyard*, 566 U.S. 463, 466 (2012).

Here, the Government did not merely inadvertently fail to object to the deadline set by the Court. Rather, the Government joined in Mr. Dangleben's request for the deadline, affirmatively stated that the timeline was "reasonable," complied with the deadline, and expressly acknowledged that the Court had acted within its authority when setting the deadline. It cannot now argue the long-expired deadline carries no force. *See Spurlock*, 2025 WL 1360499, at *13–*14 (finding Government "intentionally relinquished or abandoned" any challenge to the court's death-notice deadline because Government did not object to deadline and "never otherwise requested relief from the deadline under the theory that the deadline was improper in concept or because of its rigidity").

### 3. The Government failed to seek, and is not entitled to, leave of the Court to file its untimely Death Notice.

Not only did the Government fail to object to, or timely move for an extension of, the Court's February 12, 2024 deadline, it failed to seek leave of the Court to file a withdrawal of its "no seek" notice more than fifteen months after that deadline had passed. The Government did make a passing (and wholly unpersuasive) argument in its stay briefing that, to the extent this Court "finds the [February 12, 2024] deadline retains its currency, identifiable exigencies"—namely, the Bondi Memorandum's directive that prior no-seeks be reassessed—"should justify an extension." (ECF No. 134 at 7). But the Court clearly rejected that argument in denying the stay. (*See* ECF No. 154 at 8 ("[T]he fact remains that the court-ordered deadline for filing a Section 3593 notice has expired.")). Furthermore, in that same opinion, the Court expressly communicated that leave would be required before the Government could file any revised notice:

> Although not directly before the Court, the Court seriously questions whether the Government can amend its "no-seek" notice without a demonstration of "good cause." *See e.g. United States v. Spurlock*, Case No. 3:23-cr00022-MMD-CLB-1, 2025 U.S. Dist. LEXIS 89675, at *59 (D. Nev. May 9, 2025) (opining that the Federal Death Penalty Act "must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so."). The Court will decline to address this issue at the present moment *because no such request has been made by the Government.*

(*Id.* at 8–9 n.7 (emphasis added)).

16

The Government's blithe disregard for this Court's prior deadline, the above-quoted directive in its stay opinion, and the rules governing these proceedings is itself sufficient grounds for striking the Death Notice. *Cf. Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007) (district court "had no duty" to even consider allowing amendment where plaintiff "never properly requested" leave to amend); *Ely v. Reading Co.*, 424 F.2d 758, 763 (3d Cir. 1970) (upholding district court's refusal to permit expert witness to testify where expert's name was not listed in pretrial order but was only included in a supplemental pretrial memorandum filed without leave of the court).Moreover, although this Court retains authority to extend the deadline on its own motion and/or to reconsider its prior order establishing that "any notice" under § 3593(a) be filed by February 12, 2024, there is nothing in the record suggesting that the Government is entitled to either form of relief.

### a.    The Government does not warrant an extension of time under Fed. R. Crim. P. 45(b)(1)(B).

Fed. R. Crim. P. 45(b)(1)(B) provides, in relevant part:

> When an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made: . . . (B) after the time expires if the party failed to act because of excusable neglect.

That rule applies to "these rules, [] any local rule or court order, or [] any statute that does not specify a method of computing time." Fed. R. Crim. P. 45(a). Thus, even in the absence of a motion from the Government, this Court has the authority to extend its February 12, 2024 deadline on its own motion. However, such discretion is warranted only if the delinquent party failed to act because of "excusable neglect." This, in turn, calls for an equitable determination based on the "danger of prejudice, the length of the delay, the delay's impact on judicial proceedings, the reason for the delay, whether the movant had control over the delay, and whether the movant acted in good faith." United States v. Kennedy, 354 F. App'x 632, 636 (3d Cir. 2009). Here, there is no question that each of these factors weighs against a finding that the Government has acted with "excusable neglect."

###### i. Mr. Dangleben would be manifestly prejudiced by a reversal of the Government's no-seek notice.

First, this Court has already determined that Mr. Dangleben would be manifestly prejudiced by any change in the Government's position regarding the death penalty when it denied the Government's motion to stay proceedings. (ECF No. 154 at 7). In reaching this determination, the Court began by rejecting the Government's argument that there could be no prejudice because no firm trial date was set at the time it filed the stay motion, pointing out that the matter had in fact been "set for trial for a date certain and that date was continued, in part, because of Defendant's reliance upon the Government's notice not to seek the death penalty." *Id.* at 7. (*See also* ECF No. 146-1 at 6) (FPD Campbell's declaration stating that he would not have moved to continue deadlines or the October 28, 2024 trial date had he thought that doing so "could lead to reversal of the no-seek notice"). In any event, any such argument from the Government was moot by the time it filed its Death Notice, as the Court set a trial date of October 6, 2025, the day prior to that filing. (*See* ECF No. 157 at 2).

Additionally, the Court found that any change in the Government's position on death at this stage of proceedings would "present a clear tactical disadvantage" to Mr. Dangleben, who—in reliance on the Government's no-seek decision—did not request the appointment of Learned Counsel at the outset of the case and had not commenced any mitigation investigation. (ECF No. 154 at 7).[17] As indicated above, by statute, Mr. Dangleben was entitled to the "prompt" appointment of Learned Counsel. 18 U.S.C. § 3005. This requirement is designed, in part, to ensure that Learned Counsel is appointed "prior to the time that submissions are to be made to persuade the Attorney General not

---

[17] This case is akin to *Constanza-Galdomez*, in which the case had not proceeded as a death case for over a year, no learned counsel had been sought until the government sought to reverse its no-seek notice, and thus no mitigation case had been developed. *See id.* at 11 & fn. 2.

18

to seek the death penalty." *Id.* at 8 (quoting *In re Sterling-Suarez*, 306 F.3d 1170, 1172 (1st Cir. 2002)); *see also id.* ("Having Learned Counsel assist in persuading the [G]overnment not to seek the death penalty is an immensely favorable outcome for the defense."). The "prompt" appointment of Learned Counsel also facilitates counsel's compliance with the ABA Guidelines, which—, together with the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases—stand as "the defining architecture for any measure of effective performance"[18] of capital defense counsel, and provide that "[i]nvestigation and planning for both phases [of a capital case] must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty." Am. Bar Ass'n, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. 2003), *reprinted in* 31 HOFSTRA L. REV. 913, at 925 (2003), Guideline 1.1, Commentary.

But here, Mr. Dangleben operated without Learned Counsel for sixteen months. This has already caused Mr. Dangleben prejudice because he had "no meaningful opportunity to submit mitigation evidence" to the Capital Review Committee in the timeframe between Learned Counsel's appointment and her meeting with the Committee on April 28, 2025. (ECF No. 154 at 8). *See also Constanza-Galdomez, supra*, at 19. At the same time, "any change to the United States' position would be detrimental" to Mr. Dangleben's trial preparation, which is "not what it would have been had a 'no-seek' notice not been filed." *Id.* At present, Mr. Dangleben faces the prospect of a trial date less than four months away without any meaningful capital defense investigation or preparation having been conducted. Meanwhile, counsel must simultaneously prepare for the July 23–25 omnibus hearing—at which no fewer than fourteen motions are expected to be addressed, including substantial

---

[18] Russel Stetler & W. Bradley Wendel, The Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Traveled and the Road to be Traveled: Part One: The ABA Guidelines and the Norms of Capital Defense Representation, 41 Hofstra L. Rev. 635, 696 (2013).

motions to dismiss and suppress, as well as a venue motion, among others—and an October 6 trial, while redirecting considerable time and energy into moving to strike the Government's improper Death Notice.[19]

Critically, this prejudice to Mr. Dangleben's trial preparation cannot be cured by simply continuing the trial to allow counsel time to conduct a professionally responsible penalty-phase investigation.[20] Even setting aside the serious speedy-trial implications of any such continuance, "[p]reparation for a non-capital trial cannot be simply imported into a capital case, with its combined guilt and penalty phases." *Spurlock*, 2025 WL 1360499, at *18. Rather, best practices require that, from the outset, capital counsel "seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.'" *Id.* (quoting ABA Guideline 10.10.1, at 1047). In other words, "well before trial," capital counsel must formulate an "integrated defense theory" that is capable of being reinforced "during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." *Id.* Thus, as the *Spurlock* court determined:

> Spurlock will never be in the position he was eight months ago no matter the length
> of any continuance: At many junctures, the capital or non-capital nature of a trial may

---

[19] Each of these tasks individually would be daunting. Combined, they are overwhelming. As discussed in the ABA Guidelines referenced herein as well as in the attached declarations, a comprehensive mitigation investigation compliant with the ABA Guidelines cannot be completed in time to synthesize that information for purposes of an October 6, 2025 trial. *See infra* § III.B.3; *see also* Exhibits A–D. At the same time, efforts to do so would prevent counsel from concentrating on preparations for the omnibus hearing and trial. Finally, no capital-case motions have been filed in this case, nor have capital jury questionnaires been drafted, as this case has been a noncapital case from its inception. Reversing direction and litigating this case as a capital case will literally take thousands of hours. When the Government filed its May 21 Death Notice, there were only 138 days remaining until the October 6, 2025 trial date. Even assuming that undersigned counsel never slept or took breaks to eat, that is still not nearly enough time to complete the Herculean tasks outlined above and discussed further in § III.B.3 below.

[20] The time-consuming requirements of a capital penalty-phase preparation that complies with the ABA Guidelines are set forth in detail below. *See infra* § III.B.3.

