IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
SAINT THOMAS DIVISION

United States of America
     *Plaintiff,*

     v.

Richardson Dangleben, Jr.
     *Defendant.*

Criminal No. 3:23-CR-072-RAM-GAT

## Reply to Opposition to Motion to Strike Notice of Intent to Seek the Death Penalty

The Government's attempt to seek death against Mr. Dangleben without good cause, fifteen months after declaring its intention not to seek death, violates this Court's order and the Federal Death Penalty Act ("FDPA"). The Government's actions have caused irreparable harm that no forward-looking continuance of the trial date could repair. Before addressing specific arguments made by the Government, Mr. Dangleben highlights what is *not* disputed:

- The authority of this Court to set and enforce reasonable deadlines by which the Government must declare its intent to seek death in a given case;

- The declarations of Susan Garvey, Matthew Rubenstein, David A. Ruhnke, and Russell Stetler regarding the extensive and time-consuming requirements imposed upon counsel in a capital case;

- The specific, detailed recommendations of the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"); and

- The policies of the Judicial Conference of the U.S. Courts concerning federal death penalty cases (including its endorsement of the ABA Guidelines).

Meanwhile, the arguments that the Government does make rest on the absurd proposition that a change in executive policy absolves the Government from respecting the valid orders and procedural rules of this Court. More broadly, the arguments envision a new regime for administration of the federal death penalty, in which the Government would be empowered to keep both defendants

1

and district courts guessing about whether the Government will seek the death penalty—even after formally stating that it would *not* seek the death penalty—until shortly before a firmly scheduled noncapital trial date. Defendants and courts would be powerless to prevent such uncertainty. That regime would work a radical change to longstanding norms and practices, reflected in federal statutes and endorsed by the Judicial Conference, going back decades. Moreover, it would inject arbitrariness and fundamental unfairness into the area of our legal system in which courts "'as much as is humanly possible'" should take "'extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee . . . that the sentence was not imposed out of whim, passion, prejudice, or mistake.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 n.2 (1985).

The governmental prerogatives and death-penalty regime proposed through the Government's arguments are unworkable and unjust, and nothing in the *Response* suggests that they are permissible, let alone justifiable.

## I. The Government's attempt to reverse its no-seek notice violates this Court's lawful, reasonable order.

The Government has never objected to this Court's authority to set a deadline on the Government's decision whether to seek death in this case, or to the reasonableness of the deadline selected. Nor does the Government do so now. Instead, it argues that the change in trial date "effectively vitiated" that deadline or that "exigent circumstances" permit the deadline's "extension." (ECF No. 190 at 3). Neither argument is persuasive, and the Government's attempt to circumvent this Court's valid deadline—without regard to the procedural rules governing this Court—should be rejected as unjustified and grossly unfair.

### A. The Court's February 12, 2024 deadline remains valid and is long expired.

The Government cites no authority for the proposition that a change in trial date automatically invalidates, *sub silentio*, prior court orders and the pleadings filed in compliance with those orders. Indeed, any such rule would prove utterly chaotic given that scheduled trial dates often change. And

it would prove particularly destructive as applied to the type of deadline at issue here, as "defense counsel and the Court would have to continue to treat every single capital-eligible case as a death case, regardless of an earlier representation that the government would not seek death," lest the trial date be rescheduled and the Government, as here, uses that event to reverse position on a prior no-seek notice. *U.S. v. Spurlock*, No. 3:23-CR-00022, 2025 WL 1360499, at *16 (D. Nev. May 9, 2025).[1]

Also unsupported is the Government's claim that the particular deadline at issue here—namely, the February 12, 2024 deadline to file any notice of intent to seek death—was set solely with reference to the number of days prior to the then-scheduled trial. To the contrary, the trial was originally scheduled for December 11, 2023 (ECF No. 27), yet the Court initially ordered that the Government provide any notice of intent to seek death *after* that scheduled trial date (ECF No. 35). In other words, the parties and the Court understood that the originally scheduled trial date would change, and the Court ordered that the notice be filed even before a new trial date was chosen.[2] Thus, although the Court referenced the amount of time until the rescheduled trial in granting the Government an extension of the notice deadline, it gave no indication that the deadline was strictly tethered to that trial date and certainly did not suggest that the deadline was otherwise meaningless.

The Government's argument is also inconsistent with the U.S. Courts' *Guide to Judicial Policy*, which recommends that the district court "establish a schedule for resolution of whether the Government will seek the death penalty" within a reasonable time "after appointment of counsel," and not within a reasonable time "prior to trial."[3] Similarly, the policy advises that courts "exercise

---

[1] The government initially filed a notice of appeal of the district court's decision striking the death notice. *See U.S. v. Spurlock*, Crim. No. 3:23-022-MMD-CLB (D.Nev.) at ECF No. 420. The government subsequently moved to dismiss that appeal, and the Ninth Circuit granted that motion to dismiss and closed that appellate case. *U.S. v. Spurlock*, Case No. 25-3040 (9th. Cir.) at Dkt. Nos. 12, 13. *Sprulock* is poised for a noncapital trial.