> lead the defense to make decisions which are mutually exclusive to those which would be made if the posture were different. . . .

> The Court will not speculate about the extent to which defense counsel or Spurlock himself would have made different decisions if the Government had timely disclosed its intention to seek the death penalty. But neither will the Court ignore that a case on a capital track would have involved material differences in defense preparations which cannot be recreated by merely further continuing proceedings.

*Id.* at *19 (quotation marks omitted).

Not only is the same true for Mr. Dangleben, the prejudice here if the Government were allowed to reverse its no-seek would be even greater than in *Spurlock* because Mr. Spurlock was appointed Learned Counsel at the outset of his case, and that counsel remained on the case for one full year, withdrawing only after the Government filed its no-seek notice. *Id.* at *2, *5. By contrast, here, Learned Counsel was not appointed until sixteen months after Mr. Dangleben was indicted, and as yet neither a mitigation specialist nor capital experts have been retained.[21]

At least two additional factors are relevant to prejudice. The first is that, if Mr. Dangleben had known that reversal of the no-seek was possible, he would have been strongly incentivized to enter into a plea bargain with the Government before the election (and, if necessary, even could have pleaded guilty to the indictment without a plea agreement, thus precluding the Government's ability to seek the death penalty under 18 U.S.C. §3593(a) and the Double Jeopardy Clause). *See Hynes v. Tomei*, 237 A.D.2d 52, 55 n.1 (N.Y. App. Div. 1997) (discussing a defendant's differing incentives to plea bargain in a case with a capital charge depending on whether the prosecution is seeking the death penalty), *rev'd on other grounds*, 706 N.E.2d 1201 (N.Y. 1998). At a minimum, Mr. Dangleben would have had the

---

[21] As a result of his reasonable reliance on the Government's formal assurance that it would not seek the death penalty, Mr. Dangleben is at present necessarily unable to point to all the specific ways in which any mitigation investigation and death-penalty defense preparation have been negatively impacted. He would need to undertake the lengthy and resource-intensive task of preparing for a capital trial to fully understand all the ways in which the Government's reversal, if permitted, has prejudiced his preparation for any eventual capital penalty trial. He reserves the right to provide such further evidence of prejudice in the future should the need arise.

benefit of a discussion with Learned Counsel about whether he should resolve this case before the Government could renege on its promise that it would not seek the death penalty.

The second is that Mr. Dangleben has been subject to unjustified, inhumane treatment by the Government's seeking to renege on its formal announcement in February 2024 that it would not seek the death penalty. Other courts have recognized the psychological harm inflicted on a defendant resulting from the prosecution's mere delay in deciding whether to seek the death penalty (when it ultimately decides not to do so). *See, e.g.*, *United States v. Green*, No. 12-CR-83S, 2018 WL 786185, at *11 (S.D.N.Y. 2018) (in dismissing an indictment on speedy trial grounds, the court noted among other factors the "unique anxiety and concern that comes with the looming prospect of the death-penalty, a prejudice not easily measurable and one absent in the majority of criminal cases"), *aff'd sub nom.*, *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019) ("Black, Green, and Rodriguez were forced for two years and ten months to worry over whether the Government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees."). The psychological harm inflicted by the Government here carries an even more inhumane type of psychological trauma. Indeed, when District Judge Otis D. Wright, III, was confronted with a potential reversal of a no-seek notice, he responded:

> Okay. I'm going to say this for the last time. You can't tell people that this form of punishment is off the table so that they can now sleep again and then change your mind and go, "It's back on again." No.

*United States v. Edwin Martinez,* Case No. 2:19-CR-117-ODW (C.D. Cal 2024) (ECF No. 1248 at 13). As discussed below, such wanton inhumane conduct by the Government violates the Eighth Amendment and should preclude the death penalty. *See infra* § III.F.

ii.    **The Government's 464-day delay severely impacted this Court's proceedings in this case.**

The next two factors in the "excusable neglect" assessment are the length of the delay and the impact on judicial proceedings. The delay here was undeniably lengthy: the Government filed its May 21, 2025 Death Notice **four hundred and sixty-four days** after the February 12, 2024 deadline to do so. And the impact of this substantial delay on these proceedings cannot be overstated. This Court both asked for and accepted the position of the Government in February 2024, when it affirmed it did not intend to seek the death penalty in Mr. Dangleben's case. This Court then relied on the Government's no-seek notice, including in the scheduling of hearings and trial dates after the no-seek notice (which were based in part on the fact that the Government affirmatively took the death penalty off the table). And the Court again relied on the original notice by scheduling, on May 20, 2025, a non-capital trial to commence on October 6, 2025,[22] and by managing this case and arranging this Court's calendar (and working with court staff) in reliance on that non-capital trial date. At present, there are no fewer than fourteen pretrial motions that have been partially or mostly briefed and that are scheduled to be addressed at the omnibus hearing scheduled for July 23–25, 2025. Yet a number of these motions will be substantially affected if this case suddenly transforms from a non-capital case to a capital case, thereby requiring entirely new rounds of briefing from both parties. Meanwhile, as this Court recognized in denying the Government's stay motion, "seeking the penalty of death against Dangleben . . . by no means simplifies any issue pending before the Court. In fact, to the contrary, if this case were to proceed as a death penalty case, the complexities of this case will be multiplied exponentially." (ECF No. 154 at 8).

---

[22] The Court set aside two weeks for that noncapital trial. Clearly, that two-week period would be woefully insufficient for a capital trial, as capital jury selection alone would be expected to take longer than two weeks. *See, e.g., Constanza-Galdomez, supra,* at 3.

iii.    **The 464-day delay was entirely within the Government's control.**

Moving away from prejudice and the impact of the Government's Death Notice on the proceedings, this Court has not directly addressed the reason for delay or whether it was within the Government's control. However, during the March 12, 2025 status conference on the stay motion, the Court did express skepticism at the Government's attempt to deny responsibility for any detrimental reliance by the defense on the prior no-seek notice. Specifically, after AUSA Adam Sleeper remarked that the "ultimate determination" whether to seek death "does not lie with the US Attorney's Office," the Court asked: "The prosecution of this case is by the United States, correct?," immediately clarifying that was "a rhetorical question." (ECF No. 145 at 26–27). The Court continued:

> [I]f the [G]overnment is allowed to review a decision that was made after the deadline, simply because there was a change in administration, then why wouldn't that apply in any other circumstance? Because if it can apply to the most serious situation, why can't it apply to any other situation? . . . [Y]ou're suggesting that there are two entities that's prosecuting this case?

(*Id.* at 28–30).

And in fact, any argument that the current leadership of the Department of Justice cannot be responsible for the actions of the former administration's departmental leadership would contradict the Supreme Court's well-established rule that all prosecutors in the same office are vicariously responsible for each other's knowledge and prior representations. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."); *cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) (attributing one prosecutor's plea-bargain promise to a second prosecutor in the same office who had been unaware of the first prosecutor's promise when the second prosecutor breached the agreement at the defendant's sentencing); *United States v. Gebbie*, 294 F.3d 540, 550 (3d Cir. 2002) (holding that U.S. Attorneys "represent the United States, and their promises on behalf of the Government must bind each other absent express contractual limitations

or disavowals to the contrary"). Although the Department of Justice may change its charging and sentencing policies in a new administration, it may not do so in a specific pending litigation when a prior formal representation was made and its reversal would prejudice the opposing litigant. *Cf. United States v. Mendoza*, 464 U.S. 154, 161–62 (1984) (holding that nonmutual offensive collateral estoppel does not apply to federal government).

### iv.    The Government cannot establish that it has acted in "good faith."

This Court also raised questions during the March 12, 2025 status conference regarding the Government's good faith in the process of reconsidering the death penalty, the final factor in the "excusable neglect" analysis. Specifically, after AUSA Sleeper indicated that he had invited the defense to "present mitigation arguments" to the Capital Review Committee, the Court interjected:

> So let me ask you this. In the presidential address that was issued by President Trump, . . . he publically stated that he is directing the Department of Justice to seek the death penalty in all cases in which a law enforcement officer was killed. Is this process, the review process, is it—how should I say this—is it being done in a good faith manner or is it being done just to say that a review process was done, Attorney Sleeper?

(ECF No. 145 at 4). The Court's comment was truly prescient, for just two days later, the President gave a speech at the Department of Justice in which he stated:

> On Day One, I signed an Executive Order directing [the] Attorney General to ensure that anyone who murders a police officer, immediately, with as fast a trial as we can have, gets the death penalty.[23]

While AUSA Sleeper replied that it was his "understanding" that there was "still room for presentation of mitigation (*id.* at 5), the Court also questioned the timing of the Government's invitation, making the point (discussed above) that such presentations require "a lot of resources" on the part of the

---

[23] Available at https://www.youtube.com/watch?v=gvgnqKgufLw (at 42:46-42:59) (last accessed June 14, 2025).

defense (*id.* at 7).[24] Later, the Court lamented the extensive briefing necessary to resolve the Government's stay motion because "it's kind of like the more time we spend trying to figure this out is essentially giving the [G]overnment what they are requesting without allowing the defense to meaningfully participate in the process." (*Id.* at 21). The Government did not attempt to argue otherwise.