[2] Specifically, on November 16, 2023, the Court issued an order directing the Government to file any notice pursuant to 18 U.S.C. § 3593(a) no later than January 12, 2024 (ECF No. 35), and on November 22, 2023, the Court adopted a joint proposed scheduling order setting a new trial date of October 28, 2024 (ECF No. 38).

[3] U.S. Courts, Criminal Justice Act Guidelines, Guide to Judiciary Policy, Vol. 7 Defender Services, Part A: Guidelines for Administering the CJA and Related Statutes, Ch. 6 § 670 (Jan. 2025).

their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously," again without any mention of the time between the recommended deadline and any pending trial date.[4] The commentary is likewise devoid of any reference to a pending trial, focusing instead on that a "decision not to seek the death penalty against a defendant has large and immediate cost-saving consequences," meaning the "sooner that decision is made, the larger the savings."[5]

Lastly, the Government's proposition that the notice-deadline was tethered to the October 28, 2024 trial date ignores this Court's finding that the trial date "was continued, in part, because of Defendant's reliance upon the Government's notice not to seek the death penalty." (ECF No. 154 at 7). If all parties and the Court understood that moving the trial date would "effectively vitiate" the prior no-seek notice, the Court would not have credited FPD Campbell's declaration stating that he would not have moved to continue the October 28 date had he thought that doing so "could lead to reversal of the no-seek notice." (ECF No. 146-1 at 6). That the Court did credit that assertion, and that the Government has not challenged the Court's related finding, merely underscore the absurdity of the Government's position that the deadline lost all force upon the resetting of the trial date.

B.      The claim of "exigent circumstances" is both irrelevant and meritless.

Bereft of legal or factual authority for its argument that the February 12, 2024 deadline has been "effectively" invalidated, the Government alternatively contends that the deadline should be "extended" based on "exigent circumstances." (ECF No. 190 at 4). For support, the Government cites to the Court's order setting the initial notice deadline (*id.*, citing ECF No. 35); but that is simply a one-line text order directing the Government to file any notice "no later than January 12, 2024." Presumably, the Government intended to cite to the Court's January 25, 2024 order extending the

---

[4] *Id.*, Appx. 6A: Recommendations & Commentary Concerning the Cost and Quality of Defense Representation (Updated Spencer Report, September 2010), at 106–07. The Department of Justice was a contributor to the establishment of this guideline. *See* JCUS, Defender Services Committee Memorandum, March 25, 2008 ("Gleeson Memorandum").

[5] *Id.*

initial notice deadline by thirty days, which also ordered that "no further request to extend the notice deadline SHALL be entertained absent exigent circumstances and supporting evidence." (ECF No. 46 at 3). Yet even with that assumption, the Government's argument suffers from two fatal flaws.

The first is that the Court's willingness to consider an "extension" of the notice deadline became irrelevant either when the Government complied with the deadline by filing its no-seek notice on February 7, 2024 or, at the latest, when the February 12, 2024 deadline passed with no request for extension being filed by the Government. And, to the extent that was not clear from the plain language of the January 25, 2024 order, it certainly became clear when this Court denied the Government's motion to stay proceedings to allow it to reconsider its no-seek. (ECF No. 154). In support of that motion, the Government made the same "exigent circumstances" argument it advances in the *Response*, claiming that Attorney General Bondi's directive that prior no-seeks be reassessed was an "identifiable exigenc[y]" that "should justify an extension" of the notice deadline. (ECF No. 134 at 7). But the Court rejected this argument, finding no basis for a stay and expressly affirming that the "deadline for filing a Section 3593 notice has expired." (ECF No. 154 at 8).

In light of the expired deadline, the proper procedure would have been for the Government to move for an extension under Fed. R. Crim. P. 45(b)(1)(B), which provides that, "[w]hen an act must or may be done within a specified period," the court "may extend the time"—even "after the time expires"—upon a showing of "good cause" and that the "party failed to act because of excusable neglect." Although the motion would surely have been denied for lack of good cause and excusable neglect (ECF No. 179 at 17–27), it would have at least demonstrated respect for this Court's rules. Instead, the Government simply filed its May 21, 2025 Notice of Intent to Seek the Death Penalty ("Death Notice"), with no accompanying motion and no acknowledgement of its prior no-seek or its flagrant violation of the February 12, 2024 deadline. And still, despite the discussion of Rule 45(b)(1)(B) in the *Motion to Strike*, the Government continues to flout the Court's rules and prior

opinion, choosing instead to merely repeat its previously rejected argument that it deserves an "extension" of a long-expired order.