Courts have found that a party acted in "good faith" despite failing to comply with a deadline where the non-compliance is the result of inadvertence or mistake. For instance, in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, the Supreme Court determined that the creditor in bankruptcy proceedings had acted in good faith and was entitled to an extension of the deadline for filing claims where the deadline had been published in a "peculiar and inconspicuous" notice, causing the creditors' counsel to believe no such date had been established. 507 U.S. 380, 395–99 (1993);[25] *see also Consolidated Freightways Corp. of Del. v. Larson*, 827 F.2d 916, 919 (3d. Cir. 1987) (describing good faith factor within an excusable neglect analysis as "whether the court is satisfied that the inadvertence resulted despite counsel's substantial good faith efforts toward compliance"). In other instances, good faith has been found on the part of a party who missed a deadline due to circumstances beyond his control. *See, e.g.*, *United States v. Kennedy*, 354 F. App'x 632, 636–37 (3d Cir. 2009) (defendant acted in good faith despite failing to comply with appeal deadline where his trial attorney had "abandoned him after the trial" and failed to advise him of the deadline); *United States v. Milton*, 621 F.Supp.3d 421, 427 n.6 (S.D.N.Y.

---

[24] The Government's decision to obtain the Superseding Indictment with aggravating circumstances twelve days **before** undersigned counsel attended the April 28, 2025 meeting with the Department of Justice Capital Case Review Committee further calls into question the "good faith manner" of the authorization process employed by the Department of Justice in this case. (*See* ECF No. 145 at 4, *supra*).

[25] Like Fed. R. Crim. P. 45(b), Bankruptcy Rule 9006(b)—the rule at issue in *Pioneer Inv. Servs.*—allows a court to permit late filings where the movant's failure to comply with the deadline "was the result of excusable neglect." The Third Circuit has observed that both Fed. R. Crim. P. 45(b) and Bankruptcy Rule 9006(b) are modeled on Fed R Civ. P. 6(b). *In re Delloso*, 72 F.4th 532, 540 (3d Cir. 2023).

2022) (finding defendant acted in good faith, despite raising an untimely argument in support of his motion suppress, because facts required to support the new argument first came to light during suppression hearing).

The Government here cannot make any type of analogous showing, as it was well aware of the Court's February 12, 2024 deadline and the late-filed Death Notice is based solely on a change in the Government's own position. Furthermore, the Government's change in position on this critical matter comes after Mr. Dangleben relied on the initial representation of the Government for more than one year of trial preparation and is motivated by purely political concerns, as opposed to any change in the facts or law applicable to this case. Given these circumstances, the Government cannot be found to be acting in "good faith" and it is not entitled to equitable relief from this Court under Fed. R. Civ. P. 45(b)(1)(B).

     **b.**     **Reconsideration of this Court's February 12, 2024 deadline is not warranted under the Court's Local Rules.**

Absent an equitable grant of a fifteen-month extension of time by this Court, the May 21, 2025 Death Notice cannot be deemed timely unless this Court were to reconsider its prior order setting the February 12, 2024 deadline. Of course, the Government has not complied with the Court's Local Rule of Civil Procedure 7.3, made applicable to criminal cases by Rule 1.2 of the Local Rules of Criminal Procedure,[26] which requires that a motion for reconsideration be made in writing, within fourteen days of the challenged ruling,[27] and that it "concisely identify" the existence of one of three bases for reconsideration, namely: "(1) an intervening change in controlling law; (2) the availability of

---

[26] District Court Rule Crim. Proc. 1.2 provides that "[i]n cases of general procedure not covered by these Rules, the Local Rules of Civil Procedure shall apply." This Court's Local Rules of Criminal Procedure do not address motions for reconsideration.

[27] Here, any such request came *sixteen months* after the challenged ruling. *Compare* ECF No. 44 *with* ECF No. 159.

new evidence, or; (3) the need to correct clear error or prevent manifest injustice." LRCi 7.3(a)–(b); *see also* LRCi 7.3(c) ("A motion for reconsideration shall include the following certification by counsel: 'I express a belief, based on a reasoned and studied professional judgment, that the grounds for reconsideration set forth above are present in this case.'").

Nor has the Government otherwise offered any qualifying basis for reconsideration under Local Rule 7.3. Thus, although this Court retains the authority to reconsider a prior ruling sua sponte, the granting of such an "'extraordinary' remedy" is not warranted here. *Bostic v. AT&T of the Virgin Islands*, 312 F. Supp. 2d 731, 733 (D.V.I. 2004).

First, neither the Bondi Memorandum, nor the Presidential Executive Order on which it is based, constitutes "an intervening change in controlling law." LRCi 7.3(a)(1). Instead, at most, they represent a change in Department of Justice policy. The Government has offered no authority claiming that changes in Executive Branch policy represent "controlling law" binding upon this Court, nor does any such authority exist.

Second, the Government offers no "new evidence" supporting reconsideration. LRCi 7.3(a)(2). Every one of the statutory mitigating factors cited in the May 21, 2025 Death Notice was known to the Government when the complaint was filed on July 7, 2023. (*Compare* ECF No. 159 at 1-2 *with* ECF Nos. 1-1, 11). The non-statutory aggravating factors were also well-known when the complaint was filed:

- The Government knew of the harm to the decedent, an on-duty law enforcement officer, and his family. (*See, e.g.,* ECF No. 1-1 at 5; ECF No. 11 at 2, 3).

- The Government knew of the other charged crimes of violence. (*See, e.g.,* ECF No. 1-1 at 3–5; ECF No. 11 at 2, 3).

- The Government was well aware of the homicide of Keith Jennings on February 24, 2023 and Mr. Dangleben's pretrial release status. (*See, e.g.,* ECF No. 1-1 at 5; ECF No. 11 at 3, 4).

The Bondi Memorandum, as relied upon by the Government, is a policy statement outlining, inter alia, the Administration's view of history, the Administration's view of the preceding Administration, and various changes and announcements of Department of Justice policy. (ECF No. 122-1). It provides no "new evidence" of anything. All facts and circumstances alleged by the Government in its May 21, 2025 Death Notice were well-known to the Government at the time the initial complaint was filed. Thus, as in *Spurlock*, "to the extent the [G]overnment attempts to superimpose a post-hoc case-development related argument" to justify its change in position on death, that argument "rings hollow." 2025 WL 1360499, at *23.

Third, the Government has made no mention of "the need to correct clear error or prevent manifest injustice." LRCi 7.3(a)(3). The Government cannot argue that the Court's February 12, 2024 deadline was made in "clear error," as it agreed to the setting of such a deadline and complied with that deadline. And, as discussed above, federal courts regularly set deadlines for the filing of a notice of intent to seek death in line with their inherent authority to manage cases and ensure the efficient administration of justice. *See supra* § III.A.1. Nor would the enforcement of the February 12, 2024 deadline constitute "manifest injustice." As then-Circuit Judge Gorsuch observed in analyzing the "manifest injustice" standard under Fed. R. Civ. P. 16(e)—which governs requests to modify a final pretrial order—the standard intentionally sets a high bar for amendment, in part, to ensure "reasonably fair disclosure to the court and opposing parties alike of their real trial intentions." *Monfore v. Phillips*, 778 F.3d 849, 851 (10th Cir. 2015). Thus, for instance, in *Monfore*, the court found no abuse of discretion in the trial court's refusal to allow the defendant to modify the pretrial order in a manner that would "force the plaintiff to prepare for an entirely different trial," explaining that a "district court does not abuse its discretion in holding a party to . . . the strategy he articulated through pleading and discovery . . ., especially when indulging an eleventh-hour strategic shift would mean either imposing prejudice on the other side or inviting more delay." *Id.* at 853. The same rationale applies here.

Finally, although not mentioned in Local Rule 7.3, the Third Circuit has held that where a district court revisits a prior ruling sua sponte, it "must take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *DeFranco v. Wolfe*, 387 F. App'x 147, 156 (3d Cir. 2010). Because this Court has already determined that Mr. Dangleben would be prejudiced by any change in the Government's position not to seek death in this case, it may not, consistent with Third Circuit precedent, reconsider its February 12, 2024 deadline to allow for the filing of the May 21, 2025 Death Notice.

### 4.    Striking the Death Notice is within the Court's authority and is the only appropriate remedy.

As demonstrated above, the undisputed facts in this case are as follows: (1) acting within its authority to set deadlines aimed at promoting the fair administration of justice, this Court set an unambiguous deadline for the filing of "any notice" to seek death in this case; (2) the Government accepted and complied with that deadline by filing its February 7, 2024 no-seek decision and has not sought leave of the Court to revive the deadline or to modify its prior filing; and (3) no grounds exist to warrant a sua sponte exercise of discretion by this Court to alter its prior deadline and allow the Government to change its position on the death penalty in a manner that will cause substantial, incurable prejudice to Mr. Dangleben.

It is well-established that this Court has the authority to enforce its own orders. *See, e.g., W.R. Grace*, 526 F.3d at 503 (district court has "authority to issue and enforce its pretrial orders"). One available means of exercising that authority is to strike non-compliant pleadings. *United States v. Rosado-Rosario*, No. 97-049 (JAF), 1998 WL 28273, at *3 (D.P.R. Jan. 15, 1998) (striking notice of intent to seek death filed thirty-two days after court's deadline for such notice, stressing that "[n]oncompliance with local rules, as well as noncompliance with court orders" will "not be tolerated").

Moreover, under these circumstances, "striking the notice is not only within the Court's authority, it is ultimately the only remedy which affords appropriate weight to that authority." *Spurlock*, 2025 WL 1360499, at *15. As the *Spurlock* court explained:

> A continuance would not, as the Government contends, cure its violation. To the contrary, it would effectively reward the violation and render the notice deadline powerless to serve its well-founded purposes. . . . At the same time, if the Court takes the Government's preferred path and declines to strike the Death Notice while continuing trial, there is no need to resort to the imagination to see clear costs to defendants and courts.