The second fatal flaw in the "exigent circumstances" argument is that, even if this Court were to pretend that the Government has properly moved to extend by filing a response to the *Motion to Strike* a full 518 days after the deadline passed, the Government has failed to meet the relevant standard. Typically used in the context of police action, the "common thread" among the situations in which exigent circumstances is found is "the existence of a true emergency." *United States v. Mallory*, 765 F.3d 373, 384 (3d Cir. 2014). Obviously, the Government's cited "exigency"—namely, a "swing in attitude toward capital punishment" (ECF No. 190 at 4), fails to rise to the level of an "emergency." And even if "exigent circumstances" requires merely "unusual" circumstances, as the Government contends, there is nothing unusual about a change in the presidency of the United States, or even in a change in the policy priorities of a new administration. The cases cited in the *Response* are entirely inapposite and do not prove otherwise.

Finally, even if the change in policy cited by the Government somehow amounted to an "exigent circumstance," the requested extension would not be warranted because the law does not allow parties to manufacture exigencies in order to profit therefrom. *See, e.g.*, *Kentucky v. King*, 563 U.S. 452, 460–61 (2011) (discussing the "police-created exigency" doctrine and observing that the police may not manufacture an exigency in order to justify a warrantless search).

C.      **Regardless of form, the Government's requests that the February 12, 2024 deadline be disregarded or extended should be rejected.**

Even setting aside the various problems with the particular framing of the Government's attempts to circumvent this Court's valid and long-expired deadline, the underlying premise—that the "particulars of the case do not require fidelity to the original deadline" (ECF No. 190 at 3)—is baseless and should be rejected.

According to the Government, the original deadline should be treated as irrelevant because

the case "remains in its preliminary stages: trial was recently scheduled but no substantive motions have been decided as the hearing on the pretrial motions has not passed." (*Id.* at 4). But this position ignores the reality,[6] recognized by the *Spurlock* court, that "[p]reparation for a non-capital trial cannot be simply imported into a capital case, with its combined guilt and penalty phases." 2025 WL 1360499, at *18; *see also id.* (explaining that capital counsel must formulate—"well before trial"—an "integrated defense theory" that is capable of being reinforced "during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument"); ABA Guideline 10.10.1 ("Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."); *Florida v. Nixon*, 543 U.S. 175, 192 (2004) ("[I]n a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed."). Thus, as stated in the *Motion to Strike*, Mr. Dangleben "will never be in the position he was" when the Government filed its no-seek notice— regardless of when his trial commences—because "[a]t many junctures, the capital or non-capital nature of a trial may lead the defense to make decisions which are mutually exclusive to those which would be made if the posture were different." (ECF No. 179 at 20–21) (quoting *Spurlock*, 2025 WL 1360499, at *19). The Government does not even attempt to argue otherwise.

The Government also argues that the February 12, 2024 deadline is irrelevant because "the defendant has now been appointed learned counsel." (ECF No. 190 at 4). But, as this Court recognized in its opinion denying the Government's motion for a stay, Mr. Dangleben refrained from seeking the appointment of Learned Counsel at the outset of the case in reliance on the Government's no-seek decision. (ECF No. 154 at 7). As a result, he proceeded for sixteen months without Learned Counsel and without any mitigation investigation and therefore had "no meaningful opportunity to submit

---

[6] It also ignores the reality that over a dozen noncapital motions are fully briefed and ready to be argued at the omnibus hearing which is only days away.

mitigation evidence" during the Capital Review Committee meeting held on April 28, 2025. (ECF No. 154 at 8). Thus, as this Court found, Mr. Dangleben has already been prejudiced by the Government's attempt to reverse its no-seek. (*Id.*). Furthermore, as detailed in the unrebutted declarations cited in the *Motion to Strike*, it is patently unreasonable to expect Mr. Dangleben to prepare for a death penalty trial from the ground up in four-and-a-half months. (ECF No. 157 at 38–43); *see also infra*, Section II.B.

In short, contrary to the Government's baseless assertion, the "particulars of" this case absolutely require "fidelity to" both the deadline for the Government's notice and the no-seek notice that was filed in compliance with that deadline.

## II. The FDPA prohibits the Government's eleventh-hour reversal of its no-seek decision.

The Government interprets the FDPA to permit it to withdraw a notice of its intent not to seek the death penalty at any time for no reason. According to the Government, it "properly changed its position on pursuit of the death penalty without moving to amend its prior notice." (ECF No. 190 at 11). In other words, it can do what it wants, when it wants, so long as notice is filed a reasonable time before trial (*id.* at 11–12), particularly if the trial is "amenable to further continuance" (*id.* at 5).[7] That interpretation would render meaningless a statute designed to give reasonable notice of the Government's death decision and permit the Government to mislead the Court and the defendant with impunity, as it has done here.