*Id.* at *15–*16. Because the same is true in this case, the Court should strike the Government's May 21, 2025 Death Notice with prejudice.

### B.  The Government's Death Notice Violates 18 U.S.C. § 3593.

The Government's Death Notice also violates the plain text of the Federal Death Penalty Act for several reasons. First, the notice provision of 18 U.S.C. § 3593(a) does not authorize the Government to reverse a decision not to seek the death penalty. Even if it did, the Government would be required at a minimum to seek the Court's leave to do so and to establish good cause for its reversal, neither of which it has done. Next, even an authorized death notice needs to be filed reasonably in advance of the scheduled trial date; the four-and-a-half-month notice the Government is now attempting to provide fails that requirement. And finally, as this Court has already found, Mr. Dangleben would be irreparably prejudiced by the Government's about-face.

#### 1.  The statute does not authorize the Government to reverse a no-seek decision.

In any case in which the Government seeks the death penalty, § 3593(a) requires it to file a notice that contains two things: (1) a statement that the Government believes that "a sentence of death is justified under this chapter and that the [G]overnment will seek the sentence of death," § 3593(a)(1); and (2) a recitation of "the aggravating factor or factors that the [G]overnment, if the defendant is convicted, proposes to prove as justifying a sentence of death," § 3593(a)(2). The notice provision of

the Federal Death Penalty Act does not permit the Government to renege on a formal decision not to seek the death penalty both because a formal no-seek announcement under § 3593(a)(1) is binding and because principles of statutory construction make clear that amendment is only permitted as to the list of proposed aggravating factors under § 3593(a)(2).

First, once the Government avers under § 3593(a)(1) that it does not intend to pursue the death penalty, its ability to capitally prosecute the defendant irrevocably ceases. *United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) ("[A]fter the [G]overnment declared that it would not seek the death penalty, the appellants were no longer capital defendants."). A defendant's request for Learned Counsel, to which they would be statutorily entitled under 18 U.S.C. § 3005 in a capital case, is therefore "rendered moot by the [G]overnment's decision not to seek the death penalty." *Id.*; *see also United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) ("[T]he [G]overnment's **irrevocable decision** not to pursue the death penalty eliminated Waggoner's right under § 3005 to a second court-appointed counsel.") (emphasis added). The Government's unqualified statement that it "will not seek the death penalty for Richardson Dangleben, Jr." (ECF No. 47), has therefore rendered its subsequent Death Notice a nullity. *See, e.g.*, *Spurlock*, 2025 WL 1360499, at *21 (opining that the Federal Death Penalty Act "must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so," without deciding on the categorical prohibition); (ECF No. 154 at 8 n.7 (citing *Spurlock* with approval)).

Second, straightforward principles of statutory construction dictate that death notices may only be amended to alter the list of noticed aggravating circumstances, and not the decision whether to seek the death penalty in the first place. Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotations and citation omitted). In the notice provision of the Federal Death

Penalty Act, the language authorizing amendment appears only in § 3593(a)(2), which governs the notice required as to aggravating circumstances, and not in § 3593(a)(1), which governs the decision to seek capital punishment. This stands to reason, as it is illogical to describe a complete course-reversal as an "amendment." The language and structure of the Federal Death Penalty Act thus make clear that a purported amendment that reverses a no-seek determination is prohibited.

### 2. Even if § 3593 allowed for the reversal of a no-seek, it would require, at minimum, that the Government request leave to amend and establish "good cause," which it has not.

Even were it possible to supplant a no-seek notice with a death notice, the text of § 3593 would require the Government to seek the Court's leave and to demonstrate good cause[28] for the reversal. The Government has made no attempt to satisfy either requirement; its Death Notice should be stricken for this independent reason.

Section 3593(a)(2) provides that "[t]he court may permit the attorney for the [G]overnment to amend the notice upon a showing of good cause." This statutory language plainly requires the Government to seek this Court's leave before attempting to alter its § 3593(a) notice. As discussed above in Section III.A.3, the Government has not done so. This failure therefore violates the text of the Federal Death Penalty Act in addition to the Court's Order, the Federal Rules of Criminal Procedure, and the Court's Local Rules. *See* § 3593(a)(2); *supra* § III.A.3.

The Government also cannot demonstrate good cause. As it has made clear, its sole basis for attempting to reverse course on its decision not to seek the death penalty is a policy memorandum

---

[28] Mr. Dangleben presents this argument only in the alternative, and strongly asserts that 18 U.S.C. § 3593(a), does not permit the Government to seek the death penalty after filing a prior formal notice that the Government was not seeking the death penalty. Nevertheless, assuming *arguendo*, that if reversing a no-seek notice could ever be allowed, Mr. Dangleben asserts that a showing of extraordinary circumstances would need to be shown to do so, or in the alternative, good cause. As discussed herein, the current Administration's political decisions do not constitute good cause, let alone an extraordinary circumstance. Rather, policy shifts by a new Administration are commonplace and fail to justify the Government's actions here.

issued by the current Attorney General. (ECF No. 122 at 1–2). In other words, the Government

simply changed its mind. But if a mere change of opinion were sufficient to demonstrate good cause,

the requirement would become meaningless; the Government would always be able to point to some

change in its decision-making to justify its new course of action.[29] And changes of policy at the

Department of Justice occur as a matter of course, particularly when a new Attorney General takes

office.

The good cause requirement is not nearly so toothless; it requires the Government to act with

reasonable diligence at a minimum. *See Spurlock*, 2025 WL 1360499 at *22 ("[I]t is clear that § 3593(a)

good cause must focus on the diligence of the [G]overnment in uncovering the new information

contained in the Amended Death Notice and the timing of when that information was obtained. Here,

as in other legal contexts, absent reasonable diligence, there can be no good cause.") (quoting *United

States v. Le*, 316 F. Supp. 2d 343, 348–49 (E.D. Va. 2004)); *see also Constanza-Galdomez, supra,* No. 1:22-

cr-409 at ECF No. 130 at 21-22; *see also, e.g.*, *United States v. Sok*, 115 F.4th 251, 263 (3d Cir. 2024)

("[T]he failure to offer 'any colorable explanation' for an untimely [Federal Rule of Criminal

Procedure] 12 argument plainly does not suffice to show good cause.") (quoting *United States v. Rose*,

538 F.3d 175, 184 (3d Cir. 2008)); *Premier Comp Solutions, LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir.

2020) ("[W]e have repeatedly recognized—and we reaffirm today—that whether 'good cause' exists

under [Federal Rule of Civil Procedure] 16(b)(4) depends in part on a plaintiff's diligence.") (citing

---

[29] As observed in *Constanza-Galdomez, supra*:

> When the government comes before a court, it does so as a litigant. Litigants do not enjoy a
> court's inherent powers. And litigants, of course, are not empowered to contravene their
> express representations to a court without good reason. The government possesses no
> special authority to go back on its word to a court. If anything, the government's special
> position comes with the obligation to "turn square corners in dealing with the people."
> *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 24 (2020).

*Id.,* at 22.

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84–85 (3d Cir. 2010), and *Eastern Minerals & Chemicals Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000)); *MCI Telecommunications Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir. 1995) (noting this Circuit has "equated 'good cause' with the concept of 'excusable neglect' of Federal Rule of Civil Procedure 6(b)(2)" regarding failure to timely serve a defendant under Federal Rule of Civil Procedure 4).

The Government has been far from diligent in filing its Death Notice. It waited fifteen-and-a-half months to file a death notice—four-and-a-half months before the scheduled start of trial—when "[t]he essential facts supporting the current charges and aggravators have been known to the government since the original indictment." *Spurlock*, 2025 WL 1360499 at *23.

The Government has previously argued that although "once it announces a decision to seek, the [G]overnment may amend the aggravating factors upon which it relies to justify a sentence of death for good cause shown, . . . no statutory provision obliges it to justify a decision to pursue capital punishment in the first instance, after initially indicating it would not." (ECF No. 134 at 3). Under that reading, the Government "would be required to show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but would be at total liberty to modify its representations in the far more significant manner—where a defendant's rights and a court's resources are most at stake—by deciding at any time, for any reason, to seek the death penalty, after formally declaring the opposite." *Spurlock*, 2025 WL 1360499 at *21. As the *Spurlock* court found, "[t]his interpretation is nonsensical for many reasons." *Id.* (noting that reversal of a no-seek decision involves noticing many new aggravating factors and "spurs more radical structural changes to the proceedings than any other type of amendment").

Indeed, were the Government's reading of § 3593 correct, it would be free to engage in precisely the type of gamesmanship in which it has engaged in this case. It would always be incentivized to file a no-seek notice as an initial matter, secure in the knowledge that it could succeed in evading

both the court-imposed deadline for filing the notice as well as the good cause requirement by later filing a death notice whenever and for whatever reason it chose. This reading would also permit the Government to indefinitely mislead the defendant about its true intentions. The notice provision's "indisputable purpose is to ensure that the accused will not be required to stand trial for his life without having received adequate notice before that trial that he *is* to stand trial for a capital offense (in addition to ensuring that an accused will not receive the death penalty without having received such notice)." *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003) (emphasis in original); *see also Ponder*, 347 F. Supp. 2d at 271 ("If the death penalty is to be sought, the sooner everyone knows, the better. That is the policy underlying § 3593."). The Government is not permitted to so casually and freely manipulate this important safeguard.