### A. Either the FDPA does not permit withdrawal of no-seek notices or it requires good cause; it cannot be neither.

The Government first argues that the Attorney General has absolute authority to decide whether the Government will seek the death penalty. This is uncontroverted and irrelevant; Mr. Dangleben is not challenging the Government's authority to make charging decisions as a general

---

[7] The Government never elucidates what trials are or are not "amenable to further continuance." The flaw in this assertion, which is devoid of authority in support, is that every trial is theoretically amenable to further continuance since all trials can be continued.

matter. And the cases cited by the Government are inapposite. *Mitchell v. Forsyth¸* 472 U.S. 511, 520 (1985), involved a civil suit brought against the Attorney General for civil rights violations in a domestic wiretapping case, and *U.S. v. Lee*, 274 F.3d 485, 489 (8th Cir. 2001), merely states that "[u]nder the death penalty protocol, the Attorney General is the ultimate decisionmaker on the question of whether the government will seek the death penalty or withdraw a previously filed death notice." Neither case supports the proposition that the Government can pursue the death penalty fifteen months after formally announcing it will not, simply because it changed its mind.

The Government next argues that, because the FDPA does not mandate the filing of a no-seek notice, its decision to do so has no effect whatsoever and may be reversed at its sole, unreviewable discretion. The Government further argues that it need not even demonstrate the good cause it would be required to show before amending a death notice, had it filed one. Mr. Dangleben anticipated this "nonsensical" claim in his motion to strike, and the Government has not meaningfully engaged with Mr. Dangleben's argument. *Spurlock*, 2025 WL 1360499 at *21 (describing the government's interpretation of the FDPA as "nonsensical for many reasons"); (ECF No. 179 at 35–36). Indeed, the Government neglected to cite or discuss *Spurlock* a single time in its *Response*. The Government's unwillingness to even acknowledge, let alone attempt to distinguish, a recently decided case on this precise issue that the Government elected not to appeal speaks volumes.

The Government identifies no statutory (or other) authority permitting it to declare that it is not seeking the death penalty, and to then reverse course and declare that it will do so, all without any good cause finding. The Government's position ignores the principles of statutory construction described in the *Motion to Strike* (ECF No. 179 at 31–36), which remain unrefuted. It also violates the principles of judicial administration and public policy described above and in the *Motion to Strike*. There is no authority for the illogical and unworkable approach advocated by the Government.

To the extent the FDPA permits the modification of a no-seek notice to a death notice, the

statute requires the Government to demonstrate good cause. As explained in the *Motion to Strike*, good cause entails reasonable diligence at a minimum. (ECF No. 179 at 33–35). The Government has not even attempted to suggest that it has been diligent. It has thus forfeited any argument that it can satisfy the good cause requirement (*see also* ECF No. 154 at 8 & fn.7); its Death Notice must be struck for this reason, standing alone.

**B.      The timing of the Government's notice is not reasonable and a continuance is not an appropriate remedy.**

In arguing that the death notice was timely, the Government begins by advocating that the Court disregard the standard set forth in *U.S. v. Ferebe*, 332 F.3d 722 (4th Cir. 2003), in favor of that articulated in *U.S. v. Wilk*, 452 F.3d 1208 (11th Cir. 2006). Yet the Government then proceeds to discuss the *Ferebe* factors. (ECF No. 190 at 7–11). Mr. Dangleben follows the same convention, which is the appropriate standard for the reasons set forth in the *Motion to Strike*. (*See* ECF No. 179 at 37.)

Regarding the first *Ferebe* factor—the nature of the charges—the Government contends that the superseding indictment and death notice scarcely change the nature of this case, and thus do not render the notice untimely. (ECF No. 190 at 7) (alleging that the superseding indictment "only adds a predicate offense" to the capital charge and that "the nature of the principal charge has not changed"). But this Court has already found that "if this case were to proceed as a death penalty case, the complexities of this case will be multiplied exponentially," (ECF No. 154 at 8), a finding the Government does not dispute.

As to the second *Ferebe* factor—the nature of the aggravating circumstances—Mr. Dangleben noted in his *Motion to Strike* that he would be forced to defend against an entirely separate local homicide that the Government noticed as a non-statutory aggravating factor. (ECF No. 179 at 38).[8] According to the Government, however, this possibility "has always existed" because Mr. Dangleben

---

[8] *See also* ABA 2003 Guidelines for Appointment of Counsel in Capital Cases at p. 112.