> **3.      The timing of the Government's Death Notice is not reasonable, as required by § 3593.**

The Death Notice also violates the statutory requirement that the Government file a notice of intent to seek the death penalty "a reasonable time before the trial." § 3593(a). In ruling on death notice timeliness challenges, courts must conduct "a pre-trial inquiry into the objective reasonableness of the that timing." *Ferebe*, 332 F.3d at 724.

Two circuits have set forth factors to be considered by the objective reasonableness test under § 3593(a). In *Ferebe*, the Fourth Circuit listed four non-exhaustive factors to be considered: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." *Ferebe*, 332 F.3d at 737. In *United States v. Wilk*, the Eleventh Circuit set forth a largely similar non-exhaustive list of relevant factors: "(1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the

indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." 452 F.3d 1208, 1221 (11th Cir. 2006).

The difference between the two tests is that in *Ferebe*, courts must calculate the time remaining before trial "irrespective of the filing's effects," 332 F.3d at 737, whereas in *Wilk*, courts need not limit their analysis to the scheduled trial date because "[c]ontinuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the [G]overnment's intent to seek the death penalty," 452 F.3d at 1223. The Third Circuit has not had occasion to interpret the timeliness requirement of § 3593(a). Here, neither party has requested a continuance of the trial date after the filing of the Death Notice. For that reason, the *Ferebe* and *Wilk* standards do not meaningfully differ in the current posture of Mr. Dangleben's case, and the Death Notice is untimely under either standard. However, Mr. Dangleben relies for the remainder of this analysis on *Ferebe* because his case is factually dissimilar to *Wilk*, where "all parties knew" from the outset that the case "was a likely death penalty case, and thus, Wilk's counsel, who had extensive capital crimes experience, began to prepare a death defense months before the Death Notice was filed." 452 F.3d at 1222. Moreover, permitting the Government to evade the timely notice requirement by forcing this Court to grant a continuance at this late stage will reward the Government's misleading and dilatory conduct.

### a. Nature of the charges

The first *Ferebe* factor, "the nature of the charges presented in the indictment," weighs strongly in Mr. Dangleben's favor. *Ferebe*, 332 F.3d at 737. As the Court has already determined, this is a complex case. (ECF No. 38 at 3 ("The Court finds that, due to the nature of the charges, the potential penalties the defendant is facing, the voluminous discovery—some of which is outstanding—the difficulties in ensuring Dangleben's review of discovery, the need for thorough investigation and expert consultation, and additional time to engage in motion practice, this matter should be designated

as a complex case.")). The Government has conceded as much. (ECF No. 32). The Court made that determination when everyone understood this to be a non-capital case; it has since become considerably more complex because of the Government's belated attempt to seek the death penalty. (*See* ECF No. 154 at 8) ("[I]f this case were to proceed as a death penalty case, the complexities of this case will be multiplied exponentially.").[30]

### b.    Nature of the aggravating factors

The second *Ferebe* factor, "the nature of the aggravating factors provided in the Death Notice," also weighs in Mr. Dangleben's favor. *Ferebe*, 332 F.3d at 737. Most notably, the Government has provided notice that it intends to present evidence of an entirely separate locally-charged homicide as a non-statutory aggravating factor. (*See* ECF No. 159 at 3). As a result of the Government's decision to seek the death penalty, Mr. Dangleben will now be required to effectively defend against two (unrelated) homicide trials instead of one. Capital trials "are qualitatively different"[31] than noncapital trials, and the government now seeks to introduce an entirely distinct homicide to the mix. Further, the government seeks to introduce victim-impact evidence in that qualitatively different capital trial— evidence that has yet to be disclosed via discovery.

### c.    Time remaining before trial

The third *Ferebe* factor, "the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects," dwarfs each of the other factors and strongly supports striking the death notice as untimely. *Ferebe*, 332 F.3d at 737. The death notice was filed on May 21, 2025, ECF No. 159, at a time when a trial date had just been set for October 6, 2025,

---

[30] Further, as set forth in *Constanza-Galdomez*, there is nothing about the nature of the charges that justifies the government's 464-day delay in filing its death notice. (*See id.* at 12-13).
[31] *See id.* at 14.

ECF No. 157 at 2.[32] Mr. Dangleben would be required to prepare for a death penalty trial from the ground up in four-and-a-half months were the death notice not stricken. This is a patently unreasonable timeframe.[33]

The Supreme Court has "long referred" to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases "as 'guides to determining what is reasonable'" attorney conduct. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The ABA Guidelines make clear that "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." ABA Guideline 10.7, Commentary, at 1022 (internal quotation omitted). In the case of the client, "this begins with the moment of conception." *Id.* This investigation requires counsel to investigate, among other things: the client's medical history, family and social history, educational history, military service, employment and training history, and prior juvenile and adult correctional experience. *Id.* at 1022–23. In doing so, it is "necessary to locate and interview the client's family members (who may suffer from

---

[32] In *Constanza-Galdomez,* the District Court found a death notice filed 109 days before the trial date to be untimely. (*See id* at 1-2). There, the District Court observed that the "death notices in this case are untimely and incurably defective." (*Id.* at 3; *see also id* at 15-17).

[33] Because it takes so long for the defense (and the court) to prepare for a death penalty trial, the DOJ typically files a notice that it is seeking the death penalty long before a trial is scheduled to occur. In *Ferebe*, 332 F.3d at 725, the Fourth Circuit noted that "Ferebe presents some evidence, and the prosecution does not challenge it, that, nation-wide, federal prosecutors file Death Notices, upon authorization by the Attorney General, with an average of 8.4 months remaining before trial." 332 F.3d at 725. The average time between death penalty notices and scheduled trial dates has grown significantly since *Ferebe* was decided. During the past two decades or so, the average time between the authorization of a capital prosecution by the Attorney General and the start of a capital trial has been *28 months. See United States v. Wilson Arturo Constanza-Galdomez, et al.,* Case No. 1:22-CR-00409-SAG (D. Md.) (ECF No. 101-4) (declaration of Matthew Rubenstein, Director of the Capital Resource Counsel (CRC), which is funded and administered by the Administrative Office of the U.S. Courts) (*See* attached Exhibit (hereinafter "Exh.") A). Also noteworthy is that in such cases, "Learned Counsel" had been appointed at the outset of the case or close to it. Thus, in those cases, unlike in the present case, the defense already has had a meaningful opportunity to start developing capital mitigation before the formal notice of the government's intent to seek the death penalty, and likely at the time of any presentation to the Attorney General's Capital Review Committee.

some of the same impairments as the client) and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others." *Id.* at 1024.

The defense team is also required to collect records, which "can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness." *Id.* Records "should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children." *Id.* at 1024–25. The "collection of corroborating information from multiple sources—a time-consuming task—is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence." *Id.* at 1025. A non-exhaustive list of the records that counsel must try to obtain for Mr. Dangleben and all of his family members includes: school records; social service and welfare records; juvenile dependency or family court records; medical records; military records; employment records; criminal and correctional records; family birth, marriage, and death records; alcohol and drug abuse assessment or treatment records; and INS records. *Id.*

Conducting a professionally reasonable capital defense investigation requires two attorneys, a mitigation specialist, and an investigator at a minimum. ABA Guideline 4.1 at 952. As this was not a potential capital case until last month, and Learned Counsel has only recently been approved for a limited "seed budget," Mr. Dangleben has yet to engage a mitigation specialist. A mitigation specialist is "an indispensable member of the defense team throughout all capital proceedings." ABA Guideline 4.1, Commentary, at 959. Mitigation specialists "possess clinical and information-gathering skills and training that most lawyers simply do not have." *Id.* It is the mitigation specialist who is typically tasked with conducting the time- and resource-intensive investigation into the client and his family members summarized above. *Id.* ("The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of

the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.").

The defense team must also consult with myriad expert witnesses that would not otherwise be necessary at a non-capital trial. In particular, "mental health experts are essential to defending capital cases." *Id.* at 956. Creating "a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process." *Id.* Counsel "must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary." *Id.*

Not only must defense counsel perform the time-consuming, exhaustive investigation outlined above, but they must also research and litigate an entirely new set of death-penalty-specific motions. One of "the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." ABA Guideline 10.8, Commentary, at 1030.

The above recitation of counsel's additional duties in a death penalty case is merely representative and far from comprehensive. But it makes clear that conducting the requisite interviews, obtaining needed records, consulting with appropriate experts, and researching and litigating death-penalty-specific motions in order to "formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages" cannot possibly be accomplished in four-and-a-half months. ABA Guideline 10.10.1, Commentary, at 1047–48. Indeed, three nationally recognized capital mitigation experts recently filed declarations in the case of *United States v. Constanza-*

41

*Galdomez, et al.* No. 1:22-cr-409 (D. Md.)—another case in which the Government was denied in its attempt to unjustifiably withdraw a previously filed no-seek notice and proceed under an egregiously untimely and unauthorized notice of intent to seek death—opining that three-and-a-half months is insufficient time to prepare for a capital penalty-phase trial and providing reasons that demonstrate the same is true here. *See* Case No. 1:22-CR-00409-SAG (D. Md.) (ECF No. 101-5) (Declaration of David A. Ruhnke (Exh. B))[34] at ¶ 7; *id.* (ECF No. 101-6) (Declaration of Susan Garvey (Exh. C))[35] at ¶ 29; *id.* (ECF No. 101-6) (Declaration of Russell Stetler (Exh. D))[36] at ¶ 4. Specifically, each expert relies on caselaw and guidelines such as those from the American Bar Association discussed immediately above to illustrate why it typically takes *at least* one year, and often more, to effectively investigate and develop mitigation.[37]

---

[34] Mr. Ruhnke is a veteran "Learned Counsel" in death penalty cases, having tried nineteen capital cases to a conclusion; served for many years as a member of the Federal Death Penalty Resource Counsel Project, which was formed through the Office of Defender Services of the Administrative Office of the U.S. Courts; and has repeatedly been qualified to testify as an expert witness on the preparation and trial of capital cases. *See* Exh. B, Ruhnke Dec. at ¶¶ 4–5 *see also id.* at 11–22 (Ruhnke's resume, attached to his declaration).