"could open the door to the admission of that evidence in the government's case-in-chief." (ECF No. 190 at 8). Theoretically, the Government is correct—but only if one assumes that undersigned counsel's competence and dedication lie somewhere between *Strickland v. Washington*, 466 U.S. 668 (1984), and *U.S. v. Cronic*, 466 U.S. 648 (1984). Thankfully, however, the record here indicates that counsel has taken efforts to avoid just such a possibility. (*See, e.g.*, ECF Nos. 72, 73, 112, 114).[9] Hence, the Government's claim is based neither in fact nor common sense. (ECF No. 190 at 8–9).[10]

The Government also profoundly misunderstands mitigation when it states that "much of the mitigation investigation is inherent to formulating defenses to the original indictment." (ECF No. 190 at 9). As set forth in the accompanying exhibits to the *Motion to Strike* (ECF Nos. 179-2, 179-3, 179-4), a mitigation investigation is far broader than investigation into trial defenses. Mitigation evidence is any evidence providing a reason not to kill a client. A reasonable mitigation investigation must explore all significant relationships in a client's life, and involves interviews with family, friends, coworkers, fellow students, and anyone else who had significant contact with the client throughout his life. (ECF No. 179-3 at 7). The interview process is far too time-intensive to be completed in four months. (*Id.* at 16–21). The duty to gather records is another fundamental part of the process (*id.* at 12–16)—a task that cannot be completed in four months. And both tasks must be completed before appropriate mental health expert assistance can be completed (*id.* at 21–24)—assistance that is far broader and nuanced than determining whether mental illness provides a guilt-phase defense. Four months is simply not enough time to conduct a mitigation investigation. (ECF No. 179-4 at 2).[11]

---

[9] That the parties have discussed possible stipulations regarding Count 6 (ECF No. 190 at 9) undercuts the Government's argument and shows that undersigned counsel has specifically taken steps to prevent opening the door to the admission of the Jennings homicide at trial. Having taken those steps, there would be no reason to prepare a defense to that homicide at a noncapital trial.

[10] The Government's observation that Jennings discovery has been turned over in full (ECF No. 190 at 9) is misleading at best. The Government's death notice was filed on May 21, 2025 (ECF No. 159), and it provided the Jennings discovery over one month later, on June 27, 2025. Thus, contrary to the Government's implication, in formulating a defense to Count 6, Jennings discovery has been available for all of three weeks.

[11] Because the Government never contests any facts or conclusions in any of the declarations (ECF No. 179-1

That the Government conflates guilt-phase preparation with capital-mitigation investigation and presentation only demonstrates that it has no understanding of what it takes to defend a capital case. *U.S. v. Le*, 311 F.Supp.2d 527, 535 (E.D. Va. 2004) misses the mark. There, the aggravating factors of multiple murders that "require[d] no additional investigation" had previously been charged in the indictment, thus putting the defendant on notice of the need to defend against those murders before the death notice was filed. The Jennings homicide, however, was never charged in the indictment, and the parties specifically contemplated stipulations to prevent evidence of the Jennings homicide from being introduced during the noncapital trial.

Regarding the third *Ferebe* factor—the time remaining before trial—the Government apparently believes 138 days' notice is sufficient time to prepare a capital defense in a murder case featuring six statutory aggravators and five non-statutory factors—including a separate, uncharged murder allegation. But the Government entirely fails to account for: (1) the congressionally mandated requirement that two counsel for a capital defendant be appointed "promptly" (including at least one "Learned Counsel"); (2) the ABA Guidelines' recognition that preparing to defend against capital murder charges is qualitatively different from (and takes a great deal more time and resources than) preparing a defense in a noncapital case, in part because capital counsel must have an "integrated defense theory" at both the guilt-innocence and capital sentencing; and (3) the *uncontroverted* declarations of Matthew Rubenstein, David A. Ruhnke, Susan Garvey, and Russell Stetler about the inordinate amount of preparation required for an adequate defense in a capital trial (including, most importantly, developing mitigation for the sentencing phase). Those realities clearly demonstrate that 138 days is a woefully insufficient time in which to prepare for a capital trial from scratch.

Forcing this case to a death penalty trial on October 6, 2025 would substantially increase the odds of a death sentence for Mr. Dangleben because the amount of time and resources devoted to

---

through 179-4), the contents of those declarations are conceded.

preparing for the defense would be significantly less than in a typical federal capital prosecution with adequate time and resources to prepare. *Cf. Report to the Committee on Defender Services Judicial Conference of the United States: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at p. x (2010) (noting "a strong association between a lower cost defense representation and an increased likelihood of a death sentence at trial," with "trial cases in which defense spending was among the lowest one-third" revealing a "rate of death sentencing" of 44 percent and those in which "defense resources were in the remaining two-thirds of cost" carrying a 19 percent likelihood of death).

In discussing the fourth *Ferebe* factor—the status of discovery—the Government focuses only on factual discovery relating to the underlying charges and aggravating circumstances. (ECF No. 190 at 10–11). It simply ignores the fact that no discovery pertaining to Mr. Dangleben's mitigating evidence (or the Government's rebuttal evidence) has been produced (or even obtained, as defense counsel has not conducted a mitigation investigation or hired penalty phase experts). (ECF No. 179 at 43–44). The wholesale absence of any mitigation discovery alone makes clear that four months is insufficient time to prepare to defend a capital trial.