[35] Ms. Garvey is a veteran mitigation specialist and attorney, who currently serves as National Mitigation Coordinator for the National Habeas Assistance and Training Project, which is funded by the Administrative Office of the U.S. Courts. *See* Exh. C, Garvey Dec. at ¶¶ 4–17.

[36] Mr. Stetler is also a veteran mitigation specialist, who recently retired as the director of the National Mitigation Coordinator for Federal Death Penalty Projects, also funded by the Administrative Office of the U.S. Courts). *See* Exh. D, Stetler Dec. at ¶ 1; *see also id.* at 32–38 (Stetler's resume, attached to his declaration).

[37] *See, e.g.*, Exh. B., Ruhnke Dec. at ¶ 8 (Ruhnke observing that, once "Learned Counsel are identified and appointed here, his or her tasks are well-established as required by the case law and the ABA Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases," which he goes on to summarize); Exh. C, Garvey Dec. at ¶ 29 ("Because two principal sources for mitigation and what they reveal are documentary material and witness interviews, thousands of hours are routinely expended and done so over a lengthy period of time. These parallel tracks of investigation reinforce emerging mitigation themes as they are developed and often trigger counsel's duty to explore new areas of mitigation."); Exh. D, Stetler Dec. at ¶¶ 7–9 (summarizing the declaration's detailed explanations regarding the requirements of a professionally reasonable mitigation investigation by stating that such an investigation "is a slow, time-intensive process involving the interaction between documentary records and witness interviews," "requires building trust and rapport with the client and witnesses," and is focused on "develop[ing] social history evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and

Furthermore, each of the *Constanza-Galdomez, et al.* mitigation experts explains that in cases such as that of Mr. Dangleben, additional time is required to ensure a culturally sensitive mitigation investigation—which here involves both the uniqueness of the culture in the U.S. Virgin Islands as well as Mr. Dangleben's family history in Dominica. *See* Exh. B., Ruhnke Dec. at ¶ 9; Exh. C, Garvey Dec. at ¶ 55; Exh. D, Stetler Dec. at ¶¶ 35-36; *see also* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L REV. 883, 920 (2008); *State v. Gutierrez*, 136 Nev. 881, 477 P.3d 342 (Nev. 2020) (ruling that a capital defense attorney provided ineffective assistance by failing to travel to Mexico in order to develop mitigating evidence for his capital client, who grew up in Mexico).

In short, the third *Ferebe* factor is virtually dispositive standing alone and requires the Death Notice to be stricken.

### d.     Status of discovery

The fourth *Ferebe* factor, "the status of discovery in the proceedings," also weighs in Mr. Dangleben's favor. *Ferebe*, 332 F.3d at 737. This Court has already noted that the discovery in this matter is "voluminous." (ECF No. 38 at 3). The needed discovery (*see also* ECF No. 169) will become significantly more voluminous if this case is permitted to proceed capitally. Not only must the Government produce the discovery that was still outstanding when this was still a non-capital case, they must also produce considerable new discovery relating to its aggravating circumstances— including discovery pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)—most notably regarding the uncharged homicide it seeks to present as a non-statutory aggravating factor, along with victim-impact

---

empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage" as well as "providing the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kinds of mental health experts to consult and what questions they should address").

evidence. The parties must also exchange as-yet-developed extensive mental health expert discovery.[38]
Exchanging this amount of outstanding discovery sufficiently in advance of the October 6 trial date
to permit defense counsel to meaningfully review, investigate, and incorporate it into a coherent
defense theory is simply not possible. "To prepare for a death penalty trial, counsel would have to
essentially redo their review of all of the previously produced evidence, with an eye towards bolstering
mitigation arguments and defusing aggravating factors." *Id.* at 18.

### e.    Additional factors bearing on reasonableness

Finally, "under both *Ferebe* and *Wilk*, the Court may properly consider additional factors
bearing on reasonableness." *Spurlock*, 2025 WL 1360499, at *27. Here, as in *Spurlock*, the Government's
"disavowal of its no-seek decision sets this case doubly apart." *Id.* Overall, the Government's "actions
created 'an uncomfortable, rushed procedural scenario that offends traditional notions of fair play,
preventing [the defense] from effectively representing their clients.'" *Id.* (quoting *United States v. Colon-
Miranda*, 985 F. Supp. 31, 35 (D.P.R. 1997)) (alteration in original). The totality of the circumstances
weighs heavily in Mr. Dangleben's favor. There can be no question but that the Death Notice is
untimely within the meaning of § 3593(a).

### 4.    Mr. Dangleben would be prejudiced if the Death Notice is not stricken.

A violation of § 3593(a) does not require Mr. Dangleben to demonstrate prejudice. *Ferebe*, 332
F.3d at 727 ("[I]t is evident that an analysis of the finality of the denial of a motion to strike a Death
Notice under [§ 3593(a)] that turns wholly upon a *post-trial* assessment of *prejudice* to the accused . . .
cannot possibly be correct.") (emphasis in original). But even if it did, Mr. Dangleben has been

---

[38] The *Constanza-Galdomez* Court, in weighing this factor in favor of the defendant, emphasized that
"[n]o sentencing phase discovery has been produced, nor have the Defendants had reasonable time
to conduct their own discovery on mitigation and on defenses to the aggravating factors alleged by
the government." (*Id.* at 18).

prejudiced in multiple ways, as this Court has already found and as detailed extensively above. *See supra* § III.A.3.a.

**C.    The Government's February 7, 2024 No-Seek Notice Affirmatively Waived Its Ability to file a Subsequent Death Notice Pursuant to 18 U.S.C. § 3593(a).**

Even assuming that § 3593(a) does not speak to whether the Government can seek the death penalty after filing a contrary, prior notice of intent not to seek the death penalty, the Government's February 2024 formal notice affirmatively and irretrievably waived its ability to seek the death penalty under § 3593(a). As discussed above, "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *Olano*, 507 U.S. at 733. In other words, while courts retain discretion to entertain a forfeited argument, a "party's waiver should be enforced." *Dowdell*, 70 F.4th at 140; *see also Wood*, 566 U.S. at 466 ("A court is not at liberty . . . to bypass, override, or excuse a State's deliberate waiver."). Here, the Government not only waived any objection to the enforceability of this Court's February 12, 2024 deadline to declare an intent to seek death, *see supra* § III.A.2, it waived the ability to seek death in this case altogether by formally announcing it would not do so.

Section 3593(a) creates not only a "prophylactic right" for a potential capital defendant but also corresponding specific procedural requirements that the Government must satisfy in order to seek the death penalty against a defendant. *See Ferebe*, 332 F.3d at 727. As several courts, including the Third Circuit, have recognized, a formal statement by the Government that it does not intend to satisfy those procedural requirements, filed in court, forecloses the Government's ability in the future to seek to satisfy those procedural requirements. *See, e.g.*, *Casseus*, 282 F.3d 253, 256 (defendants "[a]re no longer capital defendants" within the meaning of § 3005 once the death penalty is formally disavowed with a no-seek notice); *Waggoner*, 339 F.3d at 918 (in discussing the requirement that two counsel—including one "learned counsel"—be appointed in a capital case, 18 U.S.C. § 3005, the court noted "the Government's irrevocable decision not to pursue the death penalty" when it filed a notice that it

was not seeking the death penalty); *United States v. Cordova*, 806 F.3d 1085, 1101 (D.C. Cir. 2015) (observing that "once the Attorney General has made a determination not to seek the death penalty," the death penalty is no longer "on the table").

As the Third Circuit has explained: "The rule that federal courts do not consider waived arguments is premised on the adversarial nature of our system of justice: that litigants, not the courts, choose the facts and arguments to present. Thus, when a party clearly chooses a particular path, it will be respected." *United States v. James*, 955 F.3d 336, 344–45 (3d Cir. 2020) (internal citations omitted). In addition, the rule "protect[s] litigants from unfair surprise." *Id.* Here, the Government "clearly ch[ose] a particular path" when it filed its February 7, 2024 no-seek decision and that path should "be respected." Any other outcome would constitute "unfair surprise" to Mr. Dangleben for all the reasons discussed above. *See* § III.A.3.

### D. The Government Is Estopped from Filing a Notice that It Intends to Seek the Death Penalty Under 18 U.S.C. § 3593(a).

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the Government is estopped from doing so. There are at least three different types of estoppel that apply here—judicial estoppel,[39] equitable estoppel, and promissory estoppel.