Lastly, as detailed in the *Motion to Strike*, this Court should consider as part of the reasonableness analysis the Government's unprecedented effort to disavow its prior formal no-seek decision and instead pursue the death penalty on the eve of trial. (ECF No. 179 at 44); *see also U.S. v. Colon-Miranda*, 985 F. Supp. 31, 35 (D.P.R. 1997); *U.S. v. Colon-Miranda*, 985 F. Supp. 36, 39 (D.P.R. 1997). The Government's sudden change of mind is a substantial additional factor—indeed, a dispositive factor on its own—demonstrating that the notice is untimely.

## C.     A continuance is an inappropriate remedy.

The Government maintains, without addressing the factual arguments raised in the *Motion to Strike* or the accompanying declarations and in conclusory fashion, that 138 days is sufficient time to prepare a capital defense. (ECF No. 190 at 9). In conjunction with that argument, the Government

repeatedly asserts that any untimeliness should be cured by a continuance, as opposed to striking the Death Notice. (*Id.* at 9–11). But *Ferebe* requires that a court consider "the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects," foreclosing the possibility that a continuance could remedy an untimely notice. 332 F.3d at 737; *see also U.S. v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D. Va. 2004); *U.S. v. Le*, 311 F. Supp. 2d 527, 532 (E.D. Va. 2004) ("[A]n untimely Death Notice cannot be rescued by delaying the trial date."); *U.S. v. Hatten*, 276 F. Supp. 2d 574, 579 n.4 (S.D. W. Va. 2003) (similar); *U.S. v. Breeden*, No. 3:03-cr-00013, 2003 WL 22019060, at *2 (W.D. Va. Aug. 22, 2003) (similar).

The cases relied upon by the Government to argue otherwise are all nonbinding and readily distinguishable. *Wilk*, 452 F.3d at 1222 (explaining the defense treated the case as a *de facto* death case since day one); *U.S. v. McGriff*, 427 F. Supp. 2d 253, 271 (E.D.N.Y. 2006) (granting a continuance primarily because significant portions of the delay were caused by "the late submission of [the defense's] mitigation statement" to the Government); *U.S. v. Pepin*, 367 F. Supp. 2d 315, 319 (E.D.N.Y. 2005) (granting a continuance primarily because the scheduled trial date wasn't a firm date; "the court had made it plain that it would provide the parties with as much time as necessary for pre-trial preparation in this capital case"). And, even if a continuance could be an appropriate remedy in certain cases, it is an improper remedy under these exceptional circumstances, where counsel had no reason to seek Learned Counsel or commence any mitigation investigation for sixteen months in reliance on the no-seek. In the cases cited by the Government, the defendants had been appointed two counsel (including at least one learned counsel) well before the Government filed its original or amended death penalty notice and also well before the scheduled trial. *Wilk*, 452 F.3d at 1211;[12] *Breeden*,

---

[12] Two counsel, including a Learned Counsel, were appointed *before* Wilk was indicted for capital charges, and the Government's death penalty notice was six months before trial and over ten months after the appointment of learned counsel. *United States v. Wilk*, 366 F. Supp.2d 1178, 1180-82 (S.D. Fla. 2005).

366 F.3d at 372; *Ponder*, 347 F. Supp.2d at 259-61.[13]

The Government's refrain throughout its *Response* that a continuance is the cure-all once again demonstrates its fundamental misapprehension of the duties of defense counsel in a capital case. As discussed above and in the *Motion to Strike*, Mr. Dangleben will never be in the position he was at the outset of the case because witnesses, experts, and Mr. Dangleben were prepared for a trial that is different in nature, course, and severity than a capital trial. The defense cannot simply import noncapital preparation into a capital trial. It would need to abandon its noncapital theory of defense and construct a new one from the ground up, but without a clean slate. It has made strategic choices about how to handle all aspects of the case based on the noncapital defense trial theory; and many of these strategic choices cannot be reversed without significant damage to the defense. It has prepared Mr. Dangleben for a noncapital trial and made representations about what that would look like, how it should be approached, and the consequences of those choices. Undoing this work doesn't simply mean work is destroyed; it means trust is eroded or lost.

In the Government's view, if it waits until the day before trial to file a death notice, any court is powerless to provide a sanction other than a continuance. This interpretation renders the notice requirement meaningless. Striking the death notice is the only appropriate remedy.

III.    **The Government's no-seek notice waived its ability to file its subsequent death notice.**

In disputing that the filing of a no-seek decision waived the Government's ability to file its death notice fifteen months later, the Government asserts the executive branch's "exclusive authority and absolute discretion" to decide which crimes to prosecute, including the capital charges filed against the defendant," citing to *Trump v. U.S.*, 603 U.S. 593 (2024). (ECF No. 190 at 13). But this argument misses the mark; the Government was free to exercise its discretion to pursue the death penalty in this

---

[13] *Le* (like *Ferebe*) never specifically discussed the extensive time and resources required to develop capital *mitigation*. Presumably, their attorneys did not argue that point in moving to strike the Government's death penalty notices. *Le* (like *Ferebe*) was decided before the 2008 Mitigation Guidelines were issued.

case, and the Court allowed it a full seven months to make that decision. The Government agreed at the time the Court set the deadline on any notice to seek death that the timeframe was reasonable, and the Court in no way encroached on the Government's process for reaching its decision. Nothing in *Trump* authorizes the Government to reverse a properly filed no-seek notice after the Court and the parties had proceeded with noncapital trial preparation on the basis of the Government's representation fifteen months later.