#### 1. Judicial estoppel

Judicial estoppel is an equitable remedy well recognized as the power of a court to prevent a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency. *Montrose Medical Group v. Bulger*, 243 F.3d 773 (3d Cir. 2001). "[W]here a party assumes a

---

[39] Mr. Dangleben recognizes that this Court previously found that the doctrines of judicial estoppel and laches did not apply to the analysis of the Government's motion to stay. (*See* ECF No. 154 at 4 n.6). Nevertheless, Mr. Dangleben raises judicial estoppel here (a) because a motion to strike the Government's May 21 Death Notice is analytically distinct from his opposition to the Government's motion to stay; and, alternatively (b) because it is incumbent on undersigned counsel to preserve all arguments for potential appellate review.

certain position in a legal proceeding, and *succeeds in maintaining that position*, he may not thereafter, simply because his interests have changed, assume a contrary position." *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 121 (3d Cir.1992) (quotation marks and citation omitted) (emphasis added). Judicial estoppel applies in criminal cases. *See, e.g., United States v. Vastola*, 989 F.2d 1318, 1324 (3d Cir. 1993).

Each case where the doctrine of judicial estoppel is asserted must be evaluated on its facts. The Supreme Court has avoided establishing "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). "Nevertheless, several factors typically inform the decision whether to apply the doctrine in a particular case," namely:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.*; *see also Spurlock*, 2025 WL 1360499, at *17 (applying three-part test set forth in *New Hampshire v. Maine* in concluding, "as a stand alone basis for the use of discretion to strike the Death Notice," that "the principles of judicial estoppel preclude the Government from reversing its" no-seek notice).

The Third Circuit has articulated the factors slightly differently: first, the party in question adopted irreconcilably inconsistent positions; second, the party adopted these positions in "bad faith;" and third, estoppel is tailored to address the harm and a lesser sanction would not be sufficient. *See Chao v. Roy's Constr.*, Inc., 517 F.3d 180, 186 (3d Cir. 2008). Regardless of precisely how the factors are articulated, they all weigh heavily in Mr. Dangleben's favor here.

Clearly, the Government has adopted "irreconcilably inconsistent positions" regarding its intention to seek death in this case. On February 7, 2024, the Government provided affirmative notice that it would not seek the death penalty. (ECF No. 47). Its May 21, 2025 Death Notice indicating that it now intends to pursue death is irreconcilably inconsistent with that previously filed no-seek notice.

As to whether the Government adopted these positions in "bad faith," Mr. Dangleben need only establish that the Government has "play[ed] fast and loose" with the court. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996). Stated differently, he must show that the Government's change in position is not merely a product of a "good faith mistake." *Id.* The purpose of the "bad faith" inquiry is to ensure that judicial estoppel is limited to instances in which a party changed positions in a "manner threatening to the court's authority or integrity." *Carrasca v. Pomeroy*, 313 F.3d 828, 835 (3d Cir. 2002). Here, this Court both asked for and accepted the position of the Government regarding the death penalty in February 2024, and relied on the Government's no-seek notice in the scheduling of hearings and trial dates—including the current trial date of October 6, 2025—as detailed above. *See supra* § III.A.3.a. Yet the Government now asserts that the Executive Branch's decisions take precedence over this Court's ability to issue and enforce scheduling orders. That argument is a direct assault on the authority of this Court.

The Government's bad faith is also demonstrated by the fact that it filed an unjustified request to stay proceedings in light of the Bondi Memorandum, "provid[ing] little to no evidence to support" that request. (ECF No. 154 at 7). Although this Court ultimately denied the motion, it also observed that the Government "in effect, received a de-facto stay while the parties briefed this issue coupled with the Court's consideration of the merits of a stay." *Id.* at 8. Meanwhile, the Government was able to rubber stamp its ultimate reversal on the death penalty by pretending to follow the Department of Justice's own requirement that "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation," *see* U.S. Dept. of Justice, *Justice Manual*, § 9-10.130, even though there was never any question that Mr. Dangleben was not given a "meaningful opportunity" to present mitigation given his long reliance on the no-seek decision. (*See* ECF No. 154 at 7–8).

The Court should also not ignore the fact that the Government acquiesced to setting an October 6, 2025 non-capital trial date on May 20, 2025 (ECF Nos. 157, 158), only to file its notice of intent to seek the death penalty one day later on May 21, 2025. (ECF No. 159). Judicial estoppel is the appropriate remedy in such situations. *See Ryan*, 81 F.3d at 363 (judicial estoppel applies when a party's position is 'tantamount to a knowing misrepresentation to or even fraud on the court.'"). *See also Constanza-Galdomez, supra*, at 24. In evaluating the Government's conduct, the Court should not "divorce its analysis of culpability from the singularly high stakes here, where the Government seeks to pursue the death penalty." *Spurlock,* 2025 WL 1360499, at *20 (*citing Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (emphasizing that the death penalty is qualitatively different from even life imprisonment)). Because, just as in *Spurlock*, the Government in this case has played "fast and loose" (*New Hampshire*, 532 U.S. at 750)—resulting in detrimental reliance by Mr. Dangleben—the Government should be estopped from seeking the death penalty.

As for estoppel being the only sanction available, Mr. Dangleben satisfies this test in that judicial estoppel will result in the striking of the May 21, 2025 Death Notice, which is the only result "up to the task of remedying the damage done by a litigant's malfeasance." *Klein v. Stahl GMBH & Co. Maschinefabrik,* 185 F.3d 98, 108, 110 (3d Cir. 1999). Thus, while Mr. Dangleben asserts that this Court may strike the Death Notice on the basis of any and all of the arguments forwarded in this motion, judicial estoppel is well "tailored to address the harm identified." *Id.* By contrast, as discussed above, a continuance would "effectively reward the violation and render the notice deadline powerless to serve its well-founded purposes." *Spurlock,* 2025 WL 1360499, at *15–*16; *Constanza-Galdomez, supra*, at 19. At the same time, "[s]triking the Death Notice [is] a less drastic remedy than dismissal of the case." *Id.* at *29 (citing *United States v. Lopez-Matias*, 522 F.3d 150, 154 n.9 (1st Cir. 2008)).

2.      **Equitable estoppel**

Equitable estoppel is distinct from judicial estoppel, although both are applied to avoid injustice. *See Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59 (1984). "Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.1988). Boiled down, judicial estoppel examines the effects of inconsistent positions on the Court while equitable estoppel examines the effects of inconsistent positions on the opposing party.

Equitable estoppel is triggered by the conduct of a party that is inconsistent with a position later adopted by it and which is prejudicial to the rights of another who relied on such conduct to their detriment. *See In re M.J. Shoearama, Inc.,* 137 B.R. 182, 189 (Bankr. W.D. Pa. 1992). A party must prove the following in order to prevail when a party asserts equitable estoppel against the Government: (1) a material misrepresentation; (2) reasonable reliance upon that misrepresentation; (3) damage resulting from the misrepresentation; and (4) affirmative misconduct on the part of the Government. *See United States v. Asmar,* 827 F.2d 907, 912 (3d Cir. 1987); *see also Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 (3d Cir. 1992) (citing *Pane v. RCA Corp.,* 868 F.2d 631, 638 (3d Cir. 1989)).

Here, the Government made a material misrepresentation—the Government affirmatively stated that it would not seek the death penalty, and now it seeks to reverse that position. No further analysis is required.

In order for a party's reliance on the misrepresentation to be reasonable, the party asserting equitable estoppel must establish that they neither knew nor should have known at the time of reliance that Government's conduct was misleading. *Heckler,* 467 U.S. at 63. There was no reason for undersigned counsel to doubt the veracity of the Government's February 7, 2024 notice stating it would not seek the death penalty. Everything that the Government had said and done before filing

50

that notice was consistent with a no-seek (*see* ECF No. 146-1), and the notice was unambiguous. Likewise, undersigned counsel had no reason to doubt the veracity of the no-seek notice as filed between February 7, 2024, and January 20, 2025. Government counsel never provided any notice of an intent to reverse, or even reevaluate, that notice. While the issue of the death penalty was discussed during the run-up to and aftermath of the presidential election, there was no outreach by the Government to undersigned counsel informing them that it might try to reverse its former decision. Indeed, it is instructive that in the history of the federal death penalty, no incoming President has sought a reevaluation of the prior administration's no-seeks. There are no examples of an incoming President reversing a no-seek based on a disagreement with the prior decision, nor is there any mention of such a procedure in the *Justice Manual*. The Government's desire to reevaluate no-seeks pursued under the Biden Administration is truly unprecedented, and counsel's reliance on the prior no-seek notice was reasonable.

Unquestionably there is damage from the misrepresentation, as extensively discussed throughout this pleading.

Finally, there is ample misconduct on the Government's part.[40] The Government's attempted reversal violates this Court's orders and applicable rules in addition to the applicable statutes, while placing the internal processes of the Department of Justice on a higher plane than this Court's clear authority to set deadlines, manage this case, and ensure the guarantee of Mr. Dangleben's constitutional and statutory rights.

---

[40] "It is not necessary that actual fraud be shown;" it "is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice." *United States for Use and Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938); *accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 897 (4th Cir. 1968).

### 3.    Promissory estoppel

The Government's May 21, 2025 notice also should be barred under the promissory-estoppel doctrine. The elements of promissory estoppel are (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).