The Government also cites to *U.S. v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004), in which the court affirmed the denial of a motion to strike a second notice of death after the initial notice was withdrawn at the penalty phase of the original trial and then refiled upon retrial. But *Peoples* was a double jeopardy case and involved no detrimental reliance, as learned counsel had been appointed long before the capital trial and thus had adequate time to prepare for a capital sentencing.[14] The Government's reliance on cases in which the court accepted a decision to reverse a decision *to seek* the death penalty are equally unavailing, given that the *Justice Manual* specifically contemplates such action and that process involves the willing participation and support of the defendant.

In contrast to the inapposite cases relied upon by the Government, the opinion in *Spurlock*—which involved closely similar facts and legal arguments—specifically noted that the Government had enjoyed "ample opportunity to exercise discretion in determining whether to pursue capital punishment" before holding that the Government "may not now unilaterally derail the course of proceedings with regard to this matter of clear procedural and constitutional weight." *Spurlock*, 2025 WL 1360499, at *1. Also on point is *U.S. v. Constanza-Galdomez*, in which the court recognized that the "Executive is entitled to charge cases as it sees fit, and Congress has authorized the Department of Justice to seek the death penalty in qualifying cases," but nevertheless struck the Government's

---

[14] The district court docket sheet in *Peoples* (4:98-cr-00149-FJG, W.D. Mo., ECF Nos. 19 & 20) shows that learned counsel was appointed over a year before the capital trial began.

untimely reversal of a no-seek notice because, "'[w]hen a defendant's life is at stake,' courts are required to be 'particularly sensitive to insure that every safeguard is observed.'" No. CR SAG-22-409, 2025 WL 1712436, at *1 (D. Md. June 18, 2025)[15] (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976)).

As the *Spurlock* and *Constanza-Gomez* courts also found, the Government's position that it has unfettered authority to reverse a no-seek notice not only lacks support—it is indefensible from a policy and judicial-management perspective. *See Spurlock*, 2025 WL 1360499, at *16; *Constanza-Galdomez*, 2025 WL 1712436, at *2. If the Government were permitted to withdraw a no-seek notice years into a case and file a death notice shortly before trial—for any reason or no reason at all—no-seek decisions would be meaningless. Defense counsel would have to continue to treat every single capital-eligible case as a potential death case, regardless of an earlier representation that the Government would not seek death, because the defense would have no way of knowing if the Government might attempt to reverse its decision and file a notice of its intention to seek death on the eve of trial. Notice deadlines are meaningless if the Government can violate them with impunity.

Based on the Government's consistent message—as confirmed by its no-seek notice—Mr. Dangleben never sought Learned Counsel or a mitigation specialist until the Government sought a stay of proceedings to re-evaluate that notice. According to the Government, however, counsel, the Court and budgeting attorneys are compelled to seek these capital necessities regardless of the no-seek notice until a plea is entered into, or a non-death trial commences. Counsel would need to engage in unnecessary litigation about the propriety of the death penalty in death-eligible cases, regardless of DOJ's no-seek notice.[16] Furthermore, counsel would be required to abide by all the unique and

---

[15] The deadline for filing a notice of appeal of the *Constanza-Galdomez* decision striking the death notice—July 18, 2025 (*see U.S. v. Constanza-Galdomez*, Crim. No. 1:22-409-SAG (D.Md.) at ECF No. 134)—has passed without the government filing a notice of appeal. Like in *Spurlock*, the government has conceded a non-capital trial in *Constanza-Galdomez*.

[16] In addition to appointing and keeping Learned Counsel on all death-eligible cases, courts would need to follow all relevant judicial policies, such as appointing a defense team with sufficient experience, knowledge, and resources. Guide to Judiciary Policy, *supra*, § 620.10.10(b).

significant duties imposed upon the defense team in capital cases. (ECF No. 179 at 38–43.)

Because such a regime would be unworkable and unimaginably burdensome, the Court should treat the Government's no-seek notice as "irrevocable." *United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (holding that a defendant has no right to second counsel once Government provides notice of its "irrevocable [no-seek] decision").