The Government's August 2024 notice was a "clear and definite promise" that the Government would not seek the death penalty; the Government had a reasonable expectation that Mr. Dangleben and his counsel would rely to their detriment on that promise (by not seeking appointment of Learned Counsel, not conducting a mitigation investigation, nor engaging in capital motions practice, or otherwise preparing for potential capital charges and a death penalty trial); Mr. Dangleben and his counsel did so rely to their detriment on the February 7, 2024 notice; and the only manner to avoid this detriment is to enforce the Government's promise.[41]

*Black's Law Dictionary* defines a promise as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." BLACK'S LAW DICTIONARY (10th ed. 2014). The Government's formal February 7, 2024 no-seek unambiguously stated: "The United States intends to proceed with either a non-capital trial or plea agreement in this matter and will not seek the death penalty for Richardson Dangleben, Jr." ECF No. 47 at 1. That statement clearly qualified as manifestation of an

---

[41] That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. *See, e.g.*, *American Home Assur. Co. v. KBE Bldg. Corp.*, Civil No. CCB-13-1941, 2015 WL 1209940, at *2 (D. Md. Mar. 16, 2015). Indeed, by definition, the promissory estoppel doctrine applies when there is no enforceable promise.

intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Dangleben

was justified in understanding that a commitment not to seek the death penalty had been made.

    **E.**    **Permitting the Government to Seek the Death Penalty Would Violate the Fifth Amendment's Due Process Clause.**

Permitting the Government to seek the death penalty against Mr. Dangleben after formally

announcing it would not do so would violate his rights under the Due Process Clause of the Fifth

Amendment. The "law is clear that, based upon their unique role in the criminal justice system,

prosecutors generally are bound by their assurances, particularly when defendants rely to their

detriment upon those guarantees." *Commonwealth v. Cosby*, 252 A.3d 1092, 1134 (Pa. 2021). This is so

because when a "defendant detrimentally relies on the government's promise, the resulting harm from

this induced reliance implicates due process guarantees." *Government of Virgin Islands v. Scotland*, 614

F.2d 360, 365 (3d Cir. 1980); *see also Santobello*, 404 U.S. at 262 ("[W]hen a plea rests in any significant

degree on a promise or agreement by the prosecutor, so that it can be said to be part of the inducement

or consideration, such promise must be fulfilled."); *United States v. Baird*, 218 F.3d 221, 229 (3d Cir.

2000) (noting cooperation agreements "are unique and are to be construed in light of 'special due

process concerns'") (quoting *United States v. Bradbury*, 189 F.3d 200, 206 (2d Cir. 1999)); *Cosby*, 252

A.3d at 1135 ("[A]t a minimum, when a defendant relies to his or her detriment upon the acts of a

prosecutor, his or her due process rights are implicated.").

The prosecution's announcement that it does not intend to charge a particular defendant has

the potential to induce detrimental reliance by the defendant if it attempts to go back on its word.

When a "decision not to prosecute is unconditional, is presented as absolute and final, or is announced

in such a way that it induces the defendant to act in reliance thereupon . . ., and when a defendant,

having no indication to the contrary, detrimentally relies upon that decision, due process may warrant

preclusion of the prosecution." *Cosby*, 252 A.3d at 1135. Indeed, "[n]umerous state and federal courts

have found that a defendant's detrimental reliance upon the government's assurances during the plea

bargaining phase both implicates his due process rights and entitles him to enforcement even of unconsummated agreements. The cases are legion." *Id.* at 1135–36 & n.23 (collecting cases).

A promise not to seek the death penalty is analytically indistinguishable from a promise not to prosecute under due process principles, and thus has the same potential to prejudicially induce detrimental reliance. Indeed, an assurance that the Government does not intend to seek the death penalty carries substantially greater significance than does a non-prosecution assurance regarding a less serious crime. *See Woodson*, 428 U.S. at 305 ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

Here, the Government made an unconditional promise not to seek the death penalty when it filed a formal notice stating as much in response to a Court Order directing the Government to convey its capital charging decision. There is "nothing from a reasonable observer's perspective to suggest that the decision was anything but permanent." *Cosby*, 252 A.3d at 1137. And there is "no cause or reason, let alone any compelling one, to waive the prosecution's duty to comply with due process simply because the act at issue is an exercise of discretion." *Id.* at 1135.

In *Cosby*, the Pennsylvania Supreme Court ruled that prosecution of the defendant was precluded because the prosecutor's office unconditionally promised that the defendant would not be charged, and he relied on that promise to his detriment by subsequently giving inculpatory testimony in a related civil proceeding. *Id.* at 1131 ("[W]hen a prosecutor makes an unconditional promise of non-prosecution, and when the defendant relies upon that guarantee to the detriment of his constitutional right not to testify, the principle of fundamental fairness that undergirds due process of law in our criminal justice system demands that the promise be enforced."). In *Cosby*, the promise was

made via a press release. *Id.* at 1105–06. The court found that a non-prosecution decision conveyed in such a manner was sufficient to raise due process concerns, and rejected the idea that a written agreement was required before a due process violation could occur. *Id* at 1142 ("Neither the trial court, nor the Commonwealth for that matter, cites any legal principle that requires a prosecutor's assurances to be memorialized in writing in order to warrant reasonable reliance."). If a decision not to prosecute announced in a press release can be enough to detrimentally induce reliance by a criminal defendant, surely a formal averment that is filed of record by an Officer of the Court can be as well.

Mr. Dangleben detrimentally relied on the Government's no-seek notice in several ways, as this Court has already found. *See supra* §§ III.A.3.a, III.B.4. Straightforward principles of due process thus demand that the death notice be stricken in the face of the Government's attempted bait-and-switch.

### F.    Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.

Execution "is the most irremediable and unfathomable of penalties." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Criminal defendants who face a potential capital prosecution must therefore "worry over whether the government [will] seek not just their liberty, but their lives" in addition to "the psychological effects of pre-trial custody" more generally. *United States v. Black*, 918 F.3d 243, 265 (2d Cir. 2019). It is "doubtless that one facing a possible death penalty would have to be greatly concerned about the outcome of the trial." *Esperti v. Wainwright*, 447 F. Supp. 1289, 1295 (M.D. Fla. 1978); *see also United States v. Avalos*, 541 F.2d 1100, 1115 (5th Cir. 1976) (distinguishing case from "a capital case, where the anxiety would justifiably be more severe.").

While anxiety over the uncertainty of whether the prosecution plans to seek the death penalty is inherent in all potential capital cases, anguish resulting from the prosecution's decision to go back on its word after informing the defendant that the death penalty was off the table is not. The Eighth Amendment proscribes punishments that are "cruel and unusual." U.S. Const. amend. VIII. It "prohibits punishments which, although not physically barbarous, 'involve the unnecessary and

wanton infliction of pain.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Among "'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Id.* (quoting *Gregg*, 428 U.S. at 183; *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). The deliberate infliction of psychological pain caused by abruptly reneging on an assurance that the death penalty was no longer a possibility has no penological justification and is thus unnecessary and wanton within the meaning of the Eighth Amendment.

The Eighth Amendment also prohibits the death penalty from being imposed arbitrarily or capriciously. *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990) (noting "the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty"). The Federal Death Penalty Act includes a similar prohibition. *See* 18 U.S.C. § 3595(c)(2)(A) (a death sentence "imposed under the influence of passion, prejudice, or any other arbitrary factor" must be reversed). "Arbitrary" decisions include those that "[d]epend on individual discretion," are "founded on prejudice or preference rather than on reason or fact," or "involve[e] the unrestrained exercise of will." BLACK'S LAW DICTIONARY (12th ed. 2024).

Once a defendant is charged with a death-eligible crime, "whether to ask a jury to end the defendant's life is one of the most serious discretionary decisions a prosecutor can be called upon to make." *Williams v. Pennsylvania*, 579 U.S. 1, 11 (2016). In Mr. Dangleben's case, a previous administration of the Government determined that the death penalty was not "justified." *See* 18 U.S.C. § 3593(a) (permitting capital prosecution only when "the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified."). The Government's abrupt about-face, which is not the result of any change in the circumstances of the offense, is therefore arbitrary under the plain meaning of that term. Moreover, undersigned counsel have been unable to identify a single case throughout the thirty-year history of the Federal Death Penalty Act in which an Attorney General has ever retracted a formal no-seek announcement before 2025. To permit

the Government to start with Mr. Dangleben would be "cruel and unusual in the same way that being

struck by lightning is cruel and unusual." *Furman v. Georgia*, 408 U.S. 238, 309 (1972) (Stewart, J.,

concurring). The Government's Death Notice should be struck as cruel and unusual for all of the

above reasons.


## IV.    Conclusion

The legal dispute at issue is not merely about a violation of Mr. Dangleben's rights. Instead,

"[a]t stake is the honor of the Government [and] public confidence in the fair administration of

justice." *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972) (*en banc*). As noted in *Brandt* v. *Hickel,*

427 F.2d 53, 57 (9th Cir. 1970), "To say to these appellants, 'The joke is on you. You shouldn't have

trusted us,' is hardly worthy of our great government." For the foregoing reasons, this Court should

strike the Government's May 21, 2025 Death Notice (ECF No. 159), with prejudice.


Dated: June 19, 2025                              Respectfully submitted,


                                                 *s/ Matthew Campbell*
                                                 MATTHEW CAMPBELL
                                                 FEDERAL PUBLIC DEFENDER
                                                 1336 Beltjen Road, Suite 202
                                                 Charlotte Amalie, VI 00802
                                                 Tel (340) 774-4449
                                                 Fax (340) 776-7683
                                                 E-mail: Matt_Campbell@fd.org

                                                 *s/ Allison Ferber Miller*
                                                 ALLISON FERBER MILLER
                                                 *Learned Counsel*
                                                 5619 2nd St. S.
                                                 Arlington, VA 22204
                                                 Tel (321) 945-7615
                                                 E-mail: allisonferbermiller@gmail.com