## IV.  The Government is estopped from changing its declared position at this juncture.

In an effort to avoid application of estoppel doctrines, the Government first claims that its "court-mandated notice of its former intention not to seek the death penalty amounted to nothing more than a genuine expression of its then-existing plan for the case." (ECF No. 190 at 15.) But even if accepted, such a rationale would not defeat any assertion of estoppel. And the Government's claim that it never made a promise nor misled either Mr. Dangleben or the Court is likewise unconvincing, as it is belied by the Government's own words in its unequivocal February 7, 2024 no-seek notice (ECF No. 47) (stating Government "will not seek the death penalty for Richardson Dangleben, Jr.").[17]

Next, the Government resorts to a strawman, claiming that Mr. Dangleben fails to identify evidence that the Attorney General acted in bad faith. Here, the government filed a death notice in violation of this Court's orders, this Court's local rules, the FDPA, the Federal Rules of Criminal Procedure and the Constitution as the Government. That the current Attorney General has political differences with the prior Attorney General does not justify wholesale reversal of positions taken in individual cases, because prosecutors within an office are bound by the assurances of other prosecutors within that office. (ECF No. 179 at 24–25, 53–55).

Finally, the Government notes that this Court has previously determined that judicial estoppel

---

[17] The Government misses the point when it cites to the portion of the *Motion to Strike* stating that undersigned counsel had no basis to doubt the veracity of the Government's no-seek notice. (ECF No. 190 at 15). That fact merely demonstrates that counsel's detrimental reliance on that notice was reasonable; it does not support that the Government may renege on its prior positions so long as it does so based on "sincere conclusions." (*Id.*).

does not apply. (ECF No. 190 at 15–16 (*citing* ECF No. 154 at 4 & n.6)). But the Court reached that conclusion in a different context—namely, denying the Government's motion to stay proceedings—and did not articulate its reasoning. Thus, the same conclusion does not necessarily apply here. Meanwhile, that same opinion establishes a number of points undercutting the majority of the Government's arguments, including:

- this matter was "set for trial for a date certain and that date was continued, in part, because of Defendant's reliance upon the Government's notice not to seek the death penalty;"

- Mr. Dangleben "now would be prejudiced by the change of position by the Government," and indeed has already been prejudiced, because he "has been proceeding according to the 'no-seek' decision, he has been without the benefit of learned counsel for over a year and, thus, his trial preparation, as well as preparation for any re-review by the Capital Review Committee, is not what it would have been had a 'no-seek' notice not been filed;"

- given that the Government had already "complied with the court-ordered deadline" for its notice regarding the death penalty by filing a no-seek, the Government erred by focusing on the "timeliness" of the death notice "rather than any authority to withdraw or amend a 'no-seek' notice after such a notice has been filed;"

- the Court "seriously questions whether the Government can amend its 'no-seek' notice without a demonstration of 'good cause;'" and

- regardless of the trial date, "the prejudice to Defendant" if the Government were permitted to reverse its no-seek "cannot be overstated."

(ECF No. 154 at 5–9 & n.7). If the Government wants to rely on the opinion denying the Government's motion for stay, it must live with the Court's conclusions that weigh heavily against its opposition to the motion to strike.

**V.      The Government's late Death Notice violated Mr. Dangleben's constitutional rights.**

The Government offers a three-sentence response to Mr. Dangleben's argument that the Government's attempted no-seek reversal violates due process, which fails to meaningfully engage his arguments or discuss any of the authorities cited in the motion to strike. The sole argument the Government makes is that its no-seek notice was not a "promise" because it was not "negotiated for consideration." (ECF No. 190 at 16). But "promise" and "contract" are not synonymous. A promise

can be unilateral; as the authorities cited in the motion to strike make clear, when such a unilateral promise is relied upon to a criminal defendant's detriment, the due process clause is violated.

The Government's response to Mr. Dangleben's Eighth Amendment claim is similarly wanting. The Government cites only to precedent establishing that the death penalty is not *per se* unconstitutional or that the FDPA is not *per se* unconstitutional, which are strawmen not argued by Mr. Dangleben. (*Id.*). And the Government's citations to its internal policies and cases stating the truism that "elections have consequences" are beside the point entirely. The Court should find that the Government's attempted reversal of its no-seek determination is unconstitutional for the reasons set forth in the motion to strike.

### Conclusion

Permitting the Government to reverse its decision not to seek death under these circumstances would render meaningless all no-seek notices and the FDPA requirement of reasonable notice, as well as court orders setting deadlines for the Government's death decision. The Court should strike the Government's notice and a non-capital trial should commence on October 6, 2025.

Dated: July 20, 2025             Respectfully submitted,

*s/ Matthew Campbell*
MATTHEW CAMPBELL
FEDERAL PUBLIC DEFENDER
1336 Beltjen Road, Suite 202
Charlotte Amalie, VI 00802
Tel (340) 774-4449
E-mail: Matt_Campbell@fd.org

*s/ Allison Ferber Miller*
ALLISON FERBER MILLER
*Learned Counsel*
5619 2nd St. S.
Arlington, VA 22204
Tel (321) 945-7615
E-mail: allisonferbermiller@gmail.